## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

C.M., Michael Borrego Fernandez, J.M.C.,
E.R., *on behalf of themselves and all others
similarly situated, et al.*,

    Plaintiffs,

*v.*                                     Case No 1:25-cv-23182-RAR

KRISTI NOEM, *Secretary of the United
States Department of Homeland Security, et
al.*,

    Defendants.
_____

## THE STATE DEFENDANTS' MOTION TO TRANSFER VENUE AND RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

Defendants Ron DeSantis, in his official capacity as Governor of the State of Florida, Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management, and the Florida Division of Emergency Management (State Defendants), move to transfer Plaintiffs' Supplemental Class Action Complaint for Declaratory and Injunctive Relief (ECF 28) under Federal Rule of Civil Procedure 12(b)(3), and respond in opposition to Plaintiffs' Renewed Motion for Preliminary Injunction. (ECF 29).

## **INTRODUCTION**

This case is about the right of civil detainees at the Alligator Alcatraz facility to meet with their legal counsel. Detainees are currently meeting with their counsel and have been allowed to do so for over three weeks, despite some initial delays caused by the inherent logistical struggles of standing up a temporary detention center to house thousands of detainees. More meetings are taking place every day and there have been no complaints. Exhibit 1 (Saunders Decl.) ¶¶ 6, 23, 32, 37-38, 49. In fact, since the meetings began on July 15th, the State Defendants have granted every single request for a detainee to meet with legal counsel. *Id.* ¶¶ 24, 48.

Nonetheless, Plaintiffs seek an expedited mandatory preliminary injunction directing the State Defendants to continue to do what they are already doing. Injunctive relief is not proper on these facts. Injunctions do not provide relief for past alleged violations. And Plaintiffs offer no evidence to suggest the State Defendants will stop scheduling meetings with counsel without an injunction. Accordingly, the Court should deny Plaintiffs' Renewed Motion for Preliminary Injunction.

## **BACKGROUND**

On June 23, 2025, the State of Florida began constructing a temporary immigration detention facility to house illegal aliens on a portion of the Dade-Collier Training and Transition

Airport. The Florida Division of Emergency Management (DEM) took control of the property pursuant to Executive Order 23-03, in which Governor DeSantis declared a state of emergency based on the mass migration of illegal aliens into the State of Florida.[1] The airport is owned by Miami-Dade County, but the property is located in Ochopee, an unincorporated community in Collier County, Florida.[2] Indeed, *all* of the detention facility, *all* the buildings, and *all* the property at issue are sited in Collier County, not Miami-Dade. *See* Ex. 2 (Gadea-Guidicelli Decl.) ¶ 2. There is a tiny sliver of the airport's unpaved runway that lies in Miami-Dade County, but no portion of the detention facility lies there. *Id.* ¶ 3.

The detention facility, known as Alligator Alcatraz (Facility)[3], began accepting detainees on July 3, 2025. The Facility was constructed and is now maintained and operated by FDEM under the authority conferred by the Florida Emergency Management Act, chapter 252, Florida Statutes, and the Governor's Executive Order 23-03 (Emergency Management—Illegal Migration). All activities involving construction, maintenance, and operation of the Facility are dictated by state officials without involvement of the federal government, but with respect to the limited function of maintaining physical custody of illegal aliens at the Facility, the State acts pursuant to agreements between state law enforcement agencies and U.S. Immigration and Customs

---

[1] Fla. Exec. Order. No. 23-03 (Jan. 6, 2023),
https://www.flgov.com/eog/sites/default/files/executive-orders/2024/EO-23-03-1.pdf. Pursuant to Executive Order 25-153, the state of emergency remains in place until at least September 29, 2025. Fla. Exec. Order No. 25-153 (July 31, 2025),
https://www.flgov.com/eog/sites/default/files/executive-orders/2025/EO%2025-153.pdf.

[2] *See* Dade-Collier Training and Transition Airport (TNT),
https://www.miamiairport.com/dade_collier.asp.; Elizabeth Crisp, *'Alligator Alcatraz': What to know about Florida Everglades migrant detention site,* The Hill (June 25, 2025, 12:54 PM),
https://thehill.com/homenews/state-watch/5368457-florida-alligator-alcatraz-migrant-detention-center/

[3] Ana Ceballos, *Alligator Alcatraz Is No Nickname. It's Detention Camp's Official Name,* Tampa Bay Times, Jul. 1, 2025, https://www.tampabay.com/news/florida/2025/07/01/alligator-alcatraz-is-no-nickname-its-detention-camps-official-name.

Enforcement (ICE), whereby ICE delegates the power to perform certain immigration enforcement functions – in this case, the authority to maintain custody of aliens pursuant to the federal immigration laws – under section 287(g) of the Immigration and Nationality Act. Ex. 2 ¶ 5. The Facility can currently house a maximum of 3,000 civil detainees that would remain under ICE supervision and custody at all times. *Id.*

The Facility attempted the first videoconferences between detainees and their legal counsel on July 12, 2025, and completed the first successful videoconference on July 15, 2025. Ex. 1 ¶¶ 20-22. The Facility held the first in-person meeting between detainees and legal counsel on July 28, 2025. *Id.* ¶ 37. Since July 15, not a single detainee or attorney has raised an issue with the meeting process, and the State Defendants have granted every single request for a detainee to meet with legal counsel. *Id.* ¶¶ 24, 32, 37, 49.

Nonetheless, Plaintiffs allege that the State Defendants have "intentionally prevented" detainees from meeting with their legal counsel. Accordingly, Plaintiffs filed a complaint for declaratory and injunctive relief on behalf of all current and future detainees at the Facility, a motion for expedited temporary restraining order and preliminary injunction, and a motion for class certification. ECF 1, 5, & 6. The complaint named Governor Ron DeSantis, FDEM Executive Director Kevin Guthrie, Department of Homeland (DHS) Secretary Kristi Noem, ICE's Miami Field Office, the Executive Office for Immigration Review (EOIR), and Miami-Dade County as Defendants and alleged violations of detainee's First Amendment right to counsel and Fifth Amendment right to procedural due process. ECF 1.

After a scheduling conference to address discrepancies between the complaint and motion for temporary restraining order and to set an expedited preliminary injunction briefing schedule (ECF 26 & 27), Plaintiffs filed a supplemental class action complaint (ECF 28), renewed motion

for preliminary injunction (ECF 29), and renewed motion for class certification (ECF 30). The supplemental complaint alleges two claims under the First Amendment against the Federal Defendants (Counts I and III) and four against the State Defendants (Counts I-IV). Plaintiffs allege Count V against all Defendants under the Fifth Amendment.

## **LEGAL STANDARDS**

On a motion to transfer venue under Federal Rule of Civil Procedure 12(b)(3), plaintiffs bear the burden of demonstrating that venue in the forum is proper. *BP Prods. N. Am., Inc. v. Super Stop 79, Inc.*, 464 F. Supp. 2d 1253, 1256 (S.D. Fla. 2006). "The facts as alleged in the complaint are taken as true, to the extent they are uncontroverted by defendants' affidavits." *Delong Equip. Co. v. Washington Mills Abrasive Co*., 840 F.2d 843, 845 (11th Cir. 1988). When the two conflict, "the court may examine facts outside of the complaint to determine whether venue is proper." *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). When examining the record, the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff. *Id.* If the court finds that venue is improper, it "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

To obtain a preliminary injunction, a plaintiff must demonstrate "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden,* 742 F.3d 1267, 1271 (11th Cir. 2014). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "A

preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## ARGUMENT

**I.    The Court Should Transfer This Action to the Middle District of Florida.**

The federal venue statute, 28 U.S.C. § 1391, governs venue for civil actions. Section 1391(e) applies to actions where a defendant "is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority." The section provides that all such civil actions

> may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1). This section, however, "confer[s] venue only with respect to employees of the federal government acting in their official capacities at the time the suit was commenced." *Rogers v. Civ. Air Patrol*, 129 F. Supp. 2d 1334, 1337 (M.D. Ala. 2001). That is because § 1391(e)(1) says that "[a]dditional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements *as would be applicable if the United States or one of its officers, employees, or agencies were not a party.*" 28 U.S.C. § 1391(e)(1) (emphasis added).

Federal courts interpret this language to mean that a plaintiff "who sues both a federal and a nonfederal defendant . . . must press his claim in a district having venue with respect to the nonfederal defendant by authority other than § 1391(e)." *Lamont v. Haig,* 590 F.2d 1124, 1128-29, 1131 n.36 (D.C. Cir. 1978); *Blum v. Morgan Guar. Trust Co*., 539 F.2d 1388, 1391 (5th Cir. 1976) ("A statute, 28 U.S.C. [§] 1391(e), appears to allow for much freer acquisition of personal

jurisdiction over federal officers, but courts have usually construed strictly its requirement that 'each' of the defendants be a federal officer."). In other words, Plaintiffs cannot rely on § 1391(e) to satisfy venue for the State Defendants. *See, e.g.*, *Little v. King*, 768 F. Supp. 2d 56, 65 n.7 (D.D.C. 2011) ("[I]f suit is sought to be maintained not only against a federal defendant embraced within Section 1391(e) but also against an '[a]dditional person[],' there must be proper venue as specified in the pertinent statutes as to each.") (quoting *Lamont*, 590 F.2d at 1128-29); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1307 n.16 (N.D. Ala. 2003) ("[V]enue determinations for federal and non-federal defendants joined in the same action must be made separately."). Instead, Plaintiffs must satisfy § 1391(b), the general venue provision for federal question jurisdiction cases like this one.

The general federal venue statute provides that a "civil action may be brought in":

> (1) A judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) A judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) If there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 USC § 1391(b). Under this section, venue is not proper in this Court.

Plaintiffs cannot satisfy paragraph (1) in the Southern District of Florida because the Federal Defendants do not reside in Florida. *See Trujillo v. Garland,* 2023 WL 2374445, at *6 (S.D. Fla. Mar. 6, 2023) (federal officer resides in Washington, D.C., not the Southern District of Florida, despite the agency's regional offices in this district); *Brahim v. Holder*, 2014 WL 2918598, at *3 (S.D. Fla. June 26, 2014); *see also Hernandez v. USCIS*, 2021 WL 9408841, at *2 (S.D. Fla.

Aug. 31, 2021) ("Merely maintaining offices within a district does not mean a federal defendant resides in that district."). And paragraph (3) does not apply here because, as this motion will demonstrate, there *is* a district "in which an action may otherwise be brought as provided in this section" – the Middle District of Florida. 28 U.S.C. § 1391(b)(3).

Thus, for venue to be proper in this Court, Plaintiffs must show either that a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District, or that "a substantial part of property that is the subject of the action is situated" in the district. *Id.* § 1391(b)(2); *see Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir. 2003) (federal venue statute "emphasizes the importance of the place where the wrong has been committed"). But both provisions demonstrate venue is proper in the Middle District.

Indeed, the "property that is the subject of the action is situated" in Ochopee, an unincorporated community in Collier County, which is in the Middle District of Florida. *See* Dade-Collier Training and Transition Airport (TNT), https://www.miamiairport.com/dade_collier.asp. And *all* the detention facilities, *all* the buildings, and *all* the property at issue are sited in Collier County, not Miami-Dade. *See* Ex. 2 ¶ 2. Put differently, every request by a detainee to meet with counsel and every meeting itself – the underlying facts in this case – takes place in Collier County. There is a tiny sliver of the airport's unpaved runway that lies in Miami-Dade County, but no portion of the detention facility is situated there and no attorney meetings or other detention activities would occur there. *Id.* ¶ 3.

Alternatively, Plaintiffs argue that venue lies in the Southern District "because a substantial part of the events or omissions giving rise to the claim occurred in the district." Suppl. Compl. ¶ 15. "[T]he proper focus of the venue inquiry is on the relevant activities of the Defendants." *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1357

(S.D. Fla. 2009). Specifically, "[o]nly the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a substantial part of the events are to be considered." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (citation modified); *see also TMJ Prac. Mgmt. Assocs., Inc. v. Curran*, 2017 WL 3130421, at *3 n.2 (S.D. Fla. July 24, 2017) ("[T]he Court must focus its venue analysis not on all aspects of the relationships between the parties, but on the location of the acts and omissions giving rise to the claims asserted, those actions with a close nexus to the wrong."). Likewise, venue for actions challenging government policies is proper in the district where the policy was made, not where its effects were felt. *See, e.g.*, *Harvard v. Inch,* 408 F. Supp. 3d 1255, 1260, 1262-63 (N.D. Fla. 2019) (venue to challenge state policy was in Tallahassee because State policy was set there).

Here, Plaintiffs allege that "Defendants in this case have blocked detainees held at the facility from access to their legal counsel." Suppl. Compl. ¶¶ 4, 88-89. Thus, the relevant portions of the "events or omissions giving rise" to Plaintiffs' claims are the State Defendants' challenged actions (i.e., the alleged denial of access) and the policy decisions motivating those actions – which occurred in either Collier County or Leon County. The State Defendants' alleged attempts to block access occurred on site in Collier County, and the decisions on how to provide detainees access to counsel while standing up a detention facility occurred, and continue to occur, in Collier County and Leon County. Ex. 2 ¶ 5. Neither are in the Southern District. 28 U.S.C. § 89(c).

This action's only conceivable connection to Miami-Dade County is that "[t]he land upon which Alligator Alcatraz sits is owned by Miami-Dade County, Florida." Suppl. Compl. ¶ 87. But this fact has nothing to do with Plaintiffs' claims. Plaintiffs do not allege that any relevant decision-making has occurred in Miami-Dade County or elsewhere in the Southern District. Indeed, Miami-Dade County has no role in operating the Facility, and it does not claim otherwise. *See* Ex. 2 ¶ 5.

9

Thus, this action's limited connection to Miami-Dade County "do[es] not have a close nexus with the cause of action … and [it is] therefore irrelevant." *Jenkins Brick Co.,* 321 F.3d at 1373.

Accordingly, because the "events or omissions" leading to this case, and all of the relevant property, are located in outside of the Southern District, the Court should dismiss or transfer this case to the Middle District of Florida. *See* 28 U.S.C. § 1406(a).

## II.    The Court Should Deny the Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.,* 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotation marks omitted). This significant burden becomes even greater because Plaintiffs request a mandatory injunction – i.e., ask the Court to require affirmative action, rather than enjoining a party from action. *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014). Plaintiffs, as a result, "fac[e] a particularly heavy burden of persuasion." *FHR TB, LLC v. TB Isle Resort, LP.,* 865 F.Supp.2d 1172, 1192 (S.D. Fla. 2011) (Goodman, Mag. J.) (internal citation omitted) (Report and Recommendation ratified by District Court); *see also Caron Found. of Florida, Inc. v. City of Delray Beach,* 879 F.Supp.2d 1353, 1360 (S.D. Fla. 2012). That is because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation modified).[4]

---

[4] *See also, e.g.*, *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.,* 15 F.Supp.2d 1, 4 (D.D.C.1997) (internal quotation marks and citations omitted), *aff'd,* 159 F.3d 636 (D.C. Cir.1998) ("[W]here an injunction is mandatory . . . the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.").

A.  <u>Plaintiffs Are Not Likely to Succeed on the Merits Against the State Defendants.</u>

The analysis begins with the first prong because if a plaintiff cannot establish a substantial likelihood of success on the merits, the Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care v. 1-800 Contacts*, 299 F.3d 1242, 1247 (11th Cir. 2002). That said, a district court cannot grant a preliminary injunction unless the moving party satisfies *all four* of the requirements. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

1.  *Plaintiffs fail to state a claim under 42 U.S.C. § 1983 in Counts II and IV.*

Counts II and IV assert First Amendment claims against the State Defendants under 42 U.S.C. § 1983. *See* Suppl. Compl. ¶¶ 131-34 and 142-47. These counts challenge the manner in which the State Defendants are detaining illegal aliens at the Facility – specifically, the extent to which the State Defendants are preventing illegal alien detainees from meeting with legal counsel. The State Defendants oversee the state agencies that detain or supervise the detention of illegal aliens at the Facility pursuant to delegations of authority from ICE under 8 U.S.C. § 1357(g). These delegations, which are memorialized in "287(g) agreements," allow for state "detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). When performing this limited detention function, state officials are "subject to the direction and supervision" of the Secretary of Homeland Security through ICE. 8 U.S.C. § 1357(g)(3); *see also Arizona v. United States*, 567 U.S. 387, 409 (2012); ("Officers covered by these agreements are subject to [the Secretary's] direction and supervision."); *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) ("Federal law," including § 1357(g), "regulates *how* local entities may cooperate in immigration enforcement."). In fact, § 1357(g)(8) provides that a state official "acting under color of authority under . . . any agreement entered into under this subsection, *shall be considered to be acting under color of*

11

*Federal authority*" when "determining the liability, and immunity from suit, of the officer" in a civil action. 8 U.S.C. § 1357(g)(8) (emphasis added).

Section 1983, however, creates a private right of action against those who violate the rights of others while acting "*under color of any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia . . . ." 42 U.S.C. § 1983 (emphasis added); *see also Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir. 1990) ("To maintain a 42 U.S.C[.] § 1983 action, the conduct complained of must have been committed by a person acting under color of state law."). Officials act under color of state law where they "exercise[e] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). Thus, § 1983 actions "d[o] not apply when the defendants are acting under color of federal law." *Carman v. Parsons*, 789 F.2d 1532, 1534 (11th Cir. 1986) (quoting *Mack v. Alexander*, 575 F.2d 488 (5th Cir. 1978)).

Accordingly, plaintiffs cannot sue state officials under § 1983 for their actions in detaining illegal aliens under a 287(g) agreement because, for that limited purpose, those state officials are "acting under color of Federal authority." 8 U.S.C. § 1357(g)(3). Here, that means Plaintiffs' § 1983 claims in Counts II and IV fail to state a claim and should be dismissed. *See Osahar v. Postmaster Gen. of U.S. Postal Serv.*, 263 F. App'x 753, 763 (11th Cir. 2008) (plaintiff's claims under § 1983 dismissed for failure to state a claim because the statute "appl[ies] only . . . under color of state law"). And "without standing or a viable legal claim, a litigant is not entitled to a preliminary injunction." *Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022). So too here.

2.   *The State Defendants are not violating the First Amendment.*

Courts have held that the First Amendment protects the right of civil detainees to consult with legal counsel as part of their broader right of association and to access the courts. *See, e.g.*, *Mitchell v. Peoples*, 10 F. 4th 1226, 1229 (11th Cir. 2021)*; Jean v. Nelson*, 711 F.2d 1455, 1508-09 (11th Cir. 1983). Likewise, they have determined the First Amendment guarantees attorneys the right to solicit their clients in prison as an exercise of their political speech. *See, e.g.*, *Thornburgh v. Abbot*, 490 U.S. 401, 407 (1989); *In re Primus*, 436 U.S. 412, 432 (1978).

Yet courts have equally recognized that civil detainees' right to access legal counsel, and their counsel's right to solicit their services, is subject to reasonable limitation. *See, e.g.*, *Haitian Refugee Ctr., Inc. v. Baker,* 953 F.2d 1498, 1513 (11th Cir. 1992) ("[T]he Government does not infringe on a third party's first amendment right to associate with an alien by holding the alien for a period of time during which the third party is unable to contact him."); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1429 (11th Cir. 1995) ("[A]ssociational freedom in no way implies a right to compel the Government to provide access to those with whom one wishes to associate.").[5]

---

[5] It is clear, however, that the First Amendment does not entitle Plaintiffs to some of their requested relief. First, Plaintiffs request that the Court order Defendants "to make publicly available via Defendant [ICE] and/or State of Florida websites information about protocols for attorney-client communications at Alligator Alcatraz . . . and to provide this information to all persons who are or will be detained at Alligator Alcatraz." Suppl. Compl. 29-7 at ¶ 2(f). Second, Plaintiffs ask the Court to order Defendants to provide and post written information on these protocols in "English, Spanish, and Haitian Creole to all people detained by Defendants at Alligator Alcatraz." *Id.* at ¶ 2(e). The Supreme Court has stated that there is "no discernible basis for a constitutional duty [on the government] to disclose, or for standards governing disclosure of or access to information." *Houchins v. KQED, Inc.,* 438 U.S. 1, 14-15 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control"); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1430 (11th Cir. 1995) ("Because there is no authority for us to compel disclosure of the [Haitian migrants'] identities, we cannot force the government to provide [Plaintiffs] with access to the list of Haitian migrants in safe haven."). Thus, even if the Court

Nonetheless, regardless of the scope of Plaintiffs' First Amendment rights, Plaintiffs are not likely to succeed on the merits because the State Defendants are, and have been, fully complying with the First Amendment by facilitating video and in-person meetings between detainees and their counsel. Ex. 1 ¶¶ 24, 37. Indeed, the State Defendants began scheduling meetings with legal counsel on July 10 and the first videoconference took place on July 15, two days before Plaintiffs filed this suit. *Id.* ¶¶ 20, 22. And as of filing this response, each of the Plaintiffs that requested a meeting has either had the meeting, or has one scheduled. *Id.* ¶ 63. Thus, Plaintiffs cannot meet their "heavy burden of persuasion" to obtain a mandatory preliminary injunction ordering the State Defendants to comply with the First Amendment because they already are. *FHR TB*, 865 F.Supp.2d at 1192.

### A.  **The State is complying with the First Amendment.**

The Facility began accepting detainees on July 3. Ex. 1 ¶ 4. The State Defendants immediately began working to coordinate and facilitate meetings between detainees and their counsel. *Id.* ¶ 4. It took longer than expected for contractors to build the necessary infrastructure and install the equipment to schedule and facilitate these meetings. *Id.* ¶ 6. As a result, Facility staff did not obtain access to the Facility's legal inbox used to coordinate and schedule meetings between detainees and their counsel until July 10, 2025. *Id.* ¶ 7.[6]

---

agreed that Plaintiffs were entitled to a mandatory preliminary injunction under the First Amendment, that injunction could not include these requests.

[6] After gaining access to the legal inbox, Facility staff investigated and determined that there were no direct e-mails regarding visitation sent to the inbox address (legal@privacy6.com) between July 3 and July 10, 2025. Staff were forwarded five e-mails that were sent directly to the Florida Division of Emergency Management, but only one of those five dealt with legal access for detainees. Staff responded to that e-mail, which was sent by Katherine Blakenship, counsel for Plaintiff Michael Borrego Fernandez, and scheduled a visit for Mr. Borrego. Ex. 1, ¶ 7.

Nevertheless, staff worked as quickly as possible to attempt the first videoconference system on July 12, 2025. *Id.* ¶ 20. And although unsuccessful due to bad weather and poor internet connection, staff quickly resolved the issues and conducted the first videoconference meetings between detainees and counsel on July 15, 2025. *Id.* ¶¶ 20, 22. Since that first meeting, detainees and their counsel have had videoconference meetings almost every day, except on Sundays, though Sunday meetings are available under urgent circumstances. *Id.* ¶ 23. Similarly, the Facility did not have the infrastructure and space to hold in-person meetings between detainees and their counsel until July 28, 2025, when the first detainees met with their legal counsel in person. *Id.* ¶ 36.

But the Facility continues to construct additional space to ensure the necessary capacity to hold all requested videoconference and in-person meetings as the number of detainees grows. *Id.* ¶¶ 56, 59. The State Defendants are also working diligently to establish postal service for detainees to correspond with their counsel. *Id.* ¶ 55. In the meantime, the Facility uses a courier service to enable legal counsel to deliver confidential documents to detainees. Facility staff inspect the documents for contraband, pursuant to the Facility's Visitation Form, but do not inspect their contents. *Id.* ¶ 54, Ex. 10.

Counsel may request a meeting with a detainee by sending an e-mail to the Facility's legal inbox. *Id.* ¶ 5. Staff at the Facility will then provide a Legal Counsel Visitation Request Form ("Visitation Form") and a Department of Homeland Security "Notice of Entry of Appearance as Attorney or Accredited Representative" ["G-28"] Form for the counsel to fill out and return. *Id.* ¶ 12, Exs. 6 & 7. The Visitation Form asks for the counsel's name, bar number, contact information, as well as the client's name and inmate number, and the requested date, time, and purpose of the meeting. *Id.* ¶ 13. The G-28 Form asks for additional information about the attorney, contact information for the detainee, and the client's consent to be represented by that attorney. After the

attorney fills out and returns the forms, he may request a meeting with a detainee via videoconference or in person. *Id.*¶ 13. Facility staff honors the attorney's request and works with them to find a mutually convenient time. *Id.*¶ 18. Staff make their best efforts to respond to requests for meetings within 24 hours, and attorneys on average are able to have a meeting with detainees within 24 hours for video meetings, and within 24 hours for in-person. *Id.* ¶¶ 9-10.

For counsel that choose a videoconference, Facility staff provide them a link to the videoconference via e-mail. *Id.* ¶ 25. When it is time for the videoconference, Facility staff escort the detainee to an enclosed area with 2 laptop computers set up for videoconferences. *Id.* ¶ 25. Detainees log onto the Zoom application and use over-the-ear headphones to conduct the videoconference with their counsel. *Id.*¶ 26. Facility staff are nearby to monitor the detainee for security purposes, but they cannot see the screen, cannot hear counsel through the headphones, and are not close enough to the detainee to hear what he says. *Id.* ¶ 29.

The videoconferences are not recorded or transcribed, and there are no cameras that can capture images on the computer screen. *Id.* ¶ 30. Counsel can also use interpreters to assist in communicating with the detainee. The interpreter receives the link for the videoconference via e-mail after filling out and returning the G-28 Form. *Id.* ¶ 34. Facility staff have not received a single complaint from a detainee or their legal counsel concerning any aspect of the videoconferences. *Id.* ¶ 32. In fact, when offered the chance to meet via videoconference or in-person, most choose videoconference. *Id.* ¶ 33.

Counsel meeting with a detainee in person undergo security screening before entering the Facility. *Id.* ¶ 39. After arriving, Facility security staff perform a basic pat-down and inspect the attorneys' personal belongings for contraband. *Id.* ¶¶ 39. Staff does not read any documents or inspect any electronic devices in the attorneys' possession. *Id.* ¶ 39.

After the attorney arrives for an in-person meeting, Facility staff escort the detainee to their meeting area. *Id.* ¶ 40. The meeting areas are away from other detainees and enclosed to allow for confidential meetings. *Id.* ¶ 41. Facility security staff remain in the area during the meeting to monitor the detainee, but they are out of hearing range and cannot see any documents being exchanged between the detainee and his attorney. *Id.* ¶ 42. The Facility has security cameras in the meeting areas to monitor the detainees, but the cameras do not record audio and cannot see the contents of any documents being exchanged. *Id.* ¶ 43. Attorneys may share and exchange documents with detainees during in-person meetings. *Id.* ¶ 45. Detainees may keep these documents for personal use. *Id.* ¶ 45, Ex. 10. Attorneys may also bring an interpreter to the meeting with detainees. *Id.* ¶ 46.

The Facility held the first in-person meetings between five detainees and their attorneys on July 28, 2025. *Id.* ¶ 36. Since the first in-person meetings, the Facility has held approximately 68 meetings. *Id.* ¶ 47. No detainee or attorney has raised an issue with any aspect of the in-person meetings to Facility staff. *Id.* ¶ 49. In fact, since the Facility began holding meetings between detainees and their attorneys on July 15, 2025, it has approved every request for a meeting in the manner specified. *Id.* ¶¶ 24, 48. The Facility remains prepared and committed to approving and facilitating every meeting request. *Id.* ¶ 50.

The Facility currently can hold 2 simultaneous videoconference meetings and four (4) simultaneous in-person meetings. *Id.* ¶¶ 35, 51. The State Defendants anticipate the number of requests for videoconference and in-person meetings will increase as the number of detainees at the Facility increases. They have constructed additional facilities for confidential meetings between detainees and their attorneys that became operational on August 7, 2025. *Id.* ¶ 53.

Counsel for the State Defendants contacted Plaintiffs' counsel on August 1, 2025, to ask about the status of individual Plaintiffs' requests to meet with their attorneys and to offer to facilitate the process. *Id.* ¶ 60, Ex. 11. Counsel for the State Defendants asked Plaintiffs' counsel for the names of the individual Plaintiffs who have requested a meeting with their attorney, which of those Plaintiffs have not met with their attorneys but would like to, which of the Plaintiffs that have a videoconference scheduled would prefer to have an in-person meeting, and which of the Plaintiffs that have met with their attorneys would like to have another meeting. *Id.*

Plaintiffs' counsel responded with a letter on August 6, 2025. *Id.* ¶ 62, Ex. 12. Plaintiffs' counsel allege in the letter that seven of the individual Plaintiffs "have not received any meetings arranged by the facility with counsel while detained at Alligator Alcatraz." *Id.* Those are: C.M., E.R., Gonzalo Almanza Valdes, G.T.C., F.B., A.S., and R.P. *Id.* And they request that the State Defendants arrange a virtual meeting with counsel for F.B., R.P., Gonzalo Almanza Valdes, and N.M.B., as well as an in-person meeting for three of those four: Gonzalo Almanza Valdes, R.P., and N.M.B. *Id.*

The State Defendants' records, however, show that six of those seven Plaintiffs have not actually requested a meeting. *Id.* ¶¶ 63, 64. Specifically, counsel for Plaintiffs R.P., F.B., G.T.C., and C.M. did not e-mail the legal inbox to request a meeting with these detainees. *Id.* ¶ 64(a). The State Defendants' records also show that counsel for Plaintiff A.S. contacted the legal inbox requesting his immediate release and to speak to his "handling officer," but did not request a meeting. *Id.* ¶ 64(b). Facility staff directed him to ICE's Miami Field Office. *Id.* 64(b). And counsel for Plaintiff E.R. initially requested a meeting for both E.R. and another detainee, but later amended the request to only include the other detainee. *Id.* 64(c).

For the other six Plaintiffs that have requested a meeting, Plaintiffs G.M.S.G., J.M.C., and Gustavo Adolfo Lopez Hernandez have each had at least one videoconference call, while Plaintiff N.M.B. has had two. *Id.* ¶ 63(a). Plaintiff Michael Borrego Fernandez had videoconference meetings on July 21, 22, and 23, 2025. *Id.* ¶ 63(d).[7] And Plaintiff Gonzalo Almanza Valdes has an in-person visit scheduled for August 15, 2025.

In other words, all of the individual Plaintiffs that have requested a meeting, have received at least one, or have one scheduled. *Id.* ¶ 65. Those that have not received a meeting never asked for one. *Id.* ¶ 65.

\* \* \*

The Facility has worked diligently to accommodate meetings between detainees and their attorneys. *Id.* ¶¶ 8-10, 18, 22-24, 35, 37-38, 47-50, 53, 55-59. Any delays the Facility experienced were inherent to standing up a detention facility in a short time period in response to a declared state of emergency. But they are not grounds for a preliminary injunction – especially a mandatory injunction – after the issues have been resolved and the meetings are occurring. That is because "injunctions regulate future conduct only; they do not provide relief for past injuries already incurred and over with." *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (denying injunctive relief "where there is no showing of any real or immediate threat that the plaintiff will be wronged again").

Moreover, as demonstrated, the State Defendants are complying with the First Amendment. *See, e.g.*, *Smego v. Payne*, 854 F. 3d 387, 391 (7th Cir. 2017) ("[A] lawfully incarcerated party's right of access is satisfied so long as he has the opportunity to consult

---

[7] Facility staff also offered videoconference meetings for Mr. Fernandez's other counsel on July 31 and August 1, and in-person meetings for August 4, but counsel did not respond. *Id.* ¶ 63(d).

confidentially with counsel and to present his case to court"). Injunctions are available only to "forestall future violations." *Alabama v. U.S. Army Corps of Engineers,* 424 F.3d 1117, 1133 (11th Cir.2005); *see also United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). There is no justification for such a "extraordinary and drastic remedy" where the State Defendants have established a robust system to coordinate and facilitate meetings between detainees and their attorneys. *Jefferson Cnty.,* 720 F.2d at 1519; *see* Ex. 1 ¶¶ 8-10, 24, 35, 37-38.

> B. **The State Defendants may impose reasonable restrictions on meetings between detainees and their attorneys.**

Plaintiffs, however, may protest that the Facility's sensible restrictions on those legal visits burden their right to legal counsel. They would be wrong. Even if the restrictions impose a burden, Plaintiffs are not likely to succeed because the Facility's restrictions are reasonably related to the Facility's security concerns.

The Supreme Court has acknowledged in the analogous prison context that "inmate[s] retai[n] those First Amendment rights that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." *Lawson v. Singletary*, 85 F.3d 502, 509 (11th Cir. 1996) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). But the Court also recognizes that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 85 (1987). "Separation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate prison authorities." *Id.* Thus, prison officials are "accorded latitude in the administration of prison affairs." *Cruz v. Beto,* 405 U.S. 319, 321 (1972). And principles of federalism bolster that deference when "a state penal system is involved." *Turner*, 482 U.S. at 85. These principles apply with equal force to a detention facility like Alligator Alcatraz, given the

nature of the detention endeavor and the reality that many of the detainees in the Facility have criminal backgrounds.

The Supreme Court affirmed this policy of judicial restraint and deference in *Turner*. 482 U.S. at 85, 89. There, it clarified that prison regulations or policies that "imping[e] on inmates' constitutional rights" are valid if "reasonably related to legitimate penological interests." *Id.* And the Court identified four factors "that are relevant to, and that serve to channel, the reasonableness inquiry." *Thornburgh*, 490 U.S. at 414. They are:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Pope v. Hightower*, 101 F. 3d 1382, 1384 (11th Cir. 1996) (quoting *Turner*, 482 U.S. at 89-91). Plaintiffs challenging prison regulations bear the burden to prove that the regulation or policy is unreasonable. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it"); *see also Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977) (stating that "the burden was not on [the prison] to show affirmatively" that the creation of an inmate union "would constitute a present danger to security and order" (citation modified)).

This reasonableness inquiry vindicates both "the need to protect constitutional rights" and the need for "judicial restraint regarding prisoner complaints." *Pesci v. Budz* (*Pesci II*), 935 F.3d 1159, 1165 (11th Cir. 2019). In doing so, it also recognizes that "courts do not sit as super-wardens," *id.* at 1166, and thereby ensures that prison officials, rather than judges, will "make the difficult judgments concerning institutional operations," *Turner*, 482 U.S. at 89 (quotation

omitted). That said, "deference to the professional judgment of the facility administration is not tantamount to carte blanche permission to deny the fundamental rights of free speech and free expression." *Pesci v. Budz* (*Pesci I*), 730 F.3d 1291, 1299 (11th Cir. 2013). The "*Turner* standard is a deferential one, but it is not toothless." *Id.* "Deference to facility administrators and concerns relating to safety and security cannot be used as a pretext to silence undesirable speech." *Id.* at 1300.

The same considerations apply to those challenging regulations or policies in civil detention facilities. *Pesci II*, 935 F.3d at 1165. But the Supreme Court has slightly modified the standard to "reflect the salient differences between civil detention and criminal incarceration." *Pesci I*, 730 F.3d at 1297. The main difference is that civil detention, unlike prisons, "is purely rehabilitative, it is not a form of punishment." *Pesci II*, 935 F.3d at 1166.[8] Thus, "the range of legitimate governmental interests is narrower here than it is in a prison context." *Pesci I*, 730 F.3d at 1297. While "retribution and general deterrence" are "plainly legitimate justifications for prison regulations," they "decidedly are *not* a proper foundation for the restriction of civil detainees' constitutional rights." *Id.* (emphasis added); *see Kansas v. Hendricks*, 521 U.S. 346, 369 (1997) (upholding the constitutionality of the involuntary confinement of sex offenders in large part because civil detention is "not punitive"). That said, "institutional order, safety, and security" remain paramount in the civil detention context, as do "the rehabilitation and treatment of civil detainees." *Pesci I*, 730 F.3d at 1298. Thus, apart from the narrowed universe of justifications, *Turner* and its progeny govern all regulations and policies at the Facility. *Pesci II*, 935 F.3d at 1166 (noting that although persons "who have been involuntarily committed are entitled to more

---

[8] The "rehabilitative" aspect does not apply to immigration detention, but the outcome – treating regulations akin to prison regulations – is the same because the Supreme Court has made clear that immigration detention is "civil, not criminal." *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001).

considerate treatment and conditions of confinement than criminals," this fact does not warrant further departure from *Turner*) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)); *see Jean*, 711 F.2d at 1508.

C.  **The Facility's restrictions on detainees and their attorneys are reasonably related to ensuring the safety and security of detainees and Facility staff.**

Plaintiffs' Supplemental Complaint challenges the State Defendants' alleged policy of refusing to allow detainees to meet with legal counsel and denying counsel access to the Facility. *See, e.g.*, Suppl. Compl. ¶¶ 4, 88-89. That has never been the State Defendants' policy. Instead, after overcoming initial delays caused by standing up a remote detention facility in a short time period, the State Defendants have established a robust process for detainees to meet with their attorneys. Ex. 1 ¶¶ 6-7, 20. Indeed, the meetings began even before Plaintiffs filed their suit. *Id.* ¶¶ 22. As a result, Plaintiffs do not challenge specific restrictions on their First Amendment rights, and thus cannot explain why they are not "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. For that reason alone, they do not meet their burden to show that the restrictions are unreasonable and thus are not likely to succeed on the merits. *See Pesci II*, 935 F.3d at 1168. But they would not succeed even if they had challenged specific restrictions because all are narrowly tailored and essential to maintaining security at the Facility.

**A.** First and foremost, the Facility's restrictions are "rationally connected" to ensuring security in the Facility for detainees and staff. This factor is the most important of the four, and "must be satisfied if the policy is to survive." *Pesci II*, 935 F.3d at 1167.

The Facility places minimal requirements and restrictions on meetings between detainees and their attorneys. These include requiring attorneys to fill out two forms before scheduling a meeting with a detainee, placing cameras and staff in or around the video conference and in-person meeting areas to ensure safety and security, limiting the number of simultaneous meetings, and

not holding meetings on Sundays (unless necessary due to urgent circumstances). Ex. 1 ¶¶ 12-13, 15-16, 30-31, 43-44. Such "reasonable restrictions may be imposed as to the time and place of consultation between an accused and his attorney without infringing constitutional rights." *Altmayer v. Sanford*, 148 F.2d 161, 162 (5th Cir. 1945); *see also Solomon v. Zant*, 888 F.2d 1579, 1581 (11th Cir. 1989) ("[R]estrictions on an inmate's access to counsel may be justified by security considerations.").

To satisfy this prong, the State Defendants need not produce "specific evidence of a causal link between a prison policy and actual incidents of violence." *Prison Legal News*, 890 F.3d at 968 (citation modified) (quoting *Lawson v. Singletary*, 85 F.3d 502, 513 n.15 (11th Cir. 1996) (per curiam)). In fact, "[r]equiring proof of such a correlation constitutes insufficient deference to the judgment of the prison authorities with respect to security needs." *Lawson*, 85 F.3d at 513 n.15. Instead, "prison officials must be able to '*anticipate* security problems and ... adopt innovative solutions' to those problems to manage a prison effectively." *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 968 (11th Cir. 2018) (quoting *Turner*, 482 U.S. at 89).

The Facility's minimal restrictions are the epitome of such "reasonable steps" to forestall security problems. The scheduling and form requirement ensures that only licensed attorneys are advising detainees on their legal rights to protect detainees from nefarious actors that could provide harmful advice or otherwise take advantage of the detainees. Ex. 1 ¶¶ 14. Similarly, the scheduling requirement and restriction prohibiting meetings on Sundays ensures there is sufficient space for confidential meetings between detainees and counsel while also maintaining order and security at the Facility. *See Lashbrook v. Hyatte*, 758 Fed. App'x 539 (7th Cir. 2019) ("[T]he First Amendment does not mandate unrestricted and unlimited private contacts with counsel, and prisons may restrict prisoner contact with counsel so long as the restrictions reasonably relate to

legitimate penological interests) (citation omitted). And placing cameras and Facility staff in or around the video conference and in-person meeting areas further promotes security and protects both detainees and staff. *See, e.g.*, *Solomon*, 888 F.2d at 1581 ("An inmate's right to access to the court is not absolute. Likewise, restrictions on an inmate's access to counsel may be justified by security considerations.").

**B.** The second *Turner* factor asks whether, in spite of the Facility's restrictions, Plaintiffs have "alternative means of exercising" their asserted rights. *Turner*, 482 U.S. at 90. "When considering this factor, the Supreme Court has instructed that the right must be viewed sensibly and expansively." *Pope*, 101 F.3d at 1385 (citing *Thornburgh*, 490 U.S. at 417). Viewed sensibly and expansively, the right at issue here is Plaintiffs' right to meet with their counsel. Based on the record, this factor favors the State Defendants because Plaintiffs have multiple avenues of meeting with their legal counsel.

That is because none of the restrictions actually prevent Plaintiff from accessing his legal counsel. *See Pesci II*, 935 F.3d at 1170 (finding policy did not violate this factor because Plaintiff "does not claim that [the prison] has otherwise restricted his ability to communicate his ideas and allegations"). They are simply minimal parameters on the exercise of that right. *See Turner*, 482 U.S. at 90 ("Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation."). And while it may be inconvenient for counsel to fill out two forms before having a meeting, or to wait to have a meeting if the Facility is at capacity, "*Turner* does not demand the ideal." *Prison Legal News*, 890 F.3d at 973 (noting that while [Plaintiff] was barred from distributing its monthly magazine to inmates, it could still send the inmates "a variety of books"). Indeed, the Supreme Court has "found adequate alternatives" even

where prisoners are "cut off from unique and irreplaceable activities." *Livingston*, 683 F.3d at 219; *see Turner*, 482 U.S. at 92 (regulation prohibiting communication between inmates at different prisons did "not deprive prisoners of all means of expression").

**C.** The third factor requires the Court to consider the impact that accommodating Plaintiffs' (hypothetical) asserted right would have on the Facility. Taking their hypothetical argument to its logical conclusion, Plaintiffs claim the Facility should not impose any requirements for counsel entering the Facility or restrictions on the meetings themselves. But allowing attorneys – and potentially many others without sufficient protective measures in place – unfettered access to detainees without proper scheduling would cause chaos. The Facility would likely not have sufficient staff to adequately process requests from visiting counsel to meet with detainees while also monitoring all ongoing meetings. And they certainly would not be able to protect all visitors and detainees if delays caused tempers to flare and disputes to arise between detainees or counsel. "When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90 (citation modified). So too here.

**D.** The final factor asks whether the Facility's restrictions are an "exaggerated response" to the Facility's security concerns. *See Pesci II*, 935 F.3d at 1171.They are not. Indeed, it is hard to imagine less-restrictive requirements and policies than general scheduling requirements, required forms, and staff monitoring of the meetings that actually protect the detainees' interests and maintain order and security at the Facility. And Plaintiffs certainly do not offer workable alternatives. In fact, their requests for relief seek what the State Defendants are already providing. *See* Suppl. Compl. at 46, Prayer for Relief (d) (asking the Court to order Defendants to provide a method for Plaintiffs to meet and confer confidentially with counsel in person, and in scheduled,

timely, free, confidential, unmonitored, and unrecorded attorney-client telephone conversations"). "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. Thus, this final factor also favors the State Defendants. And "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91.

### 3. *The State Defendants are not violating the Fifth Amendment.*

Plaintiffs' Fifth Amendment due process claim, on the other hand, does not even apply to the State Defendants. The Fifth Amendment "protects a citizen's rights against infringement by the federal government, not by state government." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1328 (11th Cir. 2015); *see also, e.g.*, *Riley v. Camp,* 130 F.3d 958, 972 n. 19 (11th Cir. 1997) ("The Fifth Amendment obviously does not apply here-the acts complained of were committed by state rather than federal officials.").

Indeed, the Supplemental Complaint even acknowledges this point by alleging that "the Fifth Amendment, *as applied to state and local government agencies and officials by the Fourteenth Amendment* . . . ." Suppl. Compl. ¶ 149 (emphasis added). Thus, Plaintiffs will not succeed on Count V against the State Defendants.

### 4. *The Plaintiffs' proposed class and subclass are not likely to be certified.*

Plaintiffs seek certification of a sweeping and ill-defined class of "all persons who are currently, or in the future, held" at the Facility. ECF 30 at 2. But their claims vary widely in substance, duration, and cause. They do not arise from any uniform written policy, nor do they present a single issue that could be resolved "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). This is precisely the type of claim structure that courts have repeatedly held defeats Rule 23 certification in the detention, prison, and immigration contexts.

First, Plaintiffs' motion to certify is premature because the parties have not conducted class discovery. Courts routinely deny or defer class certification where the parties have not had an opportunity to explore threshold factual issues relevant to Rule 23. *See, e.g., Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) (holding "district court must conduct a rigorous analysis" and that such analysis is "virtually impossible" without discovery); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 (11th Cir. 1992). And courts have made clear that Rule 23 demands more than bare assertions or rhetoric. See *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016).

Second, the proposed class – "all persons who are currently, or in the future, held at the Alligator Alcatraz detention facility" – is facially overbroad and unworkable. It includes unnamed, hypothetical future detainees who not only cannot be identified but, more importantly, do not yet have standing. Courts have repeatedly held that such overinclusive definitions are impermissible. See *Florida Immigrant Coal. v. Uthmeier*, 2025 WL 1423357, at *16 (S.D. Fla. Apr. 29, 2025).

Last, Plaintiffs cannot satisfy the demands of Rule 23(b)(2), which requires not only that injunctive relief be appropriate for the class as a whole, but also that the class be sufficiently cohesive to warrant such relief. *See, e.g.*, *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 506–07 (D. Neb. 2007). The proposed class encompasses former detainees, minors, adults, and individuals with vastly different factual circumstances, legal statuses, and claimed injuries. Courts have repeatedly rejected certification in similar institutional contexts. Even if there were an informal practice or structural barrier to counsel access, Plaintiffs fail to show that it affects all class members in the same way. Some detainees claim they couldn't call a lawyer; others claim they didn't know how; others say they asked but got no response. These are factual variations, not evidence of a unifying policy. All doom certification.

D.  <u>Plaintiffs cannot show irreparable harm because State Defendants are providing them access to their counsel.</u>

The State Defendants have demonstrated that the Facility has resolved the temporary issues that initially delayed meetings between detainees and their counsel. Ex. 1 ¶¶ 22-24, 36-38. And the Facility is scheduling and facilitating timely, free, and confidential videoconference and in-person meetings, as requested, subject to reasonable limits and restrictions to protect visitor and detainee safety. *Id.* ¶¶ 9-16, 18, 27-31, 37-46. On these facts, Plaintiffs cannot meet their "heavy burden" to clearly demonstrate that they will suffer irreparable harm absent a preliminary injunction.

To show irreparable harm, the harm "must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Here, Plaintiffs cannot show irreparable harm because the Facility is facilitating and approving every request by counsel to meet with detainees in their preferred format. Ex. 1 ¶¶ 24, 37. And there is no danger, much less an *imminent* danger, that the State Defendants will deny detainees access to their legal counsel because they have resolved the issues that caused the initial delays and have put in place policies to ensure that access to counsel continues. *Id.* ¶ 22-24, 36-38, 56-59. Indeed, "government actors receive the benefit of a rebuttable presumption that the offending behavior will not recur." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007). And "[t]he possibility of adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

irreparable harm." *Jefferson Cnty.,* 720 F.2d at 1520. If the mere possibility of "adequate" relief weighs heavily against irreparable, then surely *actual* relief must foreclose it.

Nonetheless, Plaintiffs also claim that they have demonstrated "an ongoing violation of the First Amendment," which "necessarily" constitutes irreparable harm. Renewed Mot. at 18. That is incorrect because the State Defendants have demonstrated that they are fully complying with the First Amendment by providing detainees timely and confidential access to legal counsel. *See generally* Ex. 1. In fact, since holding its first videoconference meeting, the Facility has accommodated every single request for a meeting between detainees and their counsel and has yet to receive a single complaint regarding meetings. *Id.* ¶¶ 24, 32, 37, 49. And any restrictions on the meetings are eminently reasonable. *Id.* ¶¶ 12-16, 39-44.

Plaintiffs also argue they are nonetheless entitled to a preliminary injunction, despite the State Defendants resolving all legal access issues, because "past violations create a cognizable danger of future violations." ECF 29 at 21. They cite alleged collateral consequences stemming from past delays in accessing their legal counsel, such as prolonged detention and concomitant medical issues and the Organizational Plaintiffs not being able to speak with prospective clients. But even if these harms are ongoing, that would not entitle Plaintiffs to a preliminary injunction because the State Defendants have resolved all legal access issues and injunctions are available only to "forestall *future* violations." *Alabama,* 424 F.3d at 1133 (emphasis added).

Last, Plaintiffs insist that the "mere discontinuance of infringing conduct does not render injunctive relief inappropriate." ECF 29 at 21. But that is not what the State Defendants argue. Instead, we argue that the "extraordinary and drastic remedy" of a mandatory preliminary injunction is not justified here because the Facility has resolved all legal access issues *and* the State Defendants are not only entitled to a rebuttable presumption that the alleged denials will not recur,

but have also established policies to ensure that access continues. Ex. 1 ¶¶ 56-59. As a result, Plaintiffs do not, and cannot, show that the State Defendants will *imminently* deny them access to legal counsel. And an injunction is an "equitable remedy [that] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged *again*." *Lyons*, 461 U.S. at 111 (emphasis added); *see also Strickland*, 772 F.3d at 883 ("[I]njunctions regulate future conduct only."). Thus, Plaintiffs do not meet their heavy burden to obtain a mandatory preliminary injunction.

     E.  <u>The balance of equities does not support granting an expedited preliminary injunction where Plaintiffs are receiving their requested relief.</u>

On the last factor, Plaintiffs fare no better. This response demonstrates that the State Defendants have resolved the issues that initially delayed meetings between detainees and their counsel. Ex. 1 ¶¶ 6, 22-24, 36. And the Facility is scheduling and facilitating timely, free, and confidential meetings, as requested, subject to reasonable limits and restrictions to protect visitor and detainee safety. *Id.* ¶¶ 9-16, 18, 27-31, 37-46.

Courts recognize "the public interest in allowing the government discretion to carry out its authorized functions." *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *33 (D.D.C. June 17, 2020). That includes the State Defendants operating the Facility and facilitating meetings with detainees and their counsel. And a preliminary injunction would only serve to direct the State Defendants to do what they are already doing. There is no public interest in transforming this Court into a "super warden" of Alligator Alcatraz. *See Pesci II*, 935 F.3d at 1166. Thus, Plaintiffs cannot clearly show that they are entitled to a preliminary injunction.

Dated: August 7, 2025                      Respectfully submitted,

                                           /s/ Nicholas J.P. Meros
                                           NICHOLAS J.P. MEROS (FBN 120270)
                                           TARA K. PRICE (FBN 98073)
                                           KASSANDRA S. REARDON (FBN 1033220)
                                           **SHUTTS & BOWEN LLP**
                                           215 South Monroe Street, Suite 804
                                           Tallahassee, Florida 32301
                                           (850) 241-1717
                                           NMeros@shutts.com
                                           TPrice@shutts.com
                                           KReardon@shutts.com

                                           *Counsel for the State Defendants*

## RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3), I hereby certify that counsel for the State Defendants conferred with counsel for the Plaintiffs by e-mail on August 7, 2025, in a good faith effort to resolve the issues raised in this motion. Plaintiffs' counsel objects to the relief sought.

                                           /s/ Nicholas J.P. Meros
                                           *Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system, which provides notice to all parties, on August 7, 2025.

                                           /s/ Nicholas J.P. Meros
                                           *Counsel for the State Defendants*