**SECOND SUPPLEMENTAL DECLARATION OF KATHERINE H. BLANKENSHIP**

I, Katherine H. Blankenship, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am an attorney and co-founder of Sanctuary of the South, PLLC, ("SOS"), a legal services organization with offices in New Orleans, Louisiana, Miami, Florida and Chattanooga, Tennessee. SOS provides direct pro bono and low-cost immigration legal services and civil rights representation to people in Florida and throughout the Southeast. As part of its immigrants' rights work and mission to provide legal representation and counsel to immigrants, SOS and its lawyers provide deportation defense, asylum assistance, and family-based immigration services. SOS also represents and advocates for individuals harmed in federal custody, families of people who died wrongfully in ICE custody, and individuals physically abused by law enforcement. SOS represents people held in carceral and detention facilities due to their perceived or actual immigration status to advocate for their fundamental constitutional and human rights.

3. I am an attorney in good standing in the states of Tennessee and Florida. I am admitted in all United States District Courts in Florida and the Eleventh Circuit Court of Appeals. I specialize in the practice of immigration law. This declaration supplements my prior declarations filed in this case on July 17, 2025, at ECF Nos. 5-1, 67-7.

4. Since July 2025, SOS has had eight prospective or retained clients held at the facility known as "Alligator Alcatraz." To date, SOS has represented seven clients held at the detention facility known as "Alligator Alcatraz." SOS currently has one retained client detained at the facility, and plans to represent people held there so long as the facility is in use.

    a. One of our clients currently held at Alligator Alcatraz includes H.C.R., who is a national of Colombia. H.C.R. is almost sixty years old, and has significant health problems, including need of a hip transplant, and serious hypertension. He has no criminal history. He entered the United States on a valid visa, and has a pending asylum petition. He has a valid driver's license and a work permit. He was taken into custody on his drive home from work, when a police officer pulled him over during a traffic stop. Although H.C.R. showed the police officer his asylum documents, the officer told him that they were invalid. He was then taken into custody at a local jail, and then transferred to Alligator Alcatraz. H.C.R. seeks to proceed in this case under pseudonym as he has a pending asylum petition, and because public disclosure of his identity could expose him to further danger of harm in his home country, and due to potential harassment and notoriety in the United States in connection with his detention at Alligator Alcatraz. H.C.R. has confirmed that he wishes to be a plaintiff in this lawsuit to ensure confidential,

      private attorney communication for detainees held at Alligator Alcatraz.

5. Although it seems like Alligator Alcatraz has allowed more attorney access since this lawsuit was filed, such as by allowing some video calls, my clients and I are still facing significant and unreasonable restrictions on attorney-client communication. SOS and our clients are unaware of any formal process to submit a complaint or grievance to the facility and have seen no such process posted to any website or communicated to those held at the facility or their attorneys.

6. As described in my prior declarations, SOS has faced, and continues to face, significant challenges to attorney access at the facility. For example, it continues to be impossible to confirm the location or locate individuals who are detained at Alligator Alcatraz via ICE's online detainee locator, or the Florida Department of Corrections "Inmate Population Information Search." Neither ICE nor the state of Florida has provided any publicly available information regarding attorney access protocols at the facility. This is true for H.C.R.

7. Nothing has changed regarding detainees' ability to make any confidential outgoing legal calls. The only way that clients, including H.C.R. detained at Alligator Alcatraz can call me is still via a monitored, recorded outgoing phone line. These calls are obviously not confidential and it is impossible to maintain confidential attorney-client communication on this phone line. Every 2-3 minutes, a recorded voice interrupts the call with a notice that the call is being recorded and monitored. I feel that speaking with my clients on this line violates my ethical obligations to maintain attorney client confidentiality and makes it impossible for my clients to have a private legal call. My clients have told me that access to this phone line has been severely restricted, and that the phone is only available to all individuals detained at the facility for only 3 hours per day. This is different from other immigration detention facilities, where detainees are allowed private, unmonitored outgoing legal phone calls, as is required by ICE detention standards.

8. Scheduling and obtaining legal videoconference visits continues to be challenging. These legal videoconference calls still are not confidential. For example, on July 16, 2025, I had a videoconference call with Y.D.G., a detainee held at Alligator Alcatraz. It was clear that our conversation was not confidential. There were multiple instances of technological failures and whenever Y.D.G. had to call for assistance, he simply asked the guard to step over, and this guard stepped into the screen, apparently sitting adjacent to Y.D.G. and within earshot. I also spoke directly to the agent about the technological issues. When I alerted the agent that we continued to have problems, he was not on camera, but I merely asked him for assistance and he appeared, evidently within ear shot of our conversation. On July 23, 2025, SOS was finally able to successfully schedule a legal video call with our client, Michael Borrego. During this call, my colleague, Mich Gonzalez, experienced technological difficulties that required requesting assistance from a nearby guard who was within earshot of the legal meeting. Mr. Borrego was shackled at his ankles, wrists, and waist-chained, inhibiting his ability to fully participate in this legal visit and the call was interrupted

at least twice by technical failures. Additionally, it was visible in the video call that Mr. Borrego was not in a private, enclosed room, but a cage with TNT staff walking by throughout the approximate 50 minute call. Mr. Borrego stated during the call that he felt they were intermittently listening to the conversation. On September 11, 2025, my office made a request for a video visit with H.C.R. We have not yet received a response.

9. Nothing has changed with respect to the lack of confidential document exchange at the facility. There is still no mechanism to send or receive legal mail from the facility. The facility still requires attorneys to complete a "Legal Counsel Visitation Request Form" that instructs attorneys to "attach copies of legal documents you intend to bring for approval. All items are subject to inspection and must be pre-approved." There is no mechanism to ensure confidentiality and no assurance that any legal documents dropped off in person is being opened only in the presence of the recipient. This clearly violates attorney-client privilege, and is unnecessary for any safety concerns.

10. On July 16, 2025, a SOS paralegal attempted to visit the facility to collect signatures on time sensitive documents. She was turned away and told that the facility had no legal mail set up so that she could confidentially deliver the documents. The only option she was given was to leave the documents with TNT staff, giving up all confidentiality, and return at an unknown date and time to retrieve them.

11. It remains very difficult to obtain an in-person legal visit. To date, SOS staff have attempted to visit clients at the facility three times, only to be turned away each time. SOS attorneys have yet to be allowed into the facility for a legal visit with any client or prospective client. SOS attorneys have also attempted to schedule legal visits in advance, although this is atypical for ICE immigration detention and detrimental to effective legal representation. On July 30, 2025, Mich Gonzalez attempted to visit three clients and prospective clients at the facility in person. He was turned away and subsequently emailed legal@privacy6.com to schedule a legal visit in advance for the following day - due to the urgency of the client matters and the fact that he, as an out-of-state attorney, would not be in town long. Notably, Mr. Borrego was one of the clients Mr. Gonzalez attempted to meet with on July 30th - twenty days after I initially tried to meet with Mr. Borrego at the facility on July 10, 2025. Mr. Gonzalez was denied access to SOS clients and prospective clients and instead was offered a legal visit for the following week - after Mr. Gonzalez had left town, and weeks after SOS initially attempted to visit with clients and prospective clients.

12. On July 31, 2025, Attorney Gonzalez and I received correspondence from the legal@privacy6.com email stating that Mr. Gonzalez could not be accommodated to visit with clients in-person at the facility, including Mr. Borrego, until August 4, 2025 because other attorneys had visits slated for all times available in the dates prior to Monday the 4th of August. On the evening of August 1, 2025, Attorney Gonzalez received a message from Mr. Borrego's family member stating that he had been transferred out of the

Alligator Alcatraz facility. After being processed at the Krome facility around midnight on August 2, 2025, Mr. Borrego finally appeared on the ICE detainee locator website. Attorney Gonzalez then immediately visited Mr. Borrego at Krome in-person on the morning of August 2, 2025, without providing any prior written notice to ICE or Krome security. This was the first time SOS was able to meet with Mr. Borrego in person since his initial detention at Alligator Alcatraz on July 5, 2025.

13. The requirement to pre-schedule in-person legal visits is unlike any other detention facility. For example, for every other immigration detention center in Florida, I am able to travel to such facilities for legal visits every day of the week without any prescheduling requirements.

14. SOS staff and clients have not only been impeded from confidential legal communications, but my staff and I have also witnessed a concerning trend in which prospective and current clients appear to be targeted after securing or attempting to secure legal counsel. We have experienced this several times. For example, after requesting legal visits on July 10, 2025, most of the individuals I requested to visit with were quickly removed - either through transfer or deportation. The same has happened with two subsequent clients after we requested legal access. This makes attorney client correspondence and legal representation all the more difficult. It is impossible to manage a completely unreliable and nonexistent legal access policy at this facility while also understanding that reaching out to individuals seeking legal representation may become even more vulnerable to rapid transport or deportation.

15. Due to the many barriers to access to counsel at "Alligator Alcatraz," SOS has spent over 68 hours of staff time and at least $1,300 in costs that it would otherwise not have needed to spend in working to achieve our mission of providing legal services to immigrant communities. This includes time spent attempting to obtain information about how to establish communication with clients at the facility, speaking and coordinating with client and prospective client families to attempt to contact and receive news about their loved ones detained at "Alligator Alcatraz," corresponding with state and federal agents to request access to clients at the facility, corresponding and working with partner organizations and attorneys to secure access to the facility for client visits, informing state and federal congressional representatives about the issues of access to legal visits, or waiting for hours in person at the facility, only to be refused an in-person visit. The time I and other SOS staff have spent to date in trying to establish contact with immigrants incarcerated in this facility has resulted in our organization not being able to help other clients.

Executed this 11th day of September, 2025 at Chattanooga, TN.

*/s/ Katherine H. Blankenship*
Katherine H. Blankenship