SUPPLEMENTAL DECLARATION OF VILERKA S. BILBAO

I, Vilerka Solange Bilbao, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify, I could and would do so competently and truthfully to these matters.

2. I am the Founding Attorney of Bilbao Law, LLC, which I opened in 2019. My firm specializes in immigration law and helps immigrants in the United States to navigate the complex immigration system. We handle a wide variety of immigration matters and petitions for immigration relief and provide legal representation to detained and non-detained individuals throughout Florida. Our firm often handles pro bono detained cases in Florida, including cases of detainees at Alligator Alcatraz. I would continue to take cases at Alligator Alcatraz and any other immigration detention center in Florida.

3. I am admitted to the Florida Bar and remain in good standing. This declaration supplements my prior declaration filed in this case on Aug. 13, 2025. *See* ECF No. 67-1.

4. Since July 2025, I have represented two clients who have been detained at "Alligator Alcatraz." My client, Yuniel Michell Figueredo Corrales, was detained at "Alligator Alcatraz" from July 11, 2025 through August 11, 2025 when he was transferred to El Paso, Texas. My other client, A-G, is currently detained at this facility. A-G arrived at Alligator Alcatraz on September 8, 2025. My firm plans to continue representing clients detained at the facility.

5. Since *C.M. v. Noem* was filed, I have heard that attorneys have sometimes been able to secure in-person or virtual visits with their clients. However, from personal experience, I know these visits are unreasonably difficult to obtain.

6. For example, I have had great difficulty proceeding with the asylum claim for Mr. Figueredo Corrales due to the many attorney access barriers at the facility. Because of these barriers, I have not had the opportunity to gain a full understanding of Mr. Figueredo Corrales's case and require much more information from him. Neither my client nor I are aware of any complaint or grievance process available to him at this time.

7. Normally, when someone is in ICE custody, I can access official guidance about channels of communication on facility websites. Publicly available facility information usually includes visitation hours, email contacts, Video Attorney Visits (VAVs), and procedures for exchanging legal documents.

8. When I tried to find instructions for contacting or visiting Mr. Figueredo Corrales, there was no publicly available information. I could not locate an email address, phone number, or web page for making requests, nor any guidance on exchanging legal documents with detained individuals at "Alligator Alcatraz." To my knowledge, DHS and ICE websites still provide no information on accessing or representing clients held there, and I am unaware of any Florida state website that does so.

9. I was only able to piece together any contact information or protocols for attorney access at Alligator Alcatraz through coalitions and attorney groups I belong to. Participating in these groups requires an investment of time in addition to daily work. Not all attorneys can do that. If I were not active in these groups, I would have had no way to determine even the most basic steps for contacting clients detained at "Alligator Alcatraz." Just determining the email address to submit a visitation request required a tip from a fellow attorney.

10. While detained at "Alligator Alcatraz," Mr. Figueredo Corrales did not appear on ICE's public online detainee locator (https://locator.ice.gov/odls/). Usually this online detainee locator is delayed–meaning that a client will show up days after they are processed into the facility. However, Mr. Figueredo Corrales never appeared on the ICE detainee locator despite spending an entire month at the facility. A-G does not appear on the detainee locator, either, even though he has confirmed via telephone that he is at Alligator Alcatraz.

11. The only way detainees, including A-G, can communicate with lawyers is through a phone line that "Alligator Alcatraz" monitors and records. These unreasonable restrictions have prevented me from providing the full and zealous representation my client has a right to. Normally, I would have at least one legal call with a client within a week of having been retained—and more often an in-person visit usually lasting an hour or more. Detention facilities typically offer Video Attorney Visit ("VAV") calls with as little as 24 hours' notice, and in-person visits during visitation hours, without a need to schedule a visit.

12. My clients have not called me on the telephone from Alligator Alcatraz because of both the lack of confidentiality and the lack of availability. Instead, most of the information I received about Mr. Figueredo Corrales had to be communicated to me through his partner—if he was able to reach her at all. He reported that he struggled to have five minutes on the phone with her, as people were fighting over the limited phone access. The same is true for A-G; his family has also relayed information to me after speaking on the non-confidential phone line.

13. On July 16, 2025, at 5:33 p.m. EST, I submitted a request for a legal visit with Mr. Figueredo Corrales. My request was for a meeting via phone or video rather than an in-person visit. However, I have received numerous reports from other members of groups such as American Immigration Lawyers Association (AILA) that attorneys have traveled all the way to the Everglades to visit their clients in-person only to be turned away. I submitted my request pursuant to the advice of attorneys in my network that monitor removal issues in Florida and who had gathered the proper email to submit a legal visitation request was "privacy6.com" I thought this was strange, as I had never engaged with any facility, officer, or staff member regarding immigration legal services over any email address that didn't include a ".ice.dhs.gov" or at least the name of the detention facility. I made sure to attach my ID and bar card to my request and provided eight slots of availability. I also requested that the visitation be at the recipient's "earliest convenience."

14. On July 17, 2025, at 1:52 p.m. EST, the facility replied with instructions to complete

and return a visit request form instead of confirming an appointment. The email was signed by the "Southern Detention Coordination Team." I have never heard of this entity. It is unclear who they are or why I am required to submit sensitive client information to them. I returned the form promptly at 2:24 p.m. EST the same day, given the urgent nature of my client's legal needs. I did not receive a reply.

15. On July 18, 2025, at 11:25 a.m. EST, I sent a follow-up email and still did not receive a reply.

16. On July 21, 2025, at 11:36 a.m. EST, I sent another follow-up email, reattaching the attorney request form, a G-28, my ID, and my bar card. I emphasized that I had not yet received a response. I also stated that "I am available and prepared to meet with my client through the fastest available medium permitted by the facility" and asked that they "[p]lease confirm the scheduled visitation at [their] earliest convenience." I further asserted that I "remain available and committed to speaking with my client as soon as possible."

17. Finally, on July 22nd, 2025, at 10:14 a.m. I received a response. This one did confirm an appointment time. However, the appointment I was given was set for July 24, 2025, at 9:00 a.m. EST—eight days after sending my initial request. This appointment was for a virtual visit.

18. The July 22 visit was scheduled for forty-five minutes. Facility staff brought Mr. Figueredo Corrales twenty minutes late and did not adjust the cut off time for the call. So we only had twenty minutes total to speak about his case.

19. Our communication on the video call was clearly not confidential. Mr. Figueredo Corrales sat in a sort of tent with soft-sided, makeshift fabric walls and no roof. There were guards standing close by. Guards are always present when detained individuals are in unsecured and unenclosed areas, like these makeshift visitation rooms. These open and non-confidential visitation tents are very much unlike any other facility I have ever seen. Typically, detention facilities provide enclosed confidential rooms for attorney-client visitation. Although they usually have transparent windows, no conversation can be heard from outside the rooms. When I expressed concern about the lack of privacy and guards being able to hear our conversation through the fabric walls, especially given that there wasn't even a roof above him, Mr. Figueredo Corrales replied that he was glad there was no roof because he hadn't seen the sun or been outside at all in fourteen days.

20. I emailed legal@privacy6.com again on August 6, 2025, to request an urgent video call with Mr. Figueredo Corrales prior to the expiration of his BIA Appeal which was due on August 11, 2025. Our legal call was scheduled for August 11, 2025 - the same day of his BIA appeal deadline. During that visit, we again did not have confidentiality. Even though Mr. Figueredo Corrales had headphones, an officer was standing outside the tent and could hear everything Mr. Figueredo Corrales was saying to me. This lack of confidentiality affects the information that clients can share with us about their case, thereby impacting our ability to zealously defend them.

21. It also remains impossible to exchange legal documents confidentially with clients,

including A-G, at the facility. Prior to my video visit, I requested copies of any documents Mr. Figueredo Corrales had and any documents he had been given while in custody. As he does not understand English, he could not comprehend their contents. My client was prohibited from bringing any of his documents with him to our meeting and I was never provided copies. These barriers have delayed my ability to review the documents with him, explain their contents, and obtain critical information and personal data needed for his filings— all of which are time-sensitive, particularly given his pending appeal.

22. Mr. Figueredo Corrales has explained that staff at the facility go from cell to cell pressuring individuals to sign documents agreeing to voluntary removal. These detainees have not had the opportunity to speak with legal counsel. He is afraid to sign anything that might result in his deportation. Staff reportedly make these rounds while people are sleeping, call names, and request signatures on documents without explanation. They have told individuals that they are required to sign the documents, that they have no right to see a judge, and—if someone questions or hesitates—that they will be deported regardless.

23. This has created such deep distrust in Mr. Figueredo Corrales that, when our office sent a legal mail to the facility asking our client for his signature for FOIA requests, he initially refused to sign. Although there is no way to exchange documents confidentially with clients, as mentioned above, we needed to obtain his signature in order to obtain his records from ICE, and we were forced to use the facility's non-confidential document-exchange process despite its flaws. We mailed the document to the facility, and the facility called my firm to confirm the contents of the mail we had sent. This, of course, is a violation of attorney-client privilege. After the facility agreed to take the document to him for his signature, his fear of falling victim to ICE's coercive tactics caused a delay in obtaining his signature. He knew that other immigrants at the facility had unknowingly signed documents that led to their deportation. As a result, when facility staff approached him for a signature, he refused. Facility staff had to repeatedly ask him to sign, and we had to confirm with the client's partner who spoke to him over the phone to confirm he was signing the documents our law firm sent him, and not his own voluntary deportation. As a result, he experienced episodes of dissociation, which directly impair a person's ability to participate in their legal defense.

24. There are also many more requirements to make in-person attorney visits at Alligator Alcatraz, which requires attorneys to submit a request for a visit at least 3 days in advance. Other immigration facilities permit attorneys to visit detained clients without a pre-arranged schedule during regular visitation hours, with an ID and bar card. It also seems that detainees are transferred out from the facility during that 3-day period, making it almost impossible to meet with clients in person at Alligator Alcatraz.

25. I am concerned that if I am not able to speak with A-G as expeditiously as if he were detained at other well-established immigration detention facilities of Florida, that he could be deported without the opportunity to speak with counsel, or that he can–unknowingly or under duress–relinquish his rights to fight his immigration case. Mr. A-G's mother has confirmed he has mental health issues, the likes of which concern me, knowing that the facility does not have adequate mental health services being provided

to detainees. On September 9, 2025, I submitted a request for a legal visit with A-G at Alligator Alcatraz. I have not yet received a response.

26. Due to the many barriers to access to counsel at "Alligator Alcatraz," my firm has spent over 100 hours of staff time and at least $7,500 in costs that it would otherwise not have needed to provide legal services to clients. This includes time spent attempting to obtain information about how to establish communication with clients at the facility, speaking and coordinating with client and prospective client families to attempt to contact and receive news about their loved ones detained at "Alligator Alcatraz," corresponding with state and federal agents to request access to clients at the facility, corresponding and working with partner organizations and attorneys to secure access to the facility for client visits. The time I have spent to date in trying to establish contact with immigrants incarcerated in this facility has resulted in lost ability to help other clients, and to develop client rapport.

Executed on the 9th of September, 2025, at Jacksonville, Florida.

/s/ _Vilerka Bilbao_
Vilerka Solange Bilbao