**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Fort Myers Division**
**Case No. 2:25-cv-747-SPC-KCD**

|  |
|---|
| **H.C.R., et al.,** |
| *Plaintiffs,* |
| **v.** |
| **Kristi Noem, et al.,** |
| *Defendants.* |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs and the proposed class are immigrants detained at "Alligator Alcatraz" and law firms and legal service organizations who represent detainees at the facility. Restrictions on attorney access at the facility violate the First Amendment rights of all Plaintiffs and the proposed class. Plaintiffs H.C.R., D.G.M., and H.P. (collectively "Detained Plaintiffs"), on behalf of themselves and the proposed class, and the Organizational Plaintiffs Sanctuary of the South, and Bilbao Law, PLLC ("Organizational Plaintiffs") seek a preliminary injunction requiring Defendants to permit timely, confidential, and meaningful attorney-client communication at Alligator Alcatraz.

**INTRODUCTION**

Since July 3, 2025, Defendants have rounded up and held hundreds of immigrants at "Alligator Alcatraz," a hastily constructed temporary detention facility

1

made of tents, chain-link fence, and barbed wire in the middle of a swamp in the Florida Everglades. Nothing about this detention facility is normal: the manner and location in which it was built; the legal arrangement and claimed authority for the detention of people at the facility; and detainees' inability to meaningfully communicate with legal counsel.

Access to counsel at Alligator Alcatraz is dramatically more restrictive than at other immigration facilities and runs afoul of the requirements that Immigration and Customs Enforcement ("ICE") has in place for detention facilities. The facility's requirement that attorneys schedule in-person visits three business days in advance is unlike in-person access at other immigration detention facilities, prisons, or jails, where attorneys may see clients during visiting hours without pre-scheduling an appointment.  Defendants have engaged in a pattern and practice of transferring detainees whose attorneys have requested in-person legal visits immediately prior to the scheduled visits, precluding detainees' ability to meet with counsel in person at the facility. Scheduling delays for attorney visits have been so lengthy that some detainees are unable to speak to counsel in advance of key deadlines. Attorney-client communication is not confidential or private. Outgoing phone calls from detainees are monitored and recorded. Legal videoconferences are not private or confidential. Attorneys cannot confidentially review key documents with clients or obtain necessary signatures. Defendants have not publicly posted any information regarding attorney access protocols or provided this information to detainees, leaving attorneys and detainees in the dark about how to properly communicate with each other. Attorneys

cannot confirm whether their detained clients are held at the facility, because ICE's detainee locator continues to omit information about detainees held at Alligator Alcatraz.

Although Defendants instituted limited legal in-person and videoconference visits, their attempts to address these issues in response to this litigation are wholly inadequate, and continuing restrictions on attorney-client communication violate Plaintiffs' First Amendment rights. Defendants' restrictions also expose detainees to continuing grave harm. In the limited time since Plaintiffs filed their prior Renewed Motion for Preliminary Injunction on July 29, 2025, officers have circulated the facility, successfully pressuring desperate detainees to sign voluntary removal orders, without the opportunity to speak to counsel. The Court should therefore grant Plaintiffs' motion for preliminary injunction.

## BACKGROUND

For several weeks after the facility first opened, Defendants entirely blocked detainees from access to legal counsel. Attorneys and detainees had no means of communicating with each other at all, save for limited and infrequent access to an outgoing monitored and recorded phone line that lasted for only a few minutes at a time.  Soon after Plaintiffs filed this suit, Defendants responded by implementing some limited measures for attorney-client communication. Defendants claim that on July 15, they began offering attorney-client videoconferences. Decl. of Mark Saunders ¶¶ 22–24, Doc. 57. Defendant Guthrie announced on July 25 that the facility would shortly begin in-person attorney-client visits, and Defendants claim that they began

offering these visits on July 28. *Id.* ¶¶ 36–37.[1] These measures, however, are wholly inadequate, as conditions after these changes demonstrate. Access to counsel at Alligator Alcatraz is dramatically more restrictive than at other immigration facilities and runs afoul of the requirements that ICE has in place for detention facilities. The government continues to impose significant barriers to attorney access for detainees held at Alligator Alcatraz, in violation of Constitutional requirements.

**Defendants' current policies require attorneys to pre-schedule in-person legal visits, allowing them to transfer detainees immediately prior to scheduled visits, precluding their ability to meet with counsel at the facility.** Defendants' current policies thwart in-person attorney visitation by requiring that attorneys submit a request at least three business days in advance to visit clients in person at the facility. Suppl. Decl. Troy Elder, Ex. A (Facility Visitation Request Guide). This practice is far from the norm for other immigration detention facilities, jails, and prisons, which allow attorneys and legal representatives to conduct in-person visits during visitation hours without prior schedule with the facility. Second Suppl. Decl. of Catherine Perez ¶ 10; Second Suppl. Decl. of Johan Gutierrez ¶ 13; Second Suppl. Decl. Katherine Blankenship ¶ 13; *see also* Decl. Mich Gonzalez ¶ 7 (immediately after Mr. Borrego's transfer to Krome, his attorney was able to visit him without pre-scheduling a visit).

---

[1] The Florida Channel, 7/25/25 Governor's Press Conference (Jul. 25, 2025), https://thefloridachannel.org/videos/7-25-25-governors-press-conference/ [https://perma.cc/RC8A-TYLE] (at 28:00) ("we should have our first set of onsite legal representation no later than Monday. And we're scheduled to do that almost 24/7 if we need to… We can do those meetings all day long, 24/7, 365.").

This requirement has significantly hindered the ability of attorneys to meet with clients in person and rendered in-person attorney visits virtually unavailable. In the last three weeks alone, Defendants have engaged in a pattern and practice of transferring detainees whose attorneys have requested in-person legal visits immediately prior to the scheduled visits.

For example, attorneys at Americans for Immigrant Justice ("AIJ") submitted an urgent attorney visitation request to the facility on August 11, 2025, seeking legal visits with ten detained clients. Suppl. Decl. Troy Elder ¶¶ 10–12. The request included attorney identification, proof of bar admission, executed Forms G-28, and legal visitation forms, and stated the attorneys' availability for visits on August 12 or August 14, 2025, either in person, by phone, or video. *Id.* Later that day, the facility replied that in-person attorney interviews could be scheduled for Thursday, August 14, 2025, beginning at 9:00 a.m., and inquired whether thirty minutes per detainee would suffice. *Id.* AIJ confirmed that this was acceptable, and the facility issued written confirmation that afternoon that the AIJ visits were scheduled for August 14, 2025, from 9:00 a.m. to 2:00 p.m. *Id.* However, late in the evening on August 13, 2025, the facility notified AIJ that *all ten clients* scheduled for visits had been transferred out of the facility, that there was no other information regarding the clients' information, and that the visits could not occur. *Id.*

On August 18, 2025, Mr. Elder submitted another visitation request by email, requesting visits with another group of 21 detained clients. *Id.* ¶ 13. The request contained the subject heading "URGENT Attorney Request for Visitation" and

reiterated the urgent nature of the request in the body of the email. *Id.* The email also included the clients' identifying information, attorney identification, proof of bar admission, executed Forms G-28, and required visitation forms. *Id.* Mr. Elder indicated availability for in-person, telephonic, or video meetings on August 19, August 21, and August 22, 2025. *Id.*

On the same day, the facility replied, asking whether AIJ wanted to meet with the detainees individually. *Id.* ¶ 14. Mr. Elder responded on the same day, confirming the desire for individual visits, and requested the visitation schedule. *Id.* The facility confirmed that in-person visits were scheduled for August 21, 2025, from 8:00 a.m. to 5:00 p.m. *Id.* However, on August 21, 2025, the facility informed Mr. Elder that *all 21 of the clients* scheduled for visitation had been transferred from the facility, that the facility had no other information about their whereabouts, and that the visits would be canceled. *Id.* ¶¶ 16–18.

Similarly, on August 27, 2025, attorney Carlos Saturne requested an in-person legal visit with his client held at Alligator Alcatraz. Decl. Carlos Saturne ¶ 8. The facility scheduled an in-person visit to take place on September 3, 2025, at 1:30 p.m. *Id.* However, on September 2, an ICE officer called Mr. Saturne and informed him that it would "be better to wait" to visit his client at the Broward Transitional Center, another facility, because ICE had decided to transfer him from Alligator Alcatraz. *Id.* On September 3, the ICE detainee locator confirmed that his client had been transferred.

*Id.* ¶ 10. Mr. Saturne was never able to have a single legal call or visit with his client while detained at Alligator Alcatraz. *Id.*

Likewise, on July 30, 2025, Mich Gonzalez, an attorney from Organizational Plaintiff Sanctuary of the South ("SOS"), visited the facility to meet with a client, but was turned away from the facility. Gonzalez Decl. ¶ 6–7. Mr. Gonzalez emailed legal@privacy6.com, and on July 31, received an email from the facility stating that he could not be accommodated to visit clients in person at the facility until August 4, 2025. *Id.* ¶ 7. On the evening of August 1, 2025, his client was transferred from Alligator Alcatraz to the Krome Detention Center, where Mr. Gonzalez was able to meet with him in person the next day, without having to prearrange a visit. *Id.* This visit at Krome was the first time that SOS was able to meet with this client in person since his initial detention at Alligator Alcatraz on July 5, 2025. *Id.*

**Attorneys face prolonged delays in scheduling attorney videoconferences under the facility's current policies, often prejudicing detainees' cases.** Defendants claim that facility staff "make their best efforts to address or at least respond scheduling requests within 24 hours," and that "[o]nce Facility staff respond to a scheduling request, counsel are typically able to meet with their clients within 24 hours for virtual meetings, and within 24 hours for in-person meetings." Saunders Decl. ¶¶ 9–10, Doc. 57. However, Defendants' "best efforts" fall demonstrably short, as attorneys face prolonged delays in scheduling visits, often prejudicing detainees' cases.

Scheduling delays are so significant that some detainees are unable to speak with counsel in advance of key deadlines. For example, attorney Vilerka Bilbao emailed the facility on August 6 to request a legal videoconference to prepare for an upcoming appeal brief deadline. Supp. Bilbao Decl. ¶ 20. However, the appointment was scheduled for August 11, the day that her client's appeal brief was due. *Id.* Similarly, attorney Johan Gutierrez sent an urgent request for a video call on July 23, 2025 (a Wednesday), because his client had a bond hearing scheduled on July 25 (a Friday). Second Suppl. Gutierrez Decl. ¶ 10. At this point, the facility's current video visitation policy had been in place for over a week and Defendants claimed that by that point, video visits had occurred "nearly every day, other than Sundays" and to accommodate "urgent" meetings even on Sundays and holidays. Saunders Decl. ¶¶ 22–23, Doc. 57. He was informed, however, that no appointments were available until July 29, four days after the hearing. Second Suppl. Gutierrez Decl. ¶ 10.

Attorney Jose Flores requested a legal videoconference on August 25, 2025, to meet with Plaintiff D.G.M., but has not yet received any response, and as a result, has had to rely on communicating through the monitored, recorded outgoing phone line. Mr. Flores has been unable to discuss sensitive matters with D.G.M. because the line is not confidential. Decl. Jose Flores ¶ 6.

**Detainees cannot speak confidentially with counsel in legal videoconferences.** Defendants claim that videoconferences take place in an "enclosed area that provides visual, but not auditory, observation," and that "[f]acility security staff are present just outside of the enclosure during a video conference meeting, but

they are stationed out of hearing range." Saunders Decl. ¶¶ 25, 29, Doc. 57. However, it is clear that detainees cannot speak confidentially in legal videoconferences. As attorney Johan Gutierrez noted with respect to a July 29 videoconference with his client, "it appeared that he was in an open cage with other people in the vicinity, and that others could hear what he was saying." Second Suppl. Gutierrez Decl. ¶ 7. His client confirmed that "whatever he said . . . was not private." *Id*. Similarly, SOS attorneys Katherine Blankenship and Mich Gonzalez have observed that during supposedly confidential legal videoconferences taking place on July 16 and July 23, they have been able to ask questions of facility staff, and facility staff have stepped into the video frame to respond. Second Suppl. Blankenship Decl. ¶ 8; Gonzalez Decl. ¶ 5. This demonstrates that facility staff are within earshot of confidential videoconferences. *See also* Second Suppl. Perez Decl. ¶ 9 ("from what my client has told me and what I could see, he is not in a private, closed room."); Suppl. Decl. Vilerka Bilbao ¶ 19 (noting that the legal videoconferences are "clearly not confidential," and detainees sit in a "sort of tent with soft-sided, makeshift fabric walls and no roof.").

**Detainees cannot speak confidentially with counsel in outgoing phone calls.**
Defendants do not contest that detainees cannot speak confidentially in outgoing phone calls, as they are monitored and recorded. Second Suppl. Perez Decl. ¶ 7; Second Suppl. Gutierrez Decl. ¶ 9; Second Suppl. Blankenship Decl. ¶ 7; Flores Decl. ¶ 6; Decl. Kenia Garcia ¶ 6. Unfortunately, these calls are the only way that detainees can affirmatively reach out to contact counsel. As a result, detainees cannot

confidentially contact potential lawyers, nor can a detainee contact their lawyer confidentially to provide updates on their case. This stands in stark contrast to other ICE detention facilities, which require the provision of telephones for outgoing legal calls where detainees "can make such calls without being overheard by staff or other detainees," and which "staff may not monitor."[2]

**Detainees cannot confidentially exchange legal documents and have no way to receive legal mail.** Defendants admit that there has never been any legal mail system at the facility since it opened. Fl. Opp., Doc. 49 at 15; Saunders Decl. ¶ 55, Doc. 57. Legal staff who have attempted to visit the facility to collect signatures on time-sensitive documents have been turned away and informed that because there is no legal mail system, documents can be left at the facility to be picked up with a client's signature in the future at an unknown date and time. This process is not confidential. Second Suppl. Blankenship Decl. ¶ 9; Garcia Decl. ¶¶ 7-8.

In addition, the "Legal Counsel Visitation Request Form" that the facility requires attorneys to complete for an attorney visit instructs attorneys to "[a]ttach copies of legal documents you intend to bring for approval. All items are subject to inspection and must be pre-approved." Saunders Decl. ¶ 12, Ex. 6, Doc. 57; *see also* Suppl. Elder Decl. Ex. A; Second Suppl. Blankenship Decl. ¶ 9; Garcia Decl. ¶ 7; Flores Decl. ¶ 7. Detainees are prohibited from bringing documents to video calls with

---

[2] U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011* 389 (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/UD3R-PTXU].

attorneys. Suppl. Bilbao Decl. ¶ 21. This prohibition delays attorneys' ability to review documents with clients and obtain critical information for filings. *Id.*

**Defendants refuse to make basic information regarding attorney access protocols necessary for communication to detainees and the public.** Defendants have failed to make publicly available basic information about attorney access policies or protocols at the facility, or to provide that information to detainees. Second Suppl. Ramirez Decl. ¶ 6; Second Suppl. Perez Decl. ¶ 6; Second Suppl. Gutierrez Decl. ¶ 8; Suppl. Bilbao Decl. ¶ 8-9; Second Suppl. Blankenship Decl. ¶ 6; Flores Decl. ¶ 4; Garcia Decl. ¶ 5. Without this information, attorneys and detainees do not know how to communicate with each other. For this reason, this information is a necessary precondition for Plaintiffs to enforce their First Amendment right to consult with one another for purposes of legal representation. *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008); *Pell v. Procunier*, 417 U.S. 817, 822. Publication of this information is routine for immigration detention facilities, as ICE's website includes a webpage that lists attorney visitation protocol for all other detention facilities nationwide.[3]

**Attorneys cannot locate detained clients at Alligator Alcatraz.** Unlike all other immigration detention facilities, ICE's detainee locator continues to omit any information about detainees held at Alligator Alcatraz, so attorneys cannot confirm

___

[3] U.S. Immigration and Customs Enforcement, Detention Facilities, https://www.ice.gov/detention-facilities [https://perma.cc/YY7F-U9QN] (last updated Jun. 25, 2025). This website includes links to individual detention facilities, which in turn, include information regarding attorney visit protocol on the "Hours of Visitation" section. *See, e.g.* U.S. Immigration and Customs Enforcement, Krome North Service Processing Center, https://www.ice.gov/detain/detention-facilities/krome-north-service-processing-center [https://perma.cc/J92K-G9AD] (last updated Aug. 18, 2025).

whether detained clients are held at the facility. R Second Suppl. Blankenship Decl. ¶
6; Suppl. Bilbao Decl. ¶ 10; Flores Decl. ¶ 4; Garcia Decl. ¶ 4.

## LEGAL STANDARD

The Court should grant a preliminary injunction if Plaintiffs establish: (1) "a
substantial likelihood of success on the merits," (2) "that the preliminary injunction is
necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the
harm the preliminary injunction would cause the other litigant[s]," and (4) "that the
preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP
Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

### A. Denial of Access to Counsel Violates Detained Plaintiffs' First Amendment Rights.

Defendants have imposed significant and unreasonable barriers to attorney access
to detainees held at Alligator Alcatraz, in violation of the First Amendment.
Incarcerated people have a "First Amendment free speech right to communicate with
[their] attorneys . . . ." *Al-Amin*, 511 F.3d at 1334. *See also DeLoach v. Bevers*, 922 F.2d
618, 620 (10th Cir. 1990); *Lashbrook v. Hyatte*, 758 F. App'x 539, 541 (7th Cir. 2019).
A restriction that "interferes with protected communications, strips those protected
communications of their confidentiality, and accordingly impinges upon [detainees']
right to freedom of speech." *Al-Amin*, 511 F.3d at 1334 (quoting *Jones v. Brown*, 461
F.3d 353, 359 (3d Cir. 2006)).

Detained individuals have a First Amendment right to communicate with their
attorneys in confidence. "The ability to maintain confidentiality in attorney-client
communications is an important component of the [First Amendment] right to obtain
legal advice." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000). Prisoners have a
First Amendment right to communicate confidentially with attorneys by mail. *Al-
Amin*, 511 F.3d at 1333–34. The same principle applies to confidential phone
communication with attorneys. *Williams v. Price*, 25 F. Supp. 2d 623, 630 (W.D. Pa.
1998); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) ("[f]orcing
prisoners to conduct their meetings with attorneys in the open or to yell over the phone
obviously compromises the consultation," since "[d]etainees might be hesitant to
disclose names and information relevant to the attorney's investigation and necessary
to the advice sought"). *See also Mitchell v. Peoples*, 10 F.4th 1226, 1230 (11th Cir. 2021)
("inmates and pretrial detainees" are entitled to "the protection of uninhibited,
confidential communications with their attorneys") (cleaned up, citations omitted).

Attorney access restrictions at Alligator Alcatraz lack any reasonable relation to
legitimate governmental interests. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987).[4]
Immigrant detainees are civil detainees held pursuant to civil immigration laws, not

---

[4] Under *Turner*, courts examine whether the prison's restriction on communication is "reasonably
related to legitimate penological interests" using four factors: (1) whether there exists "a valid,
rational connection between the prison regulation and the legitimate governmental interest put
forward to justify it," (2) "whether there are alternative means of exercising the right that remain
open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will
have on guards and other inmates, and on the allocation of prison resources generally," and (4) "the
absence of ready alternatives" to the prison regulation. *Turner*, 482 U.S. at 89-91 (quotation marks
and citations omitted).

criminal laws, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), so the "legitimate penological interests" that apply to convicted prisoners are not relevant here. *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) ("Penological interests are interests that relate to the treatment (including punishment, deterrence, rehabilitation . . .) of persons convicted of crimes."); *Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004); *In re Kumar*, 402 F. Supp. 3d 377, 383-84 (W.D. Tex. 2019).

Protecting detainees' ability to speak confidentially with attorneys promotes—rather than undermines—the government's objectives. *See Al-Amin*, 511 F.3d at 1331, 1333; *see also Wells v. Tucker*, No. 4:10cv411, 2012 WL 1538366, at *5 (N.D. Fla. Feb. 15, 2012 ("there is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment") (internal quotation marks and citations omitted); *Johnson v. Galli*, 596 F. Supp. 135, 138 (D. Nev. 1984) (similar). Furthermore, "providing inmates with confidential reliable means of communication with their attorneys about grievances 'releases tension in the prisons and itself advances the state interest in maintaining institutional order and security.'" *Al-Amin*, 511 F.3d at 1330 (quoting *Bieregu v. Reno*, 59 F.3d 1445, 1457 (3d Cir. 1995)).

The restrictions to attorney access at Alligator Alcatraz are not rationally related to interests such as "maintaining order and security" at the facility. Placing detainees in cages that are not soundproofed for confidential videoconferences, with staff in earshot throughout the call, supports no legitimate governmental purpose. Likewise, a failure to provide unmonitored, outgoing legal calls has little rational relationship to

14

maintaining order and security, particularly as such phones are required to be provided
in detention facilities nationwide. A policy that requires attorneys to attach documents
to be shown in a legal visit for review by the facility has no relationship to order and
security, and also blatantly violates attorney-client privilege, "the oldest of the
privileges for confidential communications known to the common law." *Upjohn Co. v.
United States*, 449 U.S. 383, 389 (1981) (citation omitted). Nor is there any reasonable
relationship between a prohibition on detainees' ability to bring documents to virtual
legal visits and maintaining order and security in a facility. The publication of attorney
access guidelines to detainees and the public, as well as detainee locator information
is a routine practice, and widespread understanding of facility protocols and a
detainee's location would only help to promote order and security. There is no security
interest in a prolonged delay for scheduling attorney visits, nor are such delays orderly.

Moreover, there are "alternative means of exercising the right." *See Turner*, 482
U.S. at 90–91 (holding that "if an inmate claimant can point to an alternative that fully
accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a
court may consider that as evidence that the regulation does not satisfy the reasonable
relationship standard."). Here, there are clear alternative means to ensure attorney-
detainee contact in compliance with the First Amendment, of which Defendants are
aware. For example, Defendants suggest the existence of a Visitation Policy that is
applicable to the facility. Saunders Decl. ¶ 45, Doc. 57; Saunders Decl. Ex. 10 at 272
(watermarked with "DRAFT"). This Draft Visitation Policy outlines many of the very
practices that Plaintiffs seek. For example, the Draft Visitation Policy requires the

publication of a handbook that "include[s] comprehensive visitation rules and schedules" "conspicuously posted in detainee housing units and common areas to ensure accessibility"; and "visitation schedules, rules, and procedures . . . readily available to the public." *Id*. at 272. The Visitation Policy also includes protocol for "Visits by Legal Representatives and Legal Assistants" that requires "detainees to meet privately with their current or prospective legal representatives . . . during legal visitation hours." *Id.* at 274. The draft policy includes provisions for legal visits "seven days per week . . . with minimum visitation hours of eight hours on regular business days;" and requirements that the facility "provide private consultation rooms to ensure confidentiality during legal visits." *Id.* It also requires that the facility "permit the exchange of documents between detainees and legal representatives, even if contact visitation rooms are unavailable," where "[d]ocuments will be inspected but not read." *Id.* at 275.

In addition, ICE has promulgated guidelines to ensure detainee access to legal representation. Federal immigration detention standards require that detainees have access to confidential communication with counsel. ICE's Performance Based National Detention Standards require in-person legal visits, Standard 5.7.V.J–K; require private, unmonitored legal calls, Standard 5.6.V.F; and bar staff from reading written communications to or from legal counsel, Standard 5.1.II.8.[5] Provision of

---

[5] U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011* (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/UD3R-PTXU].

attorney access instructions is also required by detention standards. ICE's
Performance Based Detention Standards requires that each newly-admitted detainee
be given a copy of the ICE National Detainee Handbook.[6] The ICE National Detainee
Handbook, in turn, includes a section on "Communicating with Family, Friends, and
Legal Representatives," which provides information on placing unmonitored calls to
lawyers, the mail system, placing calls to attorneys, and in-person visits with attorneys
and paralegals, and specifies that detainees should also check the facility's local rules.[7]
This section also specifies that "your . . . legal representatives . . . may be trying to
locate you. They can find you through the Online Detainee Locator System."[8]

ICE's "Legal Access in Detention" factsheet also outlines the specific ways in
which ICE's detention standards provide for attorney access.[9] These standards provide
for in-person and videoconference legal visits, confidentiality of communication,
exchange of legal documents, the provision of unmonitored outgoing legal calls,
exchange of legal documents, and legal mail. *Id.* These standards "offer an example of
less restrictive alternative measures" that Defendants could have—but did not—take

---

[6]     U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*
56 (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf
[https://perma.cc/UD3R-PTXU].
[7] U.S. Immigration and Customs Enforcement, *National Detainee Handbook* 9–12 (2024)
https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf [https://perma.cc/W3PQ-
K27B].
[8]     U.S. Immigration and Customs Enforcement, *National Detainee Handbook* 10 (2024)
https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf [https://perma.cc/W3PQ-
K27B].
[9] U.S. Immigration and Customs Enforcement, *Legal Access in Detention at a Glance* (2021),
https://www.ice.gov/doclib/detention/LegalAccessAtAGlance.pdf [https://perma.cc/9P9G-
3HPF].

to protect attorney access. *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (finding that ICE's "fail[ure] to comply with ICE's own Detention Standards related to confidentiality . . . supports that these restrictions and conditions are punitive since there are less restrictive alternatives"); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp.3d 1036, 1065 (C.D. Cal. 2019) (finding allegations of attorney access not in compliance with ICE's detention standards stated a Fifth Amendment claim).

### B. Denial of Access to Counsel Violates the First Amendment Rights of Organizational Plaintiffs.

The Defendants' ban on attorney-client communication also violates the First Amendment rights of the Organizational Plaintiffs. Organizational Plaintiffs are legal service organizations and law firms whose mission is to provide immigration legal services to immigrants, including people in detention, and represent clients at Alligator Alcatraz. Second Suppl. Blankenship Decl. ¶ 2; Suppl. Bilbao Decl. ¶ 2.

The First Amendment protects a lawyer's ability to advise people of their legal rights and solicit prospective litigants. *NAACP v. Button*, 371 U.S. 415, 428-29 (1963). For legal service organizations, "litigation is not a technique of resolving private differences; it is a form of political expression and political association." *In re Primus*, 436 U.S. 412, 428 (1978) (quotation marks and citation omitted). In *Jean v. Nelson*, the Eleventh Circuit upheld the "purely legal claim" brought under the First Amendment by Plaintiff Haitian Refugee Center to be able to speak with potential clients in immigration detention, holding that "if *Button* and *Primus* mean anything they permit

18

legal counsel to inform individuals of their legal rights when counsel does so as an
exercise of political speech unaccompanied by expectation of renumeration." 711 F.2d
1455, 1508-09 (11th Cir. 1983), *on reh'g,* 727 F.2d 957 (11th Cir. 1984), *aff'd,* 472 U.S.
846 (1985); *see also Haitian Refugee Ctr. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1982)
(holding that "*Button* and *In re Primus* recognize a narrow First Amendment right to
associate for the purpose of engaging in litigation as a form of political expression.").

Policies or actions that unreasonably impede communication between attorneys
and detained people violate attorneys' First Amendment rights. *See Jean*, 711 F.2d at
1508-09; *see also Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974) (holding that both
counsel and an incarcerated person "derive[] from the First and Fourteenth
Amendments a protection against unjustified governmental interference with the[ir]
intended communication." (citations omitted)); *Haitian Ctr. Council v. Sale*, 823 F.
Supp. 1028, 1040 (E.D.N.Y. 1993) (denial of legal advocacy group's access to Haitian
detainees at Guantanamo Bay violates the group's speech and associational rights).
The First Amendment's protections extend to all stages of communication between
attorneys and detainees, including prior to representation. *See, e.g.*, *ACLU Fund of Mich.
v. Livingston Cnty.*, 796 F.3d 636, 644-45 (6th Cir. 2015); *Immigr. Defs. L. Ctr. v.
Mayorkas*, No. CV 20-9893 JGB (SHKx), 2023 WL 3149243, at *35 (C.D. Cal. Mar.
15, 2023).

As detailed above, Defendants have unreasonably restricted attorneys' ability
to meet with retained and prospective immigrant clients. Organizational Plaintiffs
have provided significant evidence that they have been unable to meaningfully and

confidentially communicate with their retained and prospective clients. *See, e.g.*, Second Suppl. Blankenship Decl. ¶¶ 4, 6–15; Gonzalez Decl. ¶¶ 4–7; Suppl. Bilbao Decl. ¶¶ 6-26.

Defendants, who are government officials, unreasonably interfere with Organizational Plaintiffs' First Amendment rights, and can offer no explanation as to how the abridgment of the right to counsel is "reasonably related to legitimate penological interests" so as to justify overriding the First Amendment rights of the Organizational Plaintiffs. *Turner*, 482 U.S. at 89-91; *see also Pesci v. Budz*, 935 F.3d 1159, 1166 (11th Cir. 2019) (modifying *Turner* standard for civil detainees). Accordingly, because Organizational Plaintiffs are likely to prevail on their claim that their First Amendment rights have been violated, a preliminary injunction should issue.

## II.    Defendants' Denial of Access to Counsel Causes Plaintiffs Irreparable Harm.

The restrictions Defendants have placed on the Plaintiffs and the proposed class have caused them irreparable harm. "Delays and substantially restricted access to counsel" in immigration detention facilities "pose irreparable harm . . . in the absence of preliminary injunctive relief." *S. Poverty L. Ctr.*, 2020 WL 3265533, at *32. Defendants' attorney access restrictions also place the Organizational Plaintiffs' clients at risk of irreparable harm, which suffices for their own First Amendment harm. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *FF Cosmetics*

*FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (same); *Gayle v. Meade,* 614 F. Supp. 3d 1175, 1205 (S.D. Fla. 2020) (the "*alleged* violation of a constitutional right ... triggers a finding of irreparable harm.") (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d. Cir. 1996) (emphasis in original); *see also BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury" to a business) (quotation marks and citation omitted).

Plaintiffs' evidence of "past violations create a cognizable danger of future violations," meaning that even if Defendants claim that they plan to cease their infringement on Plaintiffs' rights, this "mere discontinuance of infringing conduct does not render injunctive relief inappropriate . . . ." *Lutrario v. City of Hollywood, Fla.*, 683 F. Supp. 3d 1361, 1371 (S.D. Fla. 2023) (cleaned up). This risk of future harm is at its peak for the First Amendment claims in this case, as "even the briefest infringement of a First Amendment right constitutes irreparable injury." *S.D. v. St. Johns Cnty. Sch. Dist.*, 632 F. Supp. 2d 1085, 1096 (M.D. Fla. 2009) (rejecting the government's argument that "at the time relief was sought, the remedy Plaintiffs seek . . . was already in place").

Because the harms to the Plaintiffs and the proposed class are substantial, ongoing, and imminent, this Court should find that Plaintiffs have demonstrated the requisite irreparable harm for a preliminary injunction.

## III.    The Balance of Equities and the Public Interest Weigh Heavily in Plaintiffs' Favor.

The balance of equities and public interest weigh strongly in favor of Plaintiffs and the proposed class. "Where the government is the opposing party, balancing of the harm and the public interest merge." *Gayle*, 614 F. Supp. 3d at 1206 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs and the proposed class face irreparable harm to their constitutional rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Gayle*, 614 F. Supp. 3d at 1206 (citing *Fraihat v. ICE*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020). Where "the plaintiffs are likely to succeed on their [First Amendment] claims, the balance of equities and the public interest favor injunctive relief." *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F. 4th 1075, 1098 (9th Cir. 2022)). Conversely, "it is always in the public interest to protect First Amendment liberties." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (quoting *Joelner v. Vill. of Washington Park,* 378 F.3d 613, 620 (7th Cir. 2004)).

Defendants have no legitimate interest in restricting attorney access at Alligator Alcatraz. This is evident because DHS Defendants are readily able to provide attorney access at other ICE detention facilities and Florida Defendants are readily able to provide it in their prison system. ICE, *Performance Based National Detention Standards 2011*, 360, 389–91, 398–401 (Rev. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/UD3R-PTXU] (providing confidential visits, telephone calls, and mail at ICE detention centers); Fla. Admin.

Code R. 33-210.102(2)(c)-(e), (8)(d), 33-602.205(3)(a), 33-601.711(5) (providing private attorney visits, unmonitored legal calls, and confidential legal mail in Florida state prisons). The burden on a governmental agency is minimal when an injunction imposes attorney access requirements that are "no more than what is required by" the agency's own regulations. *S. Poverty L. Ctr.*, 2020 WL 3265533, at *33. Similarly, Defendants have no legitimate interest in depriving people held at Alligator Alcatraz of consideration of motions to redetermine custody or bond that are guaranteed by federal statute and regulation. *See* 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 1003.19(a).

Here, Plaintiffs would suffer irreparable harm without preliminary relief. Defendants, on the other hand, will be minimally burdened. Even if the injunction were granted, the government would be able to carry out all detention functions. The only thing the government would be prevented from is denying access to counsel and bond hearings to Plaintiffs and the putative class, which is not an authorized function.

## IV.    The Court Should Not Require Plaintiffs to Provide Security Before Issuing a Preliminary Injunction.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Decisions regarding the security required to be posted in connection with the issuance of preliminary relief "are entrusted to the discretion of the district court," including the discretion to "elect to require no security at all." *Transcon. Gas Pipe Line Co., LLC v.*

*6.04 Acres*, 910 F.3d 1130, 1171 (11th Cir. 2018) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978)). District courts exercise this discretion to require no security in cases brought by indigent, detained, and/or incarcerated people, those seeking to exercise their constitutional rights, and in cases that benefit the public interest. *See, e.g. Campos v. I.N.S.,* 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998); *Cruz v. Dudek*, No. 10-23048-CIV, 2010 WL 4284955, at *16 (S.D. Fla. Oct. 12, 2010), report and recommendation adopted sub nom. *Cruz v. Arnold*, No. 10-23048-CIV, 2010 WL 11601831 (S.D. Fla. Nov. 24, 2010); *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009); Wright & Miller, Fed. Practice & Proc. § 2954. This court should do so here.

## CONCLUSION

For the aforementioned reasons, Plaintiffs' Motion should be granted.


Dated: September 11, 2025                Respectfully Submitted,

                                         */s/ Eunice H. Cho*\*

Paul R. Chavez (Fla. Bar No. 1021395)    Eunice H. Cho\*\*
Christina LaRocca (Fla. Bar No.          AMERICAN CIVIL LIBERTIES
1025528) AMERICANS FOR                   UNION FOUNDATION
IMMIGRANT JUSTICE                        915 15th St. N.W., 7th Floor
2200 NW 72nd Ave                         Washington, DC 20005
P.O. Box No 520037                       202-548-6616
Miami, FL 33152                          echo@aclu.org
786-218-3381
pchavez@aijustice.org
clarocca@aijustice.org                   Corene T. Kendrick\*\*
                                         Kyle Virgien\*\*
                                         Marisol Dominguez-Rodriguez\*\*
Amy Godshall, Fla. Bar No. 1049803       AMERICAN CIVIL LIBERTIES
Daniel Tilley, Fla. Bar No. 102882       UNION FOUNDATION
                                         425 California Street, Suite 700

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
786-363-2714
agodshall@aclufl.org
dtilley@aclufl.org

San Francisco, CA 94104
(415) 343-0770
ckendrick@aclu.org
kvirgien@aclu.org
mdominguez-ruiz@aclu.org
*Counsel for All Plaintiffs and the Proposed Class*

*Designated as Lead Counsel for Plaintiffs and the Proposed Class
**Admitted pro hac vice.*

25