**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

H.C.R., D.G.M., and H.P., *on behalf of themselves and all others similarly situated*,

Plaintiffs,

*v.*

Case No 2:25-cv-00747-SPC-DNF

KRISTI NOEM, *Secretary of the United States Department of Homeland Security, et al.*,

Defendants.

**THE STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendants Ron DeSantis, in his official capacity as Governor of the State of Florida, Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management, and the Florida Division of Emergency Management (State Defendants), respond in opposition to Plaintiffs' Motion for Preliminary Injunction. (Motion) (ECF 115).

## INTRODUCTION

This case is about whether civil detainees at the Alligator Alcatraz facility are receiving constitutionally sufficient access to legal counsel. They are and have been since before Plaintiffs filed this lawsuit. Indeed, Plaintiffs acknowledge the meetings, but claim that delays in receiving them and the Facility's minimal security restrictions continue to violate the First Amendment. And they incorrectly

insist that the First Amendment demands that the State Defendants provide even more accommodations for detainees and their attorneys.

In reality, the State Defendants are providing timely and confidential meetings between detainees and their attorneys that fully comply with the First Amendment. Indeed, the State Defendants have continued to grant every request for a detainee to meet with legal counsel since the meetings began on July 15. The Facility has not received a single complaint from detainees about the meetings. All restrictions on those meetings are reasonable and promote security at the Facility. And the First Amendment does not require the State Defendants to accede to Plaintiffs' additional excessive demands. Plaintiffs, as a result, do not meet their high burden for a mandatory preliminary injunction. Accordingly, the Court should deny Plaintiffs' Motion.

## BACKGROUND

On June 23, 2025, the State of Florida began constructing a temporary immigration detention facility on a portion of the Dade-Collier Training and Transition Airport to temporarily house illegal aliens from Florida and surrounding states. The Facility, known as Alligator Alcatraz, began accepting detainees on July 3, 2025, and can house up to 3,000 detainees. Supplemental Declaration of Mark Saunders ¶¶ 8-9.

The State of Florida operates the Facility under authority conferred by the Florida Emergency Management Act, chapter 252, Florida Statutes, and Executive Order 23-03. The Florida Division of Emergency Management (FDEM) directs

construction and maintenance of the Facility. With respect to the detention and custody of aliens at the Facility, FDEM coordinates with state law enforcement agencies that act pursuant to agreements with U.S. Immigration and Customs Enforcement (ICE) under section 287(g) of the Immigration and Nationality Act. *Id.* ¶ 5. Under these agreements, ICE delegates to Florida law enforcement agencies, which are subject to ICE supervision, the authority to maintain custody of the aliens. *Id.* ¶¶ 6-7.

After overcoming initial logistical delays associated with standing up a temporary detention center, the State Defendants began arranging meetings between detainees and their counsel. The Facility held the first videoconference meeting on July 15, 2025 – two days before Plaintiffs filed this suit – and the first in-person meetings on July 28, 2025. *Id.* ¶¶ 34-35. Since the first meetings on July 15, detainees and their counsel have had videoconference meetings almost every day, except on Sundays, although Sunday meetings are available upon request. *Id.* ¶ 57. Indeed, the State Defendants have granted every single request for a meeting with counsel. *Id.* ¶ 36. And not a single detainee or attorney has complained or raised an issue with the meeting process to the State Defendants. *Id.* ¶ 37.

Nonetheless, on July 17, 2025, five individual detainees and four legal organizations filed a class action complaint in the United States District Court for the Southern District of Florida on behalf of all current and future detainees. ECF 1. Plaintiffs also filed a motion for an expedited temporary restraining order and preliminary injunction and a motion for class certification. ECF 5 & 6.

After a scheduling conference, Plaintiffs filed a supplemental class action complaint (ECF 28), a renewed motion for preliminary injunction (ECF 29), and renewed motion for class certification (ECF 30). The parties briefed the renewed motion for preliminary injunction and the Court held a hearing on August 18, 2025. ECF 84. The Court transferred the case here for improper venue. ECF 86.

After a scheduling conference to reset case deadlines, Plaintiffs filed their Amended Complaint (ECF 113), Motion for Class Certification (ECF 114), and Motion for Preliminary Injunction (ECF 115). The Amended Complaint pleads four counts under the First Amendment, two against the Federal Defendants (Counts I and III) and all four (Counts I-IV) against the State Defendants.

## LEGAL STANDARDS

To obtain a preliminary injunction, a plaintiff must demonstrate "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden,* 742 F.3d 1267, 1271 (11th Cir. 2014). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir.

1983) (internal quotation marks omitted). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo . . . is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).[1] In other words, "the burden on the moving party increases" when seeking a mandatory injunction, and Plaintiffs "bear[] a heightened burden of demonstrating entitlement to preliminary injunctive relief." *Walker v. Helton*, 2023 WL 12007423, at *1 (M.D. Fla. Nov. 13, 2023). Thus, "[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation modified).

## I. Plaintiffs are not likely to succeed on the merits against the State Defendants.

The analysis begins with the first prong because if a plaintiff cannot show a substantial likelihood of success on the merits, the court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care v. 1-800 Contacts*, 299 F.3d 1242, 1247 (11th Cir. 2002). That said, a court cannot grant a preliminary injunction unless plaintiff satisfies *all* requirements. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

### A. *The State Defendants are complying with the First Amendment.*

Although the Supreme Court has recognized that inmates and detainees retain some First Amendment rights, *see Pell v. Procunier*, 417 U.S. 817 (1974), it

[1] The *Martinez* decision is binding in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

has also recognized that those rights are subject to reasonable restrictions, *see, e.g.*, *Turner v. Safley*, 482 U.S. 78 (1987); *Thornburgh v. Abbott,* 490 U.S. 401 (1989).

1. **The First Amendment permits reasonable restrictions in the prison and civil detention contexts.**

The Supreme Court has recognized that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85. These "[s]eparation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate prison authorities." *Id*. Thus, prison officials are "accorded latitude in the administration of prison affairs." *Cruz v. Beto,* 405 U.S. 319, 321 (1972). In doing so, the Court recognizes that "courts do not sit as super-wardens," *Pesci II* at 1166, and thereby ensures that prison officials, rather than judges, will "make the difficult judgments concerning institutional operations," *Turner*, 482 U.S. at 89 (quotation omitted).

Consistent with this policy of judicial restraint and deference to prison authorities, the Supreme Court has made clear that prison regulations or policies that "imping[e] on inmates' constitutional rights" are valid if "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The Supreme Court has identified four factors "that are relevant to, and that serve to channel, the reasonableness inquiry." *Thornburgh*, 490 U.S. at 414. They are:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right

> that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Pope v. Hightower*, 101 F. 3d 1382, 1384 (11th Cir. 1996) (quoting *Turner,* 482 U.S. at 89-91). Plaintiffs challenging prison regulations bear the burden to prove that the regulation or policy is unreasonable. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it").

The *Turner* test and its emphasis on judicial deference applies to lawsuits challenging policies in civil detention facilities. *Pesci v. Budz* (*Pesci II*), 935 F.3d 1159, 1165 (11th Cir. 2019). The Supreme Court has slightly modified the standard to "reflect the salient differences between civil detention and criminal incarceration." *Pesci v. Budz* (*Pesci I*), 730 F.3d 1291, 1297 (11th Cir. 2013). Specifically, the analysis applicable to civil detention facilities recognizes that civil detention, unlike prisons, "is purely rehabilitative, it is not a form of punishment." *Pesci II*, 935 F.3d at 1166.[2] Thus, "the range of legitimate governmental interests is narrower here than it is in a prison context." *Pesci I*, 730 F.3d at 1297.

Nonetheless, "institutional order, safety, and security" remain paramount in the civil detention context. *Pesci II*, 935 F.3d at 1166 (internal marks omitted). Thus, apart from the narrowed universe of justifications, *Turner* and its progeny

---

[2] The "rehabilitative" aspect does not apply to immigration detention, but the outcome – treating regulations akin to prison regulations – is the same because the Supreme Court has made clear that immigration detention is "civil, not criminal." *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001).

govern all policies at the Facility. *Id.* (noting that although persons "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals," this fact does not warrant further departure from *Turner*) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)).

2. **The Facility's policies provide detainees timely and confidential access to their legal counsel.**

The Facility's policies ensure detainees are timely and confidentially meeting with their attorneys while imposing only minimal, common-sense restrictions on that access to ensure safety and security.

**A.** The State Defendants make it easy for attorneys to schedule a meeting with detainees. Attorneys request a meeting by sending an e-mail to the Facility's legal inbox. Suppl. Decl. ¶ 15. Staff at the Facility respond by providing a Legal Counsel Visitation Request Form (Visitation Form) and a Department of Homeland Security "Notice of Entry of Appearance as Attorney or Accredited Representative" (G-28) Form for the attorney to fill out and return. *Id.* ¶ 20, Exs. 3-4. The Visitation Form asks for the counsel's name, bar number, contact information, as well as the client's name and inmate number, and the requested date, time, and purpose of the meeting. *Id.* ¶ 21. The G-28 Form asks for additional information about the attorney, contact information for the detainee, and the client's consent to be represented by that attorney. *Id.* After the attorney fills out and returns the forms, he may request a meeting with a detainee via videoconference or in person at specific times. *Id.*¶ 24.

**B.** Contrary to Plaintiffs' claim, the Facility does not require that attorneys "submit requests three business days in advance to visit clients in person at the [F]acility." Am. Compl. ¶ 5. Instead, Facility staff members quickly and timely respond to attorneys' emails and make every reasonable effort to accommodate the first requested meeting time. *Id.* ¶¶ 27-30. Staff also makes every effort to accommodate urgent requests for an emergency meeting to meet a specific deadline (e.g., filing or appeal deadlines). But regardless of how the request is framed, staff routinely schedule meetings within 24 hours of the attorney's first request, and the Facility has even scheduled meetings on the same day that an attorney submitted his or her request. Suppl. Decl. ¶¶ 17-18, 29.

**C.** In addition, all meetings between detainees and their attorneys are confidential. All meetings take place in private rooms without staff present that are located away from other detainees. *Id.* ¶ 44. The Facility has four separate private rooms for videoconference and in-person attorney meetings. *Id.* ¶¶ 38. Only detainees and their counsel use these rooms. *Id.* ¶¶ 39-40. Indeed, the State Defendants require foreign consular officials visiting the Facility to use separate conference rooms when meeting with their citizens to keep the meeting rooms available for detainees and their attorneys. *Id.* ¶ 48.

Videoconference meetings are invite-only. Facility staff provide the attorneys a dedicated link to the videoconference platform via e-mail when they schedule the meeting. *Id.* ¶ 51. Counsel can also use interpreters to assist in communicating with the detainee. The interpreter receives the link for the

videoconference via e-mail after filling out and returning the G-28 Form. *Id.* ¶ 54. No one can access the videoconference without that link. *Id.* ¶ 51.

Detainees sit at tables and use laptop computers with the Zoom application and over-the-ear headphones to see and speak with their attorney(s). *Id.* ¶ 52. The videoconferences are not recorded or transcribed, and there are no cameras inside or outside of the meeting rooms that can capture images on the computer screen. *Id.* ¶ 53. Facility staff sit in chairs outside the room's closed door for security purposes, but they are neither close enough to see images on the computer screen nor hear the detainees' conversations with their attorneys. *Id.* ¶ 46. Exhibit 9 includes pictures of meeting rooms and the location of staff during the meetings.

Attorneys arriving at the Facility for in-person meetings undergo security screening before entering the Facility. *Id.* ¶ 41. Facility security staff perform a basic pat-down and inspect the attorneys' personal belongings for contraband. *Id.* Staff does not read any documents or inspect any electronic devices in the attorneys' possession. *Id.*

During in-person meetings, just as with videoconferences, Facility staff sit in chairs outside the room to protect the participants. Staff cannot hear the conversations or see any documents exchanged between the detainee and his attorney during the meetings. *Id.* ¶ 46. The Facility has security cameras outside of the meeting rooms, but none inside of the rooms, to monitor the meetings for the safety of all parties. The cameras do not record audio and cannot capture the

contents of any documents being exchanged. *Id.* ¶ 47. Attorneys may also bring an interpreter to in-person meetings with detainees. *Id.* ¶ 42.

**D.** Contrary to Plaintiffs' claims, the Facility provides confidential documents to and from attorneys and their clients. The Facility uses a courier service that will deliver to detainees any documents their attorneys provide. Facility staff inspect the documents for contraband in the presence of the detainee(s) but do not read or otherwise inspect their contents. *Id.* ¶ 63. And, again contrary to Plaintiffs' claims, detainees may bring these documents to their in-person meetings and thereafter either keep them for personal use or sign and provide them to their attorneys. *Id.* ¶ 69. *Contra* Motion at 10-11.

**E.** Facility staff installed posters throughout the Facility with the protocols for requesting and obtaining meetings with attorneys. Suppl. Decl. ¶ 73, Ex. 10. Staff also regularly provide this and other similar information provided by ICE directly to detainees. This includes forms allowing detainees to voluntarily leave the country, but Facility staff do not pressure to sign the forms. Suppl. Decl. ¶ 75. *Contra* Am. Compl. ¶ 10. Staff keep detailed records of the information they provide to detainees, which the Facility maintains in weekly reports. Suppl. Decl. ¶ 74, Ex. 11. Florida and ICE officials jointly conduct regular inspections of the Facility to ensure that it complies with federal and state law and to correct any deficiencies. *Id.* ¶ 76.

**F.** Last, since the Facility began holding meetings between detainees and their attorneys on July 15, 2025, the State Defendants have granted every request

for a meeting in the manner specified. In that time, the Facility has held approximately 298 videoconferences and 90 in-person meetings. *Id.* ¶¶ 49, 58. Outside of this litigation, no detainee or attorney has complained to Facility staff about any aspect of the meetings. *Id.* ¶ 55.

* * *

The above demonstrates that the State Defendants are timely scheduling and facilitating confidential meetings between detainees and their attorneys. Attorneys request meetings via email and Facility staff make every reasonable effort to accommodate the first requested time slot. Detainees meet with their counsel, whether via videoconference or in person, in private rooms without cameras or any form of recording. Facility staff provide security outside of the meeting rooms but do not – and cannot – listen to the conversations. Facility staff receive documents sent by attorneys and confidentially deliver them to the detainees, who may keep and bring them to meetings or return them to their attorneys. And staff routinely provide detainees information describing how to schedule meetings with attorneys. This is all – and arguably more than – the First Amendment requires.

3. **The Facility's procedures for legal access are reasonably related to ensuring the safety and security of detainees, attorneys, and staff.**

The Facility's rules for meetings between detainees and their attorneys are also reasonably related to the Facility's security concerns. And while nothing more is necessary, the rules are in fact narrowly tailored and essential to maintaining security at the Facility.

**A.** First and foremost, the Facility's restrictions are "rationally connected" to ensuring security in the Facility for detainees and staff. This factor is the most important of the four and "must be satisfied if the policy is to survive." *Pesci II*, 935 F.3d at 1167.

To satisfy this prong, the State Defendants need not produce "specific evidence of a causal link between a prison policy and actual incidents of violence." *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 968 (11th Cir. 2018) (citation modified) (quoting *Lawson v. Singletary*, 85 F.3d 502, 513 n.15 (11th Cir. 1996)). In fact, "[r]equiring proof of such a correlation constitutes insufficient deference to the judgment of the prison authorities with respect to security needs." *Lawson*, 85 F.3d at 513 n.15. Instead, "prison officials must be able to '*anticipate* security problems and . . . adopt innovative solutions' to those problems to manage a prison effectively." *Prison Legal News*, 890 F.3d at 968 (quoting *Turner*, 482 U.S. at 89).

The Facility's minimal restrictions on the meetings between detainees and their counsel are the epitome of "reasonable" steps to forestall security problems. The Facility's requirement that attorneys provide documentation when scheduling meetings ensures that only legitimate, licensed attorneys are advising detainees on their legal rights to protect detainees from nefarious actors that could take advantage of the detainees or breach security of the Facility. *See Solomon v. Zant*, 888 F.2d 1579, 1581 (11th Cir. 1989) ("An inmate's right to access to the court is

not absolute. Likewise, restrictions on an inmate's access to counsel may be justified by security considerations."); Suppl. Decl. ¶ 22.

Similarly, the requirement that attorneys schedule meetings in advance ensures there is sufficient space for confidential meetings between detainees and counsel while also maintaining order and security at the Facility. Without such a requirement, attorneys could show up and demand a meeting at any time, potentially diverting staff and resources away from supervising the detainees and monitoring ongoing legal meetings. *See Lashbrook v. Hyatte*, 758 Fed. App'x 539, 541 (7th Cir. 2019) ("[T]he First Amendment does not mandate unrestricted and unlimited private contacts with counsel, and prisons may restrict prisoner contact with counsel so long as the restrictions reasonably relate to legitimate penological interests) (citation omitted).

Likewise, reviewing attorneys' materials upon entering the Facility prevents bad actors from introducing contraband and other materials that could harm detainees and staff. And placing cameras and Facility staff in or around the meeting rooms deters wrongful conduct and protects all detainees and visitors, while also ensuring a quick response to any violence or misconduct. *See Altmayer v. Sanford*, 148 F.2d 161, 162 (5th Cir. 1945) ("[R]reasonable restrictions may be imposed as to the time and place of consultation between an accused and his attorney without infringing constitutional rights.").

**B.** The second *Turner* factor asks whether, in spite of the Facility's restrictions, Plaintiffs have "alternative means of exercising" their asserted rights.

*Turner*, 482 U.S. at 90. "When considering this factor, the Supreme Court has instructed that the right must be viewed sensibly and expansively." *Pope*, 101 F.3d at 1385. Viewed sensibly and expansively, the right at issue here is Plaintiffs' right to meet with their legal counsel or their clients. Based on the record, this factor favors the State Defendants because Plaintiffs have multiple avenues to exercise these rights.

That is because none of the restrictions prevent detainees from meeting with their attorneys, or attorneys from meeting with their clients. *See Pesci II*, 935 F.3d at 1170 (finding policy did not violate this factor because Plaintiff "does not claim that [the prison] has otherwise restricted his ability to communicate his ideas and allegations"). They are simply minimal parameters on the exercise of that right. *See Turner*, 482 U.S. at 90 ("Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation."). And while it may be inconvenient for attorneys to fill out forms and submit to security screening before entering the Facility for a meeting, or for detainees to wait to meet with their attorneys, "*Turner* does not demand the ideal." *Prison Legal News*, 890 F.3d at 973 (noting that while [Plaintiff] was barred from distributing its monthly magazine to inmates, it could still send the inmates "a variety of books"). Indeed, the Supreme Court has "found adequate alternatives" even where prisoners are "cut off from unique and irreplaceable activities." *Prison Legal News v. Livingston*, 683 F.3d 201, 219 (5th Cir. 2012); *see Turner*, 482 U.S.

at 92 (regulation prohibiting communication between inmates at different prisons did "not deprive prisoners of all means of expression").

**C.** The third factor requires the Court to consider the impact that accommodating Plaintiffs' (hypothetical) asserted right would have on the Facility. Taking their hypothetical argument to its logical conclusion, Plaintiffs claim the Facility should not impose any requirements for counsel entering the Facility or restrictions on the meetings themselves. But allowing attorneys – and potentially many others without sufficient protective measures in place – unfettered access to detainees without proper scheduling would cause chaos. The Facility would likely not have sufficient staff to adequately process requests from visiting counsel to meet with detainees while also monitoring all ongoing meetings. And they certainly would not be able to protect all visitors and detainees if delays caused tempers to flare and disputes to arise between detainees or counsel. "When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90 (citation modified). So too here.

**D.** The final factor asks whether the Facility's restrictions are an "exaggerated response" to the Facility's security concerns. *See Pesci II*, 935 F.3d at 1171. They are not. Indeed, it is hard to imagine less-restrictive requirements and policies than general security and scheduling requirements, required forms, and staff monitoring. Moreover, these policies protect the detainees' interests and maintain order at the Facility. In any event, "prison officials do not have to set up

and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91.

Plaintiffs note, however, that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. And they point to the Facility's Legal Visitation Policy (Visitation Policy), which they claim provides "clear alternative means to ensure attorney-detainee contact in compliance with the First Amendment." Motion at 15.

But the Visitation Policy would neither "fully accommodate[] [Plaintiffs'] rights," nor impose merely a "*de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91. Plaintiffs claim the First Amendment requires the State Defendants to establish a legal mail system[3] at the Facility and provide telephones – separate from the confidential videoconference systems – for "free, confidential, unmonitored, and unrecorded outgoing legal calls." Am. Compl., Prayer for Relief (f). But the Visitation Policy does not provide for either. Thus, Plaintiffs' proposed alternative would not, under their own theory, "ensure attorney-detainee contact in compliance with the First Amendment." Motion at 15. Moreover, the financial cost of providing both alternatives would impose far more than a *de minimus* cost

[3] Moreover, the Facility already permits attorneys to send confidential legal mail to detainees via e-mail or courier service at the Facility's mailing address. Staff deliver the documents to detainees in confidential folders or pouches for the detainees review or signature. And staff will return signed documents back to the attorney at his or her request. Suppl. Decl. ¶¶ 61-62.

to the State Defendants' "penological interests" by taking money away from monitoring and protecting detainees, staff, and visitors. For both reasons, the Court cannot consider the Visitation Policy as "evidence that [the Facility's] regulation[s] do[] not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. Thus, this final factor also favors the State Defendants.

4. **Plaintiffs also make numerous incorrect claims.**

Plaintiffs minimize the Facility's robust procedures for legal access by dismissively labelling them as "last minute," "limited measures for attorney-client communication." Am. Compl. ¶¶ 3-4. Not only did the State Defendants begin preparing these procedures and conducting attorney-client meetings before Plaintiffs ever filed suit, but the above demonstrates that Plaintiffs are receiving timely and confidential access to counsel. Nonetheless, Plaintiffs maintain that the State Defendants are violating the First Amendment. Am. Compl. ¶ 10. Not so.

**A.** Foremost among Plaintiffs' complaints is that delays in scheduling meetings have denied detainees their First Amendment rights. Am. Compl. ¶ 6. To support their claims, Plaintiffs cherry pick a few seemingly egregious anecdotes and cast them as the norm for all detainees. But further review of the correspondence supports the State Defendants. Indeed, in each instance, the Facility timely responded to the attorneys and scheduled a meeting for the first available time. And any delays between an attorney's request and the subsequent meeting were the result of factors beyond the Facility's control, or because the attorney chose that specific date – not a delay by Facility staff.

For example, Plaintiffs claim that attorney Vilerka Bilbao e-mailed the Facility on August 6 requesting a meeting to prepare an appellate brief for her client, but did not receive a meeting until August 11 – one day after the brief deadline. Am. Compl. ¶ 52. In reality, Ms. Bilbao requested a meeting on August 8 or 11. Facility staff responded the same day and offered an in-person meeting on August 7, 8, or 9, or a videoconference on August 11. Ms. Bilbao responded and *chose* the videoconference on August 11. Suppl. Decl. ¶ 82(a), Ex. 19.

Similarly, Plaintiffs allege that Jose Flores, attorney for Plaintiff D.G.M., e-mailed a request for a videoconference on August 25, but "never received a response." Am. Compl. ¶ 52. That is true, but not because Facility staff ignored his request. Staff never received the request because the Facility's spam filter quarantined the e-mail after detecting a virus or malware threat. Suppl. Decl. ¶ 81(b). And staff did not know that the e-mail was quarantined because the software quarantines infected e-mails without the staff's knowledge and does not allow staff to open the quarantined emails. Suppl. Decl. ¶ 32. Mr. Flores has not followed up or inquired in the month since his request. If he does, and sends the e-mail from a safe account, the Facility will happily schedule a meeting at the first available time.

Last, Plaintiffs note that attorneys Johan Gutierrez and Mich Gonzalez each sent e-mails in late July requesting meetings, but did not receive one for six and four days, respectively. Am. Compl. ¶¶ 53 & 55.[4] Facility staff responded to both

[4] Mr. Gutierrez, however, had not provided his G-28 Form when he made his initial request. His first request after providing the required documents came two days later. Thus, in reality, the

attorneys' requests the same day they were sent, but could not schedule an immediate meeting because all meeting slots were reserved. Suppl. Compl. ¶¶ 77 & 82(b). Instead, staff scheduled both meetings for the first available slot. *Id.*

**B.** Similarly, Plaintiffs insist "that detainees cannot speak confidentially in legal videoconferences." Am. Compl. ¶ 56; Motion at 8-9. Wrong again. This claim relies entirely on anecdotes of videoconferences "in an open cage with other people in the vicinity," or "in a sort of tent with soft-sided, makeshift fabric walls and no roof." *Id.* But these anecdotes are from *July*, when the State Defendants were constructing the structures that detainees now use to meet with their attorneys. *See* Am. Compl. ¶ 56 and Motion at 9 ("As attorney Johan Gutierrez noted with respect to a July 29 videoconference . . ."); *id.* (recounting conditions during "legal videoconferences taking place on July 16 and July 23"). Now, the Facility has a separate building where detainees meet with their counsel – whether via videoconference or in-person – in separate, enclosed rooms, each with four walls, a door, and a roof. Suppl. Decl. ¶¶ 38-40, Ex. 9.

**C.** In addition, Plaintiffs allege a "pattern and practice of transferring detainees whose attorneys have requested in-person legal visits immediately prior to the scheduled visits." Am. Compl. ¶ 5. No such pattern or practice exists. If such a policy did exist, and the intent was to prevent meetings between detainees and their attorneys, why would the State Defendants facilitate and conduct more than

---

Facility scheduled meetings for both Mr. Gutierrez and Mr. Gonzalez within four days after submitting their complete requests.

100 meetings during the same period? Plaintiffs cite only three instances where Defendants allegedly transferred detainees on the eve of their scheduled meetings precisely to prevent them from taking place. *See* Am. Compl. ¶¶ 48-51. In all, these transfers prevented 32 meetings between detainees and their attorneys. *Id*. But in the same time frame (August 11-September 3, 2025), the State Defendant held 126 meetings. Suppl. Decl. ¶ 59. In other words, the State Defendants conducted 94 more meetings than they prevented through their alleged conspiracy. If their goal was to prevent legal access, the State Defendants did a poor job.

Moreover, the Amended Complaint notes that before one of the alleged conspiratorial transfers of detainees, an ICE officer called the detainees' attorney to suggest that he "wait" to visit his client at another immigration facility "because ICE had decided to transfer him from Alligator Alcatraz." Am. Compl. ¶ 51. But if Defendants were engaging in a conspiracy to prevent detainees from meeting with their attorneys, why would a federal officer call a detainees' attorney to facilitate a meeting – which ultimately occurred – at a more convenient location?

**D.** In addition, Plaintiffs allege that "attorneys are required to submit requests three business days in advance to visit clients in person in the [F]acility." Am. Compl. ¶¶ 5 & 47. This is wrong. Indeed, staff have repeatedly scheduled meetings on the same day that an attorney sent his or her initial e-mail request. Suppl. Decl. ¶ 29, Exs. 5-8. That could not occur if Plaintiffs' allegation was true.

**E.** Last, Plaintiffs claim the Facility requires attorneys to submit all documents they intend to bring to their meetings for staff approval. Am. Compl. ¶

8. Again, no such policy exists. Suppl. Decl. ¶ 41. Language to this effect appeared on the first iteration of the Visitation Form, but it was quickly removed and was never implemented. *Id.* It no longer appears on the Visitation Form. *Id.*, Ex. 3.

B. *The First Amendment does not entitle Plaintiffs to the additional relief they seek.*

Not only do Plaintiffs insist they are not receiving timely and confidential meetings with their counsel, but they claim the First Amendment demands even more. Specifically, they claim that the First Amendment requires State Defendants to (1) provide a confidential legal mail and courier service at the Facility; (2) publicly post written protocols regarding attorney access in English, Spanish, and Haitian Creole; (3) allow Plaintiffs to place free, confidential, unmonitored, and unrecorded outgoing legal phone calls; and (4) update the location of all detainees held at the Facility in the ICE Detainee Locator System within 24 hours of their inbound transfer. Am. Compl. ¶¶ 7, 9, 57, 58, 62, Prayer for Relief (f)-(h), (j).

But Plaintiffs do not cite a single case suggesting the First Amendment requires these additional steps. They cite cases suggesting that a detainee's First Amendment right to legal counsel includes the right to speak with that counsel confidentially. *See Lashbrook*, 758 F. App'x at 541. But Plaintiffs can already communicate confidentially with their attorneys via videoconference. Suppl. Decl. ¶¶ 52-53. As demonstrated above, the Facility neither monitors nor records the meetings, which take place in private, enclosed rooms beyond the earshot of Facility staff. *Id.* ¶¶ 46, 53. And none of the cases Plaintiffs cite suggests that all

phone calls must be confidential if detainees already have another method of communicating confidentially with their counsel, or that detainees must have multiple methods of confidential communication – which is what Plaintiffs demand here.

The remaining cases Plaintiffs cite for their extensive demands stand only for the general propositions that civil detainees have the right to meet with their attorneys, and attorneys have the free speech right to meet with their clients and solicit additional clients. *See In re Primus,* 436 U.S. 412 (1978); *NAACP v. Button,* 371 U.S. 415 (1963); *Jean v. Nelson,* 727 F.2d 957 (11th Cir. 1984).

Rather than cite caselaw to support their demands, Plaintiffs attempt to make much of the fact that the Facility's rules do not match the ICE Performance Based National Detention Standards. Am. Compl. ¶¶ 42-43; Motion at 16-18. But Plaintiffs do not bring a claim to enforce the Standards – if one is even cognizable. The Amended Complaint alleges only the State Defendants' policies violate the First Amendment. Plaintiffs do not cite a single case suggesting that the ICE Standards trace the outline of the First Amendment.

Instead, Plaintiffs cite only two cases regarding the ICE standards. But neither moves the needle in their favor because both analyze violations of ICE detention standards under the Fifth Amendment – not the First Amendment. *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.,* 2020 WL 3265533, at *14 (D.D.C. June 17, 2020); *Torres v. U.S. Dep't of Homeland Sec.,* 411 F. Supp.3d 1036, 1065 (C.D. Cal. 2019).

C. *The Plaintiffs' proposed class is not likely to be certified.*

Plaintiffs seek to certify a sweeping and ill-defined class consisting of "all persons who are currently, or in the future, held" at the Facility. ECF 114 at 2. The Court, however, has deferred consideration of Plaintiffs' pending motion for class certification. But "[a] court considering whether to issue preliminary injunctive relief must consider whether the movant is likely to succeed on the merits" of its claims. *A.A.R.P. v. Trump*, 605 U.S. 91, 106 n.3 (2025) (Alito, J., dissenting). Thus, "to consider whether a request for classwide relief is likely to succeed on the merits, a court must at least consider whether class certification is likely." *Id.* In other words, to obtain a preliminary injunction, Plaintiffs must demonstrate that they are likely to obtain certification. Even a cursory review of the class action allegations demonstrates they are not.

**A.** There is a presumption against class certification "because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods., Inc.*, 817 F. 3d 1225, 1233 (11th Cir. 2016). Thus, as the party seeking class certification, Plaintiffs "must affirmatively demonstrate [their] compliance" with Rule 23. *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). If this Court has doubts about whether "the requirements of Rule 23 have been met[,] [it] should refuse certification until they have been met." *Brown*, 817 F.3d at 1233-34 (quoting Fed. R. Civ. P. 23 Advisory Committee's note to 2003 amendment).

Moreover, Plaintiffs have a "burden of *proof*, not a burden of pleading." *Id.* at 1234. And district courts "must conduct a 'rigorous analysis' to determine whether the movant carried his burden, which will frequently entail overlap with the merits of the plaintiff's underlying claim.'" *Id.* (quoting *Comcast,* 569 U.S. at 33). Since this Court has deferred consideration of Plaintiffs' motion for class certification, it cannot perform the "rigorous analysis" required to certify a class before a preliminary injunction. And courts cannot grant classwide injunctive relief without certification. *See, e.g.*, *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs . . . [A] court may [not] grant relief to non-parties."); *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1349 (N.D. Ga. 2009).

But even if the Court conducted that analysis, it still could not certify a class of "all persons who are currently, or in the future, held" at the Facility because Plaintiffs do not come close to meeting their burden. Indeed, their claims rely on vague, conclusory, and self-serving declarations without any depositions or corroborating evidence. *See* ECF 114-1 to 114-9. Courts have consistently held Rule 23 demands competent evidentiary support, not speculation, generalizations, or rhetorical assertions. *See, e.g., Brown*, 817 F.3d at 1234; *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1196 (11th Cir. 2003).

**B.** To the extent the Court agrees that it needs additional time to conduct the required "rigorous analysis," or otherwise to "consider the class certification,"

Plaintiffs ask the Court to "provisionally" certify this class for purposes of the preliminary injunction hearing. They cite a few examples where district courts have done just that. *See Fla. Immigrant Coal. v. Uthmeier,* 780 F. Supp. 3d 1235 (S.D. Fla. 2025); *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 173 (D.D.C. 2015). But those courts made clear that "[i]n granting such provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met." *R.I.L-R*, 80 F. Supp. 3d at 179-80; *see Fla. Immigrant Coal,* 780 F. Supp. 3d at 1252. There is no Eleventh Circuit precedent for provisionally certifying a class for a preliminary injunction *without* conducting a "rigorous" Rule 23 analysis. Thus, for the same reasons the Court cannot fully certify the class, it cannot provisionally certify the class for purposes of a preliminary injunction.

**C.** Plaintiffs seek class certification under Rule 23(b)(2), which allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The Supreme Court made clear in *Wal-Mart v. Dukes* that "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (internal citation omitted). 564 U.S. at 360. In other words, Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each

member of the class." *Id.* The provision "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

The latter is the case here. Plaintiffs' claims vary widely in substance, duration, and cause. They are shaped by fact-specific and rapidly-evolving circumstances and discretionary decisions made by individual staff, immigration authorities, or outside actors. And the experiences of each putative class member will necessarily and manifestly vary case-by-case and over time. In other words, these are not issues that can be resolved in a "single injunction," "in one stroke," as required by *Dukes*. 564 U.S. at 350. Thus, Plaintiffs' claims are not appropriate under Rule 23(b)(2).

## II. Plaintiffs cannot show irreparable harm because they are timely and confidentially meeting with their attorneys.

The State Defendants have demonstrated that the Facility is scheduling and facilitating timely, free, and confidential videoconference and in-person meetings, as requested, subject to reasonable limits and restrictions to protect visitor and detainee safety. Suppl. Decl. ¶¶ 33-60. On these facts, Plaintiffs cannot meet their "heavy burden" to clearly demonstrate that they will suffer irreparable harm absent a preliminary injunction.

To show irreparable harm, the harm "must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Here,

Plaintiffs cannot show irreparable harm because the Facility is facilitating and approving every request by counsel to meet with detainees in their preferred format. Suppl. Decl. ¶¶ 28, 36. And there is no danger, much less an *imminent* danger, that the State Defendants will start refusing to schedule meetings because they adopted policies to ensure that access to counsel continues. *Id.* ¶ 13. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (denying injunctive relief "where there is no showing of any real or immediate threat that the plaintiff will be wronged again"). Indeed, "government actors receive the benefit of a rebuttable presumption that the offending behavior will not recur." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007). And "[t]he possibility of adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Jefferson Cnty.,* 720 F.2d at 1520. If the mere possibility of "adequate" relief weighs heavily against irreparable harm, then surely the fact that the State Defendants have already provided *actual* relief must foreclose it.

Plaintiffs, however, claim that the "mere discontinuance of infringing conduct does not render injunctive relief inappropriate" because evidence of "past violations create a cognizable danger of future violations." Motion at 21. But the State Defendants do not claim that temporarily scheduling meetings has foreclosed all injunctive relief. Rather, they argue that Plaintiffs cannot show that the State Defendants will imminently deny them access to counsel because they are timely scheduling confidential meetings between detainees and their attorneys, the

Facility has established policies to ensure such access continues, and the State Defendants are entitled to a rebuttable presumption that access will continue. And an injunction is an "equitable remedy [that] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged *again*." *Lyons,* 461 U.S. at 111 (emphasis added); *see also Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) ("[I]njunctions regulate future conduct only."). For that reason, Plaintiffs are not entitled to the "extraordinary and drastic remedy" of a mandatory preliminary injunction.

### III. The balance of equities does not support granting an expedited preliminary injunction where Plaintiffs are receiving their requested relief.

On the last factor, Plaintiffs fare no better. This response demonstrates that the State Defendants are scheduling and facilitating timely, free, and confidential meetings, as requested, subject to reasonable limits and restrictions to protect visitor and detainee safety. Suppl. Decl. ¶¶ 15-30, 36-47, 49-59, 62-76.

Courts recognize "the public interest in allowing the government discretion to carry out its authorized functions." *S. Poverty Law Ctr.*, 2020 WL 3265533, at *33. That includes the State Defendants operating the Facility and facilitating meetings with detainees and their counsel. And a preliminary injunction would only serve to install this Court as the "super warden" of Alligator Alcatraz and order the State Defendants to do what they are already doing. The Eleventh Circuit has made clear this arrangement would not serve the public interest. *See Pesci II*, 935

F.3d at 1166 (recognizing "courts do not sit as super-wardens"). Thus, Plaintiffs cannot show they are clearly entitled to a mandatory preliminary injunction.

Dated: September 25, 2025

Respectfully submitted,

/s/ *Nicholas J.P. Meros*

Francis A. Zacherl, III (FBN 868094)
Timothy W. Odzer (FBN 1020018)
Shiza Francis (FBN 1058470)
**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd, Suite 4100
Miami, Florida 33131
(305) 358-6300
FZacherl@shutts.com
TOdzer@shutts.com
SFrancis@shutts.com

Nicholas J.P. Meros (FBN 120270)
Tara K. Price (FBN 98073)
Kassandra S. Reardon (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
NMeros@shutts.com
TPrice@shutts.com
KReardon@shutts.com

*Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system on September 25, 2025.

/s/ *Nicholas J.P. Meros*
*Counsel for the State Defendants*