## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

H.C.R., et al.,

　　　*Plaintiffs,*

　　v.

KRISTI NOEM, et al.,

　　　*Defendants.*

Case No. 2:25-CV-00747-SPC-DNF

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

In the last three months, Defendants have rounded up thousands of immigrants on their way to work, in front of their churches, and in their homes, and transferred them to "Alligator Alcatraz," a temporary detention camp made of tents and barbed wire in the middle of the Florida Everglades. In their haste to fill this detention camp, Defendants have failed to ensure protection of basic constitutional rights, including the fundamental right of people held in government custody to communicate confidentially with legal counsel. Since the filing of this lawsuit, Defendants have reluctantly provided minimal avenues for attorney access to people detained at the facility. But attorney access at Alligator Alcatraz continues to fall far short of the constitutional norm. People detained at Alligator Alcatraz face restrictions to attorney-client communication that are far more severe than other immigration detention facilities, jails, and even prisons. Detainees at Alligator Alcatraz cannot place

confidential phone calls to their attorneys. Defendants have restricted in-person and virtual attorney visitation to the point where many detainees are never able to meet with counsel while held at the facility. Defendants require attorneys to submit legal documents for approval before sharing them with detained clients. And Defendants steadfastly refuse to make easily shareable information about attorney access protocols available to detainees and the public, or provide attorneys with accurate information about their clients' whereabouts.

Defendants claim that the attorney access practices that they have established at the facility are sufficient to meet constitutional muster, and attempt to portray Plaintiffs' request for modest, but meaningful, protections as unnecessary accommodations. Plaintiffs request rudimentary attorney access protections already required by federal detention standards, by which Defendants claim to abide. Although immigration detention facilities nationwide provide these routine measures for attorney access, Defendants argue—without foundation—that these protocols would pose unreasonable threats to the safety and security of the facility. At bottom, detained people held at Alligator Alcatraz face unreasonable and irreparable harm from their inability to speak confidentially with legal counsel as they face deportation from their homes and families. The Court should grant Plaintiffs' motion.

## BACKGROUND

Since the filing of this case, Defendants have enacted limited attorney access measures at Alligator Alcatraz that they claim are sufficient to meet their constitutional obligations. A close examination of the evidence, however,

demonstrates that Defendants continue to impose significant barriers to attorney access and have not implemented many of the measures they suggest they have put in place. Moreover, the current improvements to attorney access at the facility are not guaranteed: as the Florida Defendants state, the facility's visitation policy "remains fluid and subject to change as circumstances at the Facility change." Suppl. Saunders Decl. ¶ 14, Doc. 132-1.

**Defendants require attorneys to pre-schedule in-person legal visits, but transfer detainees immediately prior to their scheduled visits, precluding detainees' ability to ever meet with counsel at the facility.** Unlike other immigration detention facilities, jails, and prisons, which allow attorneys and legal representatives to conduct in-person visits during visitation hours without prior scheduling, Defendants require attorneys to pre-schedule in-person meetings at Alligator Alcatraz. Suppl. Saunders Decl. ¶¶ 24–25, Doc. 132-1; Second Suppl. Decl. of Catherine Perez ¶ 10, Doc. 114-2; Second Suppl. Decl. of Johan Gutierrez ¶ 13, Doc. 114-3; Second Suppl. Decl. Katherine Blankenship ¶ 13, Doc. 114-4.

Defendants claim that the Facility "does not require that attorneys submit requests three business days in advance to visit clients in person at the Facility." State Defs.' Resp. Pls.' Mot. Prelim. Inj. ("Fl. Opp.") 9, Doc. 132 (citation, quotation marks, and alteration omitted). However, the evidence in the record—including documents most recently submitted by Defendants themselves—confirms that the "Facility Visitation Request Guide" requires that attorneys submit a request for a legal visit three

business days in advance. Suppl. Saunders Decl. Ex. 10, Doc. 132-1; Suppl. Decl. Troy Elder, Ex. A, Doc. 114-1 (same).

Either way, Defendants routinely transfer detainees whose attorneys have requested in-person legal visits immediately prior to their scheduled visits. Notably, shortly after Plaintiffs filed the Amended Complaint, Defendants scheduled in-person legal visits for Named Plaintiffs H.C.R. and H.P. However, on the morning of the scheduled in-person visits, Defendants canceled the visits, notifying their attorneys that H.C.R. and H.P. had been moved or were imminently awaiting transfer from the facility.[1] Third Suppl. Decl. Katherine Blankenship ¶¶ 3, 7; Suppl. Decl. Kenia Garcia ¶¶ 3–4. Moreover, Defendants' accounts clearly corroborate Plaintiffs' record of detainee transfers immediately prior to scheduled in-person legal visits. *Compare* Suppl. Decl. Troy Elder ¶¶ 10–18, Doc. 114-1, *with* Suppl. Saunders Decl. ¶ 78–79, Exs. 13, 14, Doc. 132-1 (noting that "ICE transferred all the [first group of ten] detainees from the Facility prior to the scheduled visits" and "all of the [second group of 21] detainees were transferred by ICE"). Nor do Defendants dispute other of Plaintiffs' declarations showing transfers just before calls. *Compare* Decl. Carlos Saturne ¶ 8, Doc. 115-1 (attorney notified of client transfer from facility one day before scheduled visit), *with* Suppl. Saunders Decl. ¶ 80, Ex. 15, Doc. 132-1 (no information inconsistent with this account).

---

[1] Likewise, Defendants transferred Named Plaintiff D.G.M. from the facility on September 12, 2025, the day after the Amended Complaint was filed. Defendants never responded to his attorney's request for a videoconference visit. Suppl. Decl. Jose Flores ¶ 7.

Defendants state that the facility can host approximately 40 in-person meetings per day. Saunders Decl. ¶ 38, Doc. 57. Defendants have also stated that since the first in-person meeting at Alligator Alcatraz three months ago, the facility has had only 90 in-person attorney-client visits in the two months between July 28 and September 25, 2025; on average under two in-person meetings per day. Saunders Suppl. Decl. ¶¶ 35, 49, Doc. 132-1. Yet Defendants claim that in-person meetings must be scheduled in advance "because there is finite space." *Id.* ¶ 25. Although space for in-person meetings is presumably available, Defendants have turned away attorneys who have attempted to make same-day visits. *See* Decl. Mich Gonzalez ¶¶ 6–7, Doc. 114-7.

**Attorneys face prolonged delays in scheduling attorney videoconferences under the facility's current policies, often prejudicing detainees' cases.** Plaintiffs' evidence clearly demonstrates that attorneys face prolonged delays in scheduling videoconferences, often prejudicing detainees' cases, or depriving detainees of any legal visit prior to transfer from the facility. For example, Defendants never responded to the request submitted by Plaintiff D.G.M.'s attorney for a videoconference visit. Decl. Jose Flores ¶ 6, Doc. 114-8. However, Defendants transferred D.G.M. from the facility on September 12, 2025, the day after the Amended Complaint was filed. Suppl. Flores Decl. ¶ 7. Defendants claim that they never responded to his attorney's request to speak to Plaintiff D.G.M. due to an email quarantine, and suggest that he send an email from a different address. Fl. Opp. 19, Doc. 132. His attorney had already done so, to no avail. Suppl. Flores Suppl. Decl. ¶ 4. Moreover, Defendants provide no other routine methods—such as a publicly available phone number—by which attorneys can

contact the facility to request a visit should an email request go unanswered. Suppl. Flores Decl. ¶ 5.

Defendants do not dispute Plaintiffs' evidence that multiple detainees have been denied videoconference calls, or have received them only with significant delay, causing their cases prejudice. *Compare* Second Suppl. Gutierrez Decl. ¶ 10, Doc. 114-3 (noting initial request on July 23, 2025 due to bond hearing on July 25; with visit scheduled on July 29); *with* Suppl. Saunders Decl. ¶ 77, Ex. 12, Doc. 132-1 (same); *compare* Suppl. Decl. Troy Elder ¶¶ 13–18, Doc. 114-1 (noting initial request for visits with 10 clients on August 18, 2025; with videoconference scheduled on August 21, and transfer of all clients from facility prior to visit); *with* Suppl. Saunders Decl. ¶ 79, Ex. 14, Doc. 132-1 (same). Defendants attempt to explain away the delay faced by Plaintiff Bilbao Law for an urgent request for a video visit sent on August 6, 2025, by claiming that they offered Ms. Bilbao an in-person visit before August 11. Fl. Opp. 19, Doc. 132. But these in-person visits would have required Ms. Bilbao to drive approximately 12 hours, an impossibility given her other client commitments and the short notice. Second Supp. Bilbao Decl. ¶ 4. She took the first available remote visit, which was on August 11. *See id.*

Defendants claim that the facility "has repeatedly scheduled and held meetings on the same day the attorney first requested a meeting," but identify only three instances—two of which took place the day after Plaintiffs filed their Preliminary

Injunction motion. Suppl. Saunders Decl. ¶ 29, Exs. 5–6, 8, Doc. 132-1.[2] In contrast, the facility has held 298 videoconference meetings in total. *Id.* ¶ 58.

**Detainees cannot speak confidentially with counsel in legal videoconferences.** It remains clear that detainees cannot speak confidentially in legal videoconferences. Defendants generally claim that facility staff sit outside the room's closed door, Doc. 132 at 10, but Plaintiffs provide repeated and specific testimony from attorneys that their detained clients have confirmed lack of confidential conditions for legal videoconferences at Alligator Alcatraz, including staff presence during calls. Second Suppl. Gutierrez Decl. ¶ 7, Doc. 114-3; Second Suppl. Blankenship Decl. ¶ 8, Doc. 114-1; Gonzalez Decl. ¶ 5, Doc. 114-7; Second Suppl. Perez Decl. ¶ 9, Doc. 114-2; Suppl. Decl. Vilerka Bilbao ¶¶ 19–20, Doc. 114-6.

**Detainees cannot speak confidentially with counsel in outgoing phone calls.** Defendants concede that detainees cannot speak confidentially with counsel in outgoing phone calls, which are monitored and recorded. Suppl. Saunders Decl. ¶ 61, Doc. 132-1.

**Defendants require attorneys to submit legal documents for approval prior to legal visits.** The Florida Defendants claim that "[t]he Facility does not require attorneys to submit all documents they intend to bring to their meetings for staff review and approval." Suppl. Saunders Decl. ¶ 41, Doc. 132-1. But this claim is belied by Defendants' own evidence. Defendants require all attorneys who request a legal

---

[2] Defendants also cite one example of a meeting set for the day following the request. Suppl. Saunders Decl. ¶ 29, Ex. 7, Doc. 132-1.

meeting with detained clients to complete a "Legal Counsel Visitation Request Form." Suppl. Saunders Decl. ¶ 20, Ex. 3, Doc. 132-1. The request form requires that attorneys "attach copies of legal documents you intend to bring for approval. All items are subject to inspection and must be pre-approved," and requires that attorneys identify "Documents to be Reviewed with Inmate." *Id*.

**Defendants refuse to make basic information regarding attorney access protocols necessary for communication to detainees and the public.** Defendants continue to fail to make basic information about facility contact information or attorney access policies publicly available and fail to provide that information to detainees. Suppl. Flores Decl. ¶ 5; Third Suppl. Blankenship Decl. ¶ 5.

Defendants claim that they have "put up posters listing information for various consulate [sic], a visitation request guide, and pro bono immigrations [sic] services." Suppl. Saunders Decl. ¶ 73, Doc. 132-1. However, a close examination of the photo of the "Facility Visitation Request Guide" posted in the detention facility indicates that the instructions do not provide detainees with any information as to how they may request a legal visit or communicate confidentially with counsel. Rather, the posted sign provides instructions for *attorneys*, not detainees, to request a legal visit via email, to which detainees have no access. Suppl. Saunders Decl. Ex. 10, Doc. 132-1. Notably, this Facility Visitation Request Guide specifies that attorneys must request a legal visit three business days in advance. *Id.*; *see also* Suppl. Decl. Troy Elder, Ex. A; Doc. 114-1 (same).

**Attorneys cannot locate detained clients at Alligator Alcatraz.** Defendants do not dispute that ICE's online detainee locator fails to provide information about detainees held at Alligator Alcatraz. Second Suppl. Blankenship Decl. ¶ 6, Doc. 114-4; Suppl. Bilbao Decl. ¶ 10, Doc. 114-6; Flores Decl. ¶ 4, Doc. 114-8; Garcia Decl. ¶ 4, Doc. 114-5.

Some detainees held at Alligator Alcatraz are listed on ICE's website as located at a different facility, but their attorneys have been informed by the other facility that their clients are not there. For example, Attorney Viviana Medina tried to contact a client listed as being held at Krome, but who, in reality, was held at Alligator Alcatraz. When she called Krome, facility staff informed her that he was not there, and could not provide any further information as to his actual location. Her office tried to call another ICE phone number, (561) 519-9732, which had been previously listed on the locator for another client, but the person who answered cut off the phone call without providing any information as to the client's location. The client later confirmed via phone call to his family that he was being held at Alligator Alcatraz, but the inaccurate information significantly delayed the attorney's ability to prepare for his bond hearing, and she was never able to speak with him prior to his bond hearing. Decl. Viviana Medina ¶¶ 5–8.

## ARGUMENT

### I.  Federal Defendants Are Responsible for First Amendment Violations at the Facility.

The Federal Defendants begin their opposition to Plaintiffs' request for preliminary injunctive relief with a misguided argument concerning their involvement in the denial of Plaintiffs' First Amendment rights. For the first time in three months of litigation, the Federal Defendants argue that they have no connection to the allegations in the amended complaint concerning the lack of attorney access at Alligator Alcatraz. *See* Fed. Defs.' Resp. Pls.' Mot. Prelim. Inj. ("Fed. Opp.") 6–10, Doc. 131.[3] But the Federal Defendants rely on inapposite language in court orders having nothing to do with the issue, while ignoring the factual record and the clear language of the statute that purportedly governs operations at Alligator Alcatraz.

To be a proper defendant, the alleged injury must be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). The Federal Defendants easily satisfy this standard. The Federal Defendants admit that they maintain oversight of and inspect the facility to ensure compliance with ICE detention policies, which include attorney access. Decl. Juan Lopez Vega ¶¶ 3–4, Doc. 50-1; Decl. Juan Lopez Vega ¶¶ 3–5, Doc. 131-1; Pl. Mot. Prelim. Inj. 16–17, Doc. 115 (describing attorney access standards). Plaintiffs' complaints concerning attorney

---

[3] The Federal Defendants frame their arguments as concerning the sufficiency of the allegations in the amended complaint. *See* Fed. Opp. 6, Doc. 131 (quoting the *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) standard and discussing the sufficiency of the allegations in the amended complaint). This matter is before the Court on a motion for a preliminary injunction, not a motion to dismiss. Plaintiffs, therefore, focus on the factual record before the Court in adjudicating the present motion. In any event, the actual allegations in the amended complaint unquestionably tie the Federal Defendants to the deprivation of Plaintiffs' First Amendment rights. *See* Pls.' Mot. Prelim. Inj. 5, 29–35, Doc. 113.

access, fully supported by the factual record before the Court, concern acts of interference with the attorney-client relationship, including transfers from Alligator Alcatraz upon attorney visitation requests and failure to update the ICE detainee locator—all of which concern the Federal Defendants. The statute Federal Defendants invoke to hold people at Alligator Alcatraz requires them to maintain "direction and supervision" over the state officers who carry out detention at the facility. 8 U.S.C. § 1357(g)(3), (5). And they do not dispute that they have authority to require officers deputized under 287(g) agreements to fix their attorney access practices, or else terminate the agreements. That is more than enough to make them proper Defendants.

In addition, the venue order in this case and the stay decision in *Friends of Everglades* are entirely inapposite, because neither resolved the question of whether the Federal Defendants have any authority over attorney access at the facility. The Eleventh Circuit simply considered whether the commitment of federal funds for the construction and operation of Alligator Alcatraz constitutes a "major federal action" for purposes of the National Environmental Policy Act. *See Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *9 (11th Cir. Sept. 4, 2025). Nowhere did the court address whether the Federal Defendants have a connection to the deprivation of Plaintiffs' First Amendment rights. Similarly, Judge Ruiz's venue order only addressed whether the *State* Defendants' actions occurred within the Southern District of Florida. *See* Order 38–46, Doc. 86. It did not say that the *Federal* Defendants had no connection to attorney access at the facility. Rather, Judge Ruiz explained that "the Federal Defendants have admitted through

11

their affidavits that the ICE-ERO Miami Field Office oversees detention facility operations and is responsible for ensuring compliance with ICE detention standards, including attorney-client access." *Id.* at 37–38.

Both the Federal and State Defendants invoke an agreement pursuant to 8 U.S.C. § 1357(g)—known as 287(g) agreements—as the source of the authority to detain individuals, including Plaintiffs, at Alligator Alcatraz. *See* Fed. Opp. 3, Doc. 131; Lopez Vega Decl. ¶ 7, Doc. 131-1; Fl. Opp. 3, Doc. 132; Suppl. Saunders Decl. ¶¶ 5–6, Doc. 132-1. But that statute does not transfer absolute responsibility over the detention of federal immigration detainees and oversight of conditions of detention to the State Defendants. Quite the contrary. The statute explicitly provides that all functions performed pursuant to a 287(g) agreement "shall be subject to the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3). In fact, so insistent was Congress over this supervision requirement that it specifically mandated that "the position of the agency of the Attorney General who is required to supervise and direct the individual" state officers be included in any 287(g) agreement. *Id.* at § 1357(g)(5). The State Defendants explicitly concede their officers, including those responsible for Alligator Alcatraz, "are subject to ICE supervision." Fl. Opp. 3, Doc. 132. In any context, when a subordinate violates the law, their supervisor cannot disclaim responsibility. As much as the Federal Defendants may wish to wash their hands of conditions at Alligator Alcatraz, Congress has mandated otherwise.

Finally, the factual record before the Court unquestionably ties the Federal Defendants to the deprivation of Plaintiffs' First Amendment rights. Both the Federal

and State Defendants concede that the Federal Defendants remain responsible for
ensuring compliance with the federal immigration detention standards and federal
law, which, of course, includes attorney access at the facility. *See* Lopez Vega Decl. ¶
5, Doc. 131-1; Fl. Opp. 11, Doc. 132; Suppl. Saunders Decl. ¶ 76, 91, Doc. 132-1. It is
no surprise, therefore, that the Federal Defendants wholly ignore this factual record in
making this argument—because the factual record makes clear that Defendants
indisputably have a hand in the denial of Plaintiffs' First Amendment rights.

## II. Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims.

### A. The First Amendment Protects the Right of Detainees to Communicate Confidentially with Counsel.

Detained immigrants have a First Amendment right to communicate
confidentially with legal counsel. *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir.
2008). The Federal Defendants assert that there is not "any controlling authority" that
would entitle Plaintiffs to the relief they request under the First Amendment. Fed. Opp
11, Doc. 131. But in doing so, the Federal Defendants ignore clear precedent and
misconstrue the role of detention standards in the constitutional analysis.

First, the Federal Defendants claim that under applicable precedent, the First
Amendment applies only to legal mail in a detention setting, not other forms of
requested relief, because *Al-Amin* addressed a challenge to a prison's practice of
opening legal mail outside the presence of prisoners. Fed. Opp. 11, Doc. 131 (citing
511 F.3d at 1326). This is clearly incorrect. "The Supreme Court has long recognized

that an inmate retains those First Amendment rights that 'are not inconsistent with his status as a prisoner,'" and that "detainees possess at least those constitutional rights that are enjoyed by convicted prisoners." *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *Turner v. Safley*, 482 U.S. 78, 95 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). These constitutional protections are not specifically limited to legal mail, but more broadly include "'uninhibited, confidential communications' with their attorneys." *Id.* at 1230 (quoting *Taylor v. Sterrett*, 532 F.2d 462, 473 (5th Cir. 1976)).

The Federal Defendants further argue that failure to abide by federal detention standards for attorney access is insufficient to establish a constitutional violation. Doc. 131 at 11 (citing *Al-Amin*, 511 F.3d at 1336 n.37). But Federal Defendants misunderstand the legal significance of the detention standards. Federal detention standards clearly show the existence of "ready alternatives" to the Defendants' restrictions on attorney access at the facility—a key factor in establishing a constitutional violation. *Turner*, 482 U.S. at 90; *see S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (ICE's "fail[ure] to comply with ICE's own Detention Standards related to confidentiality . . . supports that these restrictions and conditions are punitive since there are less restrictive alternatives"); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (finding allegations of attorney access not in compliance with ICE's detention standards stated a Fifth Amendment claim). They also fail to provide the entire quote. Defendants quote to *Al-Amin* to claim that "regulations themselves do not constitute constitutional law," but omit that the Eleventh Circuit then wrote

14

that the existence of the regulations "further undermine[s] any claim by defendants
that they were unaware of their legal obligations." *See* Fed. Opp. 11, Doc. 131; *Al-
Amin*, 511 F.3d at 1336 n.37.

The Federal Defendants also erroneously argue that Plaintiffs must show a
"pattern and practice" to "demonstrate a violation of the First Amendment." Fed.
Opp. 12, Doc. 131 (citing *Mitchell*, 10 F.4th at 1230–31). Defendants again misconstrue
precedent. No such requirement exists. Instead, the operative test is whether an official
practice is "enough to chill, inhibit, or interfere" with a person's "ability to 'speak,
protest, and complain openly to his attorney' so that it infringed his right to free
speech." *Mitchell*, 10 F.4th at 1230.

### B. Attorney Access Restrictions Violate the Organizational Plaintiffs' First Amendment Rights.

The Federal Defendants do not contest the well-settled proposition that the First
Amendment protects a lawyer's ability to advise people of their legal rights and solicit
prospective litigants. Doc. 131 at 12 (citing *NAACP v. Button*, 371 U.S. 415, 428–29
(1963); *In re Primus*, 436 U.S. 412, 431–32 (1978)). They do not dispute that policies
that unreasonably impede attorney-client communication violate an attorney's First
Amendment rights. *Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974). Nor do they
contest that the Organizational Plaintiffs in this case seek to advise their retained
clients at Alligator Alcatraz without remuneration as a form of political speech. *See*
Second Suppl. Decl. Katherine Blankenship ¶¶ 2, 14, Doc. 114-4; Suppl. Decl. Vilerka
Bilbao ¶¶ 2, 26, Doc. 114-6.

Instead, Federal Defendants mistakenly assert that *Haitian Refugee Ctr.*, *Inc. v. Baker*, 953 F.2d 1498,1513 (11th Cir. 1992), and *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1429–30 (11th Cir. 1995)*,* preclude the Court from concluding that the Organizational Plaintiffs have suffered a First Amendment violation. Fed. Opp. 12– 15, Doc. 131. But these cases are entirely inapposite. As *Haitian Refugee Ctr.* noted, an attorney's First Amendment right to communicate with a client "is predicated upon the existence of an underlying legal claim that may be asserted by the potential litigant." 953 F.2d at 1513 (citing *Button*, 371 U.S. at 440). In this case, Organizational Plaintiffs seek to communicate with existing clients who claim relief in immigration court or protest their conditions of confinement—a fact that Defendants do not contest. Second Suppl. Decl. Katherine Blankenship ¶¶ 4, 6–15, Doc. 114-4; Suppl. Decl. Vilerka Bilbao ¶¶ 2, 4, 6–26, Doc. 114-6. In contrast, individuals with whom the organizational plaintiffs in *Haitian Refugee Ctr.* and *Cuban Am. Bar Ass'n* sought to contact had no legal claims to assert in potential litigation and had no established attorney-client relationship. Indeed, *Haitian Refugee Ctr.* addressed individuals held outside the United States, who had "no recognized substantive due process rights under the laws or Constitution of the United States." 953 F.2d at 1513. *Cuban Am. Bar Assoc.* similarly concluded that the individuals with whom the legal organizations sought to communicate lacked "any of the statutory or constitutional rights . . . that might sustain the attorneys' claims to right of association." 43 F.3d at 1429.

The Federal Defendants claim that the transfer of detainees immediately prior to scheduled legal visits does not establish a First Amendment violation. Fed. Opp.

15, Doc. 131. This argument, however, misses the point. Plaintiffs do not challenge the transfer of detainees from Alligator Alcatraz, but rather challenge detainees' inability to engage in timely and confidential attorney-client communication while held at the facility. They challenge Defendants' restrictions on the provision of more immediate options for confidential communication, such as unmonitored outgoing legal calls or unscheduled in-person attorney visits. Defendants claim that detainees are "generally housed at Alligator Alcatraz for under 72 hours," Fed. Opp. 15, Doc. 131 (citing Lopez Vega Decl., Ex. 1 ¶ 11), but even detainees held in short-term facilities have a First Amendment right to speak to counsel. *Mercado v. Noem*, No. 25-CV-6568 (LAK), 2025 WL 2658779, at \*34 (S.D.N.Y. Sept. 17, 2025). Moreover, Plaintiffs have amply demonstrated that detainees are held at Alligator Alcatraz for periods much longer than 72 hours—during which time they have been unable to engage in confidential attorney-client communication. *See, e.g.,* Second Suppl. Gutierrez Decl. ¶ 4, Doc. 114-3 (12-day detention); Second Suppl. Blankenship Decl. ¶ 12, Doc. 114-4 (28-day detention); Suppl. Bilbao Decl. ¶ 4, Doc. 114-6 (30 days).

### C. Penological Interests Do Not Apply to Consideration of the Constitutional Rights of Civil Immigrant Detainees.

Defendants cite to the four-factor test set out in *Turner*, 482 U.S. at 89, and modified in *Pesci v. Budz* (*Pesci I*), 730 F.3d 1291, 1297 (11th Cir. 2013), to argue that attorney access restrictions imposed on the immigrant detainees at Alligator Alcatraz do not violate First Amendment protections. Fed. Opp. 16, Doc. 131; Fl. Opp. 5–8, Doc. 132. This argument fails. *Turner* involved the rights of convicted prisoners, and

*Pesci I* involved the rights of so-called "sexually violent predators" whom the State of Florida continued to incarcerate in carceral facilities under civil commitment laws upon expiration of their criminal sentences. Under *Turner*, courts examine whether a prison's restriction is "reasonably related to legitimate penological interests."[4] In *Pesci I*, the Eleventh Circuit held that in the case of a civilly-committed "sexually violent predator," that the *Turner* standard "must be modified to reflect the salient differences between civil detention and criminal incarceration," and that the "government's interests in retribution and general deterrence—plainly legitimate justifications for prison regulations—decidedly are *not* a proper foundation for the restriction of civil detainees' constitutional rights." 730 F.3d at 1297 (emphasis in original).

Immigrant detainees, of course, are civil detainees held pursuant to civil immigration laws, not criminal laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). They are not convicted prisoners serving their criminal sentences like the plaintiffs in *Turner* and *Pesci I*, nor are they pre-trial detainees facing criminal charges held in local jails. Rather, immigrant detainees in proceedings seek relief from deportation, which the Supreme Court explicitly held is not of a punitive nature. *See Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty'; but it is not, in a strict sense, a criminal sanction.") (internal citation

---

[4] Under *Turner*, courts examine whether the prison's restriction on communication is "reasonably related to legitimate penological interests" using four factors: (1) whether there exists "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) "the absence of ready alternatives" to the prison regulation. *Turner*, 482 U.S. at 89–90.

omitted). Accordingly, the "legitimate penological interests" at issue with convicted prisoners have little or no application here. *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) ("Penological interests are interests that relate to the treatment (including punishment, deterrence, rehabilitation, etc. . . .) of persons convicted of crimes"); *Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004); *In re Kumar*, 402 F. Supp. 3d 377, 383–84 (W.D. Tex. 2019).

### D. Defendants' Attorney Access Restrictions at Alligator Alcatraz Are Not Reasonably Related to the Stated Justifications.

Even under *Turner*, however, the attorney access restrictions at issue at Alligator Alcatraz clearly violate Plaintiffs' First Amendment rights. Defendants mischaracterize the widespread restrictions as "minimal" and necessary for "maintaining order and security," and argue that the restrictions exist for the detainees' own protection. Fl. Opp. 13–14, Doc. 132. But these arguments fail. Defendants' failure to identify legitimate penological interests other than a vague invocation of "security and order" is fatal: when analyzing the first of the four *Turner* factors, "[i]f the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) (internal quotes omitted).

The restrictions to attorney access at Alligator Alcatraz are not rationally related to Defendants' justification of "maintaining order and security" at the facility. There is no security interest in a prolonged delay for scheduling attorney visits. Defendants claim that attorneys must schedule in-person legal visits in advance to "protect

detainees from nefarious actors," and to ensure sufficient space for confidential meetings. Fl. Opp. 13–14, Doc. 132. These justifications, however, miss the mark. Immigration detention facilities routinely allow for unscheduled in-person visits by attorneys during established visiting hours, with security screening and presentation of a bar card.[5] And as Defendants have noted, the facility has ample, unused capacity for in-person meetings. Saunders Decl. ¶ 38, Doc. 57 (noting capacity for 40 in-person meetings per day); *see* Saunders Suppl. Decl. ¶¶ 35, 49, Doc. 132-1 (data for calculated average of under two in-person meetings per day). Moreover, "providing inmates with confidential reliable means of communication with their attorneys about grievances 'releases tension in the prisons and itself advances the state interest in maintaining institutional order and security.'" *Al-Amin*, 511 F.3d at 1330 (quoting *Biereyu v. Reno*, 59 F.3d 1445, 1457 (3d Cir. 1995)).

Similarly, Defendants' failure to provide unmonitored, outgoing legal calls has little rational relationship to maintaining order and security, particularly as such phone calls are required to be provided in detention facilities nationwide. "There is no legitimate governmental purpose to be attained by not allowing reasonable access to

---

[5] *See, e.g.* ICE, Krome North Service Processing Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/krome-north-service-processing-center [https://perma.cc/AQC8-QUP9] ("Legal representatives of detainees are authorized to visit their clients during [visiting hours]"); ICE, Broward Transitional Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/broward-transitional-center [https://perma.cc/FWC9-DJTU] (same); ICE, Glades County Detention Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/glades-county-detention-center [https://perma.cc/T77Z-M6AT] (same); ICE, FDC Miami, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/fdc-miami [https://perma.cc/3AMT-MUT8] (same).

the telephone, and . . . such use is protected by the First Amendment." *Wells v. Tucker*,
No. 4:10cv411, 2012 WL 1538366, at *5 (N.D. Fla. Feb. 15, 2012). The publication
of attorney access guidelines to detainees and the public, as well as detainee locator
information is a routine practice, and widespread understanding of facility protocols
and a detainee's location would only help to promote order and security.

The other *Turner* factors look at whether there are "alternative means to exercise
the right," and the impact of the accommodations on the allocation of prison
resources. *See Turner*, 482 U.S. at 91 (holding that "if an inmate claimant can point to
an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid
penological interests, a court may consider that as evidence that the regulation does
not satisfy the reasonable relationship standard."). As Plaintiffs have noted, there are
clear alternative means to ensure attorney-detainee contact in compliance with the
First Amendment. Notably, ICE has promulgated guidelines to ensure detainee access
to legal representation, by which the facility must comply, and for which it should
have allocated funds for compliance. *See* Pl. Mot. Prelim. Inj. 16–17, Doc. 115
(describing standards); Lopez Vega Decl. ¶ 5, Doc. 131-1; Fl. Opp. 11, Doc. 132;
Suppl. Saunders Decl. ¶ 76, 91, Doc. 132-1; Order 38–46, Doc. 86. These standards
provide for in-person and videoconference legal visits, confidentiality of
communication, exchange of legal documents, the provision of unmonitored outgoing
legal calls, and exchange of legal documents. Pl. Mot. Prelim. Inj. 16–17, Doc. 115
(describing standards). ICE's "Legal Access in Detention" factsheet outlines the

specific ways in which ICE's detention standards provide for attorney access.[6] These standards "offer an example of less restrictive alternative measures" that Defendants could have—but did not—take to protect attorney access. *See S. Poverty L. Ctr.*, 2020 WL 3265533, at *30; *Torres*, 411 F. Supp. 3d at 1065.

## III.    Plaintiffs Will Suffer Irreparable Harm Absent the Requested Relief.

Plaintiffs' opening brief explained that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also* Pls.' Mot. Prelim. Inj. 20–21, Doc. 115. Plaintiffs also explained that, independently, irreparable harm stems from the specific harms faced by detained Plaintiffs because of their inability to contact counsel and those faced by Organizational Plaintiffs because of their inability to communicate with prospective and current clients. *S. Poverty L. Ctr.*, 2020 WL 3265533, at *32 ("[D]elays and substantially restricted access to counsel [in immigration detention facilities] . . . pose irreparable harm . . . in the absence of preliminary injunctive relief."); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury" to a business) (quotation marks and citation omitted)).

---

[6] Immigration and Customs Enforcement, Legal Access in Detention at a Glance (2021), https://www.ice.gov/doclib/detention/LegalAccessAtAGlance.pdf  [https://perma.cc/9P9G-3HPF].

Defendants do not contest that these injuries would qualify as irreparable harm. Instead, they claim that all harms have ceased. Fl. Opp. 27–28, Doc. 132; Fed. Opp. 18, Doc. 131. This argument sweeps aside important facts: the record plainly shows that Defendants continue to deny detained immigrants the ability to request unmonitored legal calls, fail to provide confidential spaces for video visits, unreasonably delay visits, and fail to provide basic information regarding attorney access at the facility. *See supra* pp. 3–9. For the same reasons these denials continue to violate the First Amendment, they "unquestionably constitute[] irreparable injury." *Elrod*, 427 U.S. at 373. This argument also ignores Plaintiffs' caselaw showing that even if Defendants are correct that they have fully remedied their constitutional violations (which the facts show not to be the case), a plaintiff may satisfy the irreparable injury requirement even when "the remedy Plaintiffs seek . . . [i]s already in place" because the injunctive relief "will prevent future injury." *S.D. v. St. Johns Cnty. Sch. Dist.*, 632 F. Supp. 2d 1085, 1096 (M.D. Fla. 2009); *see also Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1558 (M.D. Fla. 1988) ("[T]he mere discontinuance of infringing conduct does not render injunctive relief inappropriate[,]" as "the past violations" create "a cognizable danger of future violations[.]" (citations omitted)).[7]

---

[7] State Defendants' law does not apply here. *City of Los Angeles v. Lyons* found a claim to be too attenuated when it was premised on the risk that a particular person would encounter the police and would be placed in a particular type of chokehold. 461 U.S. 95, 105 (1983). Here, in contrast, the class is currently in Defendants' custody, where it is a certainty—not an attenuated possibility—that it is subjected to Defendants' policies. *United States v. Jefferson County* addressed the irrelevant issue of whether irreparable harm can exist when the harmed employees did not exhaust administrative remedies. 720 F.2d 1511, 1520 (11th Cir. 1983). And *Strickland v. Alexander* does not support

Second, Federal Defendants argue that, because they "do not operate Alligator Alcatraz, any injunction against the Federal Defendants will not prevent an irreparable injury." Fed. Opp. 17, Doc. 131. As explained above, the Court should reject the Federal Defendants' claims that they have nothing to do with attorney access restrictions at the facility. *Supra* pp. 9–13. For those reasons, relief will run against the Federal Defendants, and their actions irreparably harm the Plaintiffs.

## IV.    The Balance of Equities Weigh in Favor of Plaintiffs, and Any Harm to Plaintiffs Far Outweighs the Potential Harm to Defendants.

The balance of equities and public interest weigh strongly in favor of Plaintiffs and the proposed class. "Where the government is the opposing party, balancing of the harm and the public interest merge." *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1206 (S.D. Fla. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs and the proposed class face irreparable harm to their constitutional rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quotation marks and citation omitted). "'[W]here the plaintiffs are likely to succeed on their [First Amendment] claims, the balance of equities and the public interest favor injunctive relief.'" *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (citation omitted). Conversely, there is no public interest in denying First Amendment-protected rights. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261,

---

Defendants' position, as that court found standing based on a past injury because there was "a real and immediate likelihood of [a similar] future injury." 772 F.3d 876, 885 (11th Cir. 2014) (internal quotation marks omitted).

1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional

ordinance.").

The Federal Defendants do not contest that the balance of the equities and

public interest favor Plaintiffs. The Florida Defendants point to only one supposed

public interest weighing against Plaintiffs' First Amendment freedoms: "'the public

interest in allowing the government discretion to carry out its authorized functions.'"

Fl. Opp. 29, Doc. 132 (quoting *S. Poverty L. Ctr.*, 2020 WL 3265533, at \*33). But

Defendants' own opinion explains that this interest does not outweigh the significant

need for constitutionally compliant attorney access: "'[c]ourts may not allow

constitutional violations to continue simply because a remedy would involve intrusion

into the realm of prison administration.'" *S. Poverty L. Ctr.*, 2020 WL 3265533, at \*33

(quoting *Brown v. Plata*, 563 U.S. 493, 511 (2011)). That court found, despite the

government's interest in "discretion," that "the balance of equities and the public

interest weigh in favor of granting injunctive relief" to ensure adequate access to

counsel at an immigration detention facility. *Id.* This Court should do the same, and

it should hold Defendants to modest access-to-counsel guarantees similar to those that

ICE already commits to provide in its detention facilities and Florida already

guarantees in its prisons. *See* Pls.' Mot. Prelim. Inj. 22–23, Doc. 115.

## V.    The Court May Provide Preliminary Relief to the Putative Class, and Plaintiffs Are Likely to Succeed on Their Class Certification Motion.

Defendants argue that the Court should not provide injunctive relief to the

putative class members, nor certify a provisional class for purposes of issuing a

preliminary injunction to benefit the putative class. *See* Fed. Opp. 18–19, Doc.; Fl.
Opp. 24–27, Doc. 132. Their arguments are meritless.

*First*, Defendants conspicuously ignore the Supreme Court's recent decision in
*A.A.R.P. v. Trump*, in which it reaffirmed Article III courts' power to "issue temporary
relief to a putative class" and that courts "need not decide whether a class should be
certified . . . in order to temporarily enjoin the Government . . . ." 605 U.S. 91, 97–98
(2025); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J.,
concurring) (noting that the Court's holding in *CASA* related to universal injunctions
did not disturb the proposition that plaintiffs requesting preliminary injunctive relief
may "ask a court to award preliminary classwide relief that may . . . be statewide,
regionwide, or even nationwide") (citing *A.A.R.P.*, 605 U.S. at 97–98); *Benjamin v.
Oliver*, No. 1:25-cv-04470-VMC, --- F. Supp. 3d ----, 2025 WL 2542072, at *17 (N.D.
Ga. Sept. 4, 2025) ("*The availability of class-wide injunctive relief to a putative class is no
longer in doubt* following the Supreme Court's emergency docket decision in *A.A.R.P.
v. Trump*[.]" (emphasis added)). Such preliminary relief to putative classes is common
in these situations. *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1270 (S.D.
Fla. 2025) (provisionally certifying two classes of immigrants for purposes of issuing a
preliminary injunction), *mot. for stay denied*, 2025 WL 1625385 (11th Cir. June 6, 2025),
145 S. Ct. 2872 (2025); *Tefel v. Reno*, 972 F. Supp. 608, 617–18 (S.D. Fla. 1997)
(provisionally certifying class of immigrants who had been denied suspension of
deportation orders); *see also Strawser v. Strange*, 105 F. Supp. 3d 1323, 1330 (S.D. Ala.

2015) (collecting cases); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173, 179–82 (D.D.C. 2015) (provisionally certifying a class where a uniform "unlawful [immigration] detention policy aimed at deterring mass migration" applied to all class members).

Compounding their disregard for recent precedent, the State Defendants instead cite to the *dissent* in *A.A.R.P.* to support their incorrect assertion that Plaintiffs may not obtain preliminary injunctive relief unless they show that a class will ultimately be certified. *See* Fla. Opp 24, Doc. 132 (citing 605 U.S. at 106 n.3 (Alito, J., dissenting). In light of the recent decisions reaffirming district courts' power to provide injunctive relief to a putative class, this Court should reject State Defendants' circular and incorrect arguments that it cannot provide preliminary relief or provisionally certify a class "*without* conducting a 'rigorous' Rule 23 analysis." Fl. Opp. 26, Doc. 132 (emphasis in original).[8]

**Second**, State Defendants' arguments that preliminary relief is premature and that Plaintiffs' numerous declarations and other evidentiary support are "self-serving" or insufficient to certify a class similarly fail. Fl. Opp. 25–26, Doc. 132.[9] Courts

---

[8] State Defendants also cite to the almost 30-year-old, out-of-circuit case of *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997), for the proposition that "courts cannot grant classwide injunctive relief without certification." Fl. Opp. 25, Doc. 132. But *McKenzie* was a case about universal injunctions. 118 F.3d at 554–55. And *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1349 (N.D. Ga. 2009), Fl. Opp. 25, Doc. 132, involved a named plaintiff's inability to show that he would experience irreparable harm if the district court did not issue an injunction directing defendant Home Depot to notify purchasers of dryers of potential hazards. *See* 609 F. Supp. 2d at 1349.

[9] State Defendants cite to *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016), to argue that "Rule 23 demands competent evidentiary support, not speculation, generalizations, or rhetorical assertions" in support of a motion for class certification. Fl. Opp. 25, Doc. 132. But that case simply emphasized the uncontroversial proposition that "[t]he party seeking class certification has the burden of *proof*, not a burden of pleading" and that the district court in that case had erred by stating in a class certification order that it was accepting the allegations in the complaint as true for

27

routinely issue preliminary class relief prior to certifying a class, *see supra*, and courts often certify classes without extensive discovery. Defendants argue that Plaintiffs' "claims rely on vague, conclusory, and self-serving declarations without any depositions or corroborating evidence," Fl. Opp. 25, Doc. 132, but offer no details as to what they specifically view as "vague, conclusory, and self-serving" in the nine declarations Plaintiffs submitted with their class certification motion. It should go without saying that all declarations were made under penalty of perjury, and by licensed attorneys. Defendants fail to explain what additional information depositions could provide that go to class certification, but again, at the stage of providing urgent preliminary injunctive relief, courts can provide it to a putative class. *See A.A.R.P.*, 605 U.S. at 96 (noting that, in that case, the plaintiff immigrant detainees attached four declarations to their emergency motion for a TRO).

**Third**, the Federal Defendants argue that a class cannot be certified because Plaintiffs do not meet Rule 23(a)(3)'s requirement of typicality because various immigration attorneys experienced "varied communication difficulties" in attempting to secure confidential and timely access to their detained clients. Fed. Opp. 19, Doc.

---

purposes of the class certification analysis. *Brown*, 817 F.3d at 1234. Plaintiffs have never contended that they do not have the burden of proof, and State Defendants attack a straw man in their opposition. Defendants' citation to *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1196 (11th Cir. 2003), for that same proposition is inapposite, as in that case the Eleventh Circuit held that the named plaintiffs had not provided evidence to show that they met the "predominance" requirement of Rule 23(b)(3) and to show "that no fundamental conflict exists among the class members" as required under Rule 23(a)(4). 350 F.3d at 1195–96. The instant case is brought under Rule 23(b)(2)—which has no predominance requirement—not Rule 23(b)(3), and Plaintiffs have shown that the requirements of Rule 23(a)(4) are met and that the named plaintiffs do not have any conflicts with the putative class. *See* Pls.' Mot. Class Cert. 16–17, Doc. 114; Decl. of Kenia Garcia ¶ 3, Doc. 114-5; Flores Decl. ¶ 3; Second Supp. Blankenship Decl. ¶ 4a, Doc. 114-4.

131. But this misapprehends Plaintiffs' classwide allegations: here, both the proposed class representatives and the class challenge the First Amendment violations due to Defendants' facility-wide policies and practices. Typicality requires "that 'the claims or defenses of the representative parties [be] typical of the claims or defenses of the class.'" *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (quoting Fed. R. Civ. P. 23(a)(3)). "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Id.* (quotation marks and citation omitted).

Here, any variation in how interference with access to counsel plays out in any individual situation does not defeat typicality. "The commonality and typicality requirements of Rule 23(a) tend to merge," as both serve to ensure the claims of the class representatives align with those of absent class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011) (finding that even in a fact-intensive workplace discrimination case, typicality and commonality are met when a company "'operated under a general policy of discrimination'") (citation omitted); *see Carter v. City of Montgomery*, 108 F.4th 1334, 1350 (11th Cir. 2024) ("To be sure, our case law recognizes that 'substantial factual differences' between a class representative's claim and those of the class members does not per se foreclose a typicality finding.") (citation omitted); *Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004) ("Neither the typicality nor the commonality requirement mandates that all putative class members share identical claims, and factual differences among the claims of the putative class members do not defeat

29

certification") (citation modified), *overruled in part on other grounds by Ash v. Tyson Foods,
Inc.*, 546 U.S. 454, 457–58 (2006); *Fla. Imm. Coal.*, 780 F. Supp. 3d at 1267; *G.H. v.
Tamayo*, 339 F.R.D. 584, 590 (N.D. Fla. 2021); *Gayle v. Meade*, 614 F. Supp. 3d 1175,
1190–92, 1198, 1231 (S.D. Fla. 2020).

*Fourth*, State Defendants relatedly assert—without offering any specific
details—that "Plaintiffs' claims vary widely in substance, duration, and cause" and
therefore cannot be resolved in a single injunction under Rule 23(b)(2). Fl. Opp. 27,
Doc. 132. Rule 23(b)(2)'s requirement that "the party opposing the class has acted or
refused to act on grounds that apply generally to the class, so that final injunctive relief
or corresponding declaratory relief is appropriate respecting the class as a whole" is
satisfied when, as here, members of a proposed class seek common injunctive and
declaratory relief from policies and practices that are generally applicable to the class
as a whole. *Fla. Imm. Coal.*, 780 F. Supp. 3d at 1268 ("The critical inquiry is whether
the class members have suffered a common injury that may properly be addressed by
class-wide injunctive or equitable relief.") (quoting *Ibrahim v. Acosta*, 326 F.R.D. 696,
701 (S.D. Fla. 2018)); *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the
indivisible nature of the injunctive or declaratory remedy warranted—the notion that
the conduct is such that it can be enjoined or declared unlawful only as to all of the
class members or as to none of them.") (quotation marks and citation omitted).
Defendants' challenged practices and policies with respect to attorney access are not
tailored to individual detainees, but apply to the whole population of people held at
the facility, without regard to the individual circumstances of their underlying

immigration cases or any other differences among them. An injunction directing

Defendants to implement a legal access program would resolve the claims of the entire

class in one stroke.[10] The Court should issue injunctive relief that benefits the putative

class, and may provisionally certify a class for the purpose of issuing preliminary

injunctive relief.

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

Dated: October 2, 2025                    Respectfully Submitted,

                                          */s/ Eunice H. Cho*
                                          Eunice H. Cho*
Paul R. Chavez (Fla. Bar No. 1021395)     AMERICAN CIVIL LIBERTIES
Christina LaRocca (Fla. Bar No.           UNION FOUNDATION
1025528) AMERICANS FOR                    915 15th St. N.W., 7th Floor
IMMIGRANT JUSTICE                         Washington, DC 20005
2200 NW 72nd Ave                          202-548-6616
P.O. Box No. 520037                       echo@aclu.org
Miami, FL 33152
786-218-3381
pchavez@aijustice.org                     Corene T. Kendrick*
clarocca@aijustice.org                    Kyle Virgien*
                                          Marisol Dominguez-Ruiz*
Amy Godshall, Fla. Bar No. 1049803        AMERICAN CIVIL LIBERTIES
Daniel Tilley, Fla. Bar No. 102882        UNION FOUNDATION
AMERICAN CIVIL LIBERTIES                  425 California Street, Suite 700
UNION FOUNDATION OF                       San Francisco, CA 94104
FLORIDA                                   415-343-0770
4343 West Flagler Street, Suite 400       ckendrick@aclu.org
Miami, FL 33134                           kvirgien@aclu.org
786-363-2714                              mdominguez-ruiz@aclu.org
agodshall@aclufl.org
dtilley@aclufl.org

---

[10] Moreover, civil rights cases like this one, seeking only injunctive and corresponding declaratory
relief, are the "very paradigm of a proper 23(b)(2) class." *G.H.*, 339 F.R.D. at 590–91; *Amchem Prods.,
Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful,
class-based discrimination are prime examples" of Rule 23(b)(2) class actions).

31

*\* Admitted pro hac vice*
*Counsel for All Plaintiffs and the Proposed
Class*