UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

H.C.R., D.G.M., and H.P., *on behalf of themselves and all others similarly situated*,

   Plaintiffs,

v.

KRISTI NOEM, *Secretary of the United States Department of Homeland Security, et al.*,

   Defendants.

Case No 2:25-cv-00747-SPC-DNF

**THE STATE DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs' Reply relies on the same incorrect or misstated factual claims and unsupported legal arguments proffered in their Motion. Accordingly, the State Defendants submit this sur-reply to inform the Court of the true state of affairs at the Facility and note that Plaintiffs have again failed to cite a single case demonstrating a First Amendment violation.

**ARGUMENT**

**I.   Plaintiffs are not likely to succeed on the merits.**

A.  The *Turner* analysis applies to the Facility's rules on legal access.

Plaintiffs attempt to sidestep the Supreme Court's decision in *Turner* by claiming that its four-factor test, and its progeny from the Eleventh Circuit, do not apply to immigration detention centers. They are wrong.

The Supreme Court established in *Turner* that "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The Eleventh Circuit added in *Pesci I* and *Pesci II* that "[m]any of these same considerations apply in civil commitment scenarios, where courts must also protect constitutional rights while showing appropriate deference to facility administrators." *Pesci v. Budz* (*Pesci II*), 935 F.3d 1159, 1166 (11th Cir. 2019); *see also Pesci v. Budz* (*Pesci I*), 730 F.3d 1291, 1297 (11th Cir. 2013). While acknowledging "the range of legitimate governmental interests is narrower [in civil detention facilities] than it is in a prison context," the Eleventh Circuit reaffirmed that "institutional order,

2

safety, and security remain paramount in the civil detention context." *Pesci II*, 935 F.3d at 1166 (quoting *Pesci I*, 730 F.3d at 1298). To that end, it also made clear that although persons "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals," *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982), "this observation does not warrant further departure from the *Turner* standard" in the civil detention context. *Pesci II*, 935 F.3d at 1166 (quoting *Pesci I*, 730 F.3d at 1298) (citation modified).

Consistent with the Eleventh Circuit's declaration, courts across the country, including in this Circuit, have applied *Turner* to restrictions on immigrant detainees' constitutional rights. *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1038–39 (D.C. Cir. 2014) (applying *Turner* to regulations on detainees at Guantanamo Bay); *United States v. Singh*, WL 3579461, at *1–2 (M.D. Ga. July 25, 2018); (same for regulations on ICE immigration detainees); *Dep't of Homeland Sec. v. Ayvazian*, 2015 WL 5315206, at *4 (S.D. Fla. Sept. 11, 2015) (same).[1] This Court should do the same.

B. <u>The regulations are reasonably related to security interests.</u>

Plaintiffs also claim that the Court should grant its Motion, even if *Turner* applies, because the Facility's restrictions fail that analysis. Wrong again.

---

[1] *See also, e.g.*, *United States v. Glushchenko*, 2019 WL 3290334, at *2 (D. Ariz. July 22, 2019); *Lyon v. U.S. Immigration & Customs Enforcement*, 171 F. Supp. 3d 961, 986 n.18 (N.D. Cal. 2016) ("In order to give the necessary deference to the government's interests in institutional order and security, the Court will apply the *Turner* four-factor test."); *In re Soliman*, 134 F. Supp. 2d 1238, 1252–53 (N.D. Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002).

Specifically, Plaintiffs argue that the Facility's rules "clearly violate Plaintiffs' First Amendment rights." Reply at 19. There are two problems with their argument. First, as the State Defendants' filings demonstrate, the Facility has been providing detainees timely, confidential, and otherwise constitutionally sufficient access to counsel since before Plaintiffs filed this suit. Plaintiffs' cherry-picked anecdotes and other attempts to downplay that access do not change this fact.

Second, even after three months and three rounds of briefing, Plaintiffs still cannot cite a single case demonstrating that the First Amendment requires the State Defendants to provide the forms of legal access they are not currently providing – i.e., confidential outgoing telephone calls (in addition to confidential video conferences), on-demand legal meetings, and public postings describing the entirety of the Facility's legal access guidelines. In other words, Plaintiffs do not demonstrate a likely First Amendment violation, much less a "clear" violation that would justify issuing a mandatory preliminary injunction transforming this Court into the Facility's "super warden." *See Pesci II*, 935 F.3d at 1167.

On its own, this is more than enough for the Court to deny Plaintiffs' Motion. But, as demonstrated below, Plaintiffs' arguments on the *Turner* test likewise fail.

**1.** To begin, Plaintiffs misunderstand the correct frame of analysis. Plaintiffs claim the Facility's legal access rules are not rationally related to maintaining order and security because "there is no security interest in a prolonged delay for scheduling attorney visits." *Id*. But delays between requesting a visit and the visit itself are a natural byproduct of scheduling requirements – not a policy. The policy

4

is the scheduling requirement. And *Turner* asks whether the policy promotes order and security. As the Supplemental Declaration of Mark Saunders states, it clearly does. *See* Saunders Suppl. Dec. ¶¶ 22-23, 25 (ECF 132-1).

**2.** Nonetheless, Plaintiffs suggest that the Facility's legal access rules are not reasonably related to promoting order and security because the connection between them is "arbitrary or irrational." Reply at 19. Not so.

Regulations are "arbitrary or irrational" only where there is little to no "logical connection between the regulation and the asserted goal." *Turner*, 482 U.S. at 89; *see Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 970-71 (11th Cir. 2018). That is not the case here. Rather, the Facility's scheduling requirement and other regulations on legal meetings have a "valid, rational connection" to maintaining order and security at the Facility.

For example, requiring attorneys to schedule meetings in advance ensures the Facility has sufficient staff and resources to monitor and facilitate the meeting as well as monitor and protect all other detainees and visitors. Saunders Suppl. Dec. ¶ 25. Alternatively, allowing on-demand visits could endanger staff and visitors by requiring staff to divert resources away from monitoring the detainees and protecting visitors at a moment's notice to process an unexpected influx of attorneys requesting meetings. *Id*. Likewise, inspecting attorneys' belongings and legal materials for contraband – without reading or reviewing them – reduces the flow of drugs and weapons into the Facility, thereby protecting all detainees and staff. In other words, the Facility's regulations have "more than a formalistic logical

5

connection . . . between the policy and the problems it purports to solve." *Pesci II*, 935 F.3d at 1167 (quoting *Prison Legal News*, 890 F.3d at 965).

Moreover, the regulations "operate in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 90. And the State Defendants need not "adduce specific evidence of a causal link between a prison policy and actual incidents of violence." *Pesci II*, 935 F.3d at 1168 (quoting *Prison Legal News*, 890 F.3d at 968). Instead, "[r]esponsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132-33 (1977). In other words, prison officials must be able "to *anticipate* security problems and to . . . adopt innovative solutions to those problems." *Turner*, 482 U.S. at 89.

**3.** Last, Plaintiffs again claim there are alternative methods of accommodating detainees' rights that the Court may use as evidence the Facility's rules are not reasonably related to maintaining order and security. Plaintiffs initially offered the State Defendants' non-operative visitation policy as an alternative. They now rely on the ICE detention standards. The result is the same.

The detention standards are not an "obvious, easy alternative" because they do not "fully accommodate[e] the [detainees'] rights." *Turner*, 482 U.S. at 90-91. Most notably, they do not require on-demand meetings between detainees and their counsel, as Plaintiffs request. *See* Am. Compl., Prayer for Relief (d); Motion, Ex. 2 ¶ 2(a). Moreover, the State Defendants already meet the detention standards,

6

except for providing a second form of confidential electronic communication. And the financial burden of installing and operating numerous telephones for this purpose would impose far more than a *de minimis* cost to the State Defendants' "penological interests" by diverting funds from securing and protecting detainees, staff, and visitors. *See Turner*, 482 U.S. at 91.

    C. <u>Plaintiffs continue to misrepresent or misapprehend the salient facts.</u>

    **1.** Plaintiffs continue to insist that "detainees cannot speak confidentially in legal videoconferences." Reply at 7. This is incorrect.

    Plaintiffs cite "repeated and specific testimony from attorneys that their detained clients have confirmed lack of confidential conditions for legal videoconferences." *Id.* But they fail to mention that this "testimony" comes from meetings in July and early August. *Id.* (citing ECF 114-2, ¶ 9; ECF 114-3, ¶ 7; ECF 114-4, ¶ 8; ECF 114-7, ¶ 5; ECF 114-6, ¶¶ 19-20). Thus, all but one of these meetings occurred before the Facility began conducting videoconferences in the current location on August 7. *See* Saunders Second Supplemental Declaration, ¶ 16 (attached as Exhibit 1). Since then, all meetings have occurred in the private rooms pictured in Exhibit 9 of the Supplemental Declaration. Staff sit in chairs outside the rooms' closed doors to ensure the safety and security of the detainees and attorneys, but cannot hear their conversation. *Id.* ¶ 15, Ex. 11. And cameras monitor the outside of the meeting rooms, but do not capture anything inside the rooms. Saunders Suppl. Dec. ¶¶ 47, 53.

7

In other words, Plaintiffs' offer only a single anecdote suggesting that the meetings held in the private rooms are not confidential. And the anecdote claims the meeting occurred in a "tent," which was where the Facility held meetings before it completed the separate, physical structure on August 7th. ECF 114-6, ¶ 20.

**2.** Likewise, Plaintiffs maintain that the Facility requires attorneys to submit documents they plan to bring to meetings for review and approval *and* to request meetings three business days in advance. Reply at 3, 8. Also not correct.

To support the first point, Plaintiffs cite the Visitation Request Form attached to the State Defendants' response. Saunders Suppl. Decl. ¶ 20, Ex. 3. The cited language, however, was inadvertently left on the form and has never been enforced. Saunders Second Suppl. Decl. ¶¶ 11-12, Ex. 2. Facility staff have never required attorneys to submit documents for approval before his or her visit. *Id*. ¶ 12. And the language no longer appears in the operative Visitation Request Form. *Id*., Ex. 2.

Likewise, to support the latter, Plaintiffs cite the Facility's Visitation Policy. *See* Saunders Suppl. Dec. Ex. 10. But that cited language was also inadvertently left in the Visitation Policy *and* has similarly never been enforced. Saunders Second Suppl. Decl. ¶¶ 9-10. And the language no longer appears in the operative policy. *Id*., Ex. 1. Indeed, the Facility has repeatedly scheduled visits on the same day of the request, which would not be possible if Plaintiffs' allegations were true. *Id*. ¶ 14, Ex. 3-10.

8

Plaintiffs attempt to minimize this point by noting that the State Defendants "identify only three instances" of meetings held the same day of the request. Reply at 6. But those three instances were just a sample. In reality, there have been at least 12 same day visits. Saunders Second Suppl. Decl. ¶ 14, Ex. 3-10. Moreover, of the 515 visits conducted, staff scheduled 395 – or more than 76% – for fewer than 3 days from the date of the request. *Id.* ¶¶ 13-14. In other words, if Plaintiffs were correct, the Facility has been violating its own policy in more than 3/4 of meetings.

**3.** Last, Plaintiffs claimed in the Amended Complaint that counsel for Plaintiff D.G.M., Jose Flores, contacted the Facility on August 25 to request a meeting, but did not receive a response. Am. Compl. ¶ 52. The State Defendants acknowledged that they did not respond, but explained that the Facility's malware software quarantined the request without their knowledge. Response at 19. The State Defendants urged counsel to send an e-mail from a different address. *Id.* In their Reply, Plaintiffs disregard the suggestion because "[h]is attorney had already done so, to no avail." Reply at 5. Plaintiffs are wrong. The attached e-mails show that Mr. Flores did not send a follow-up email to the Facility until October 1, requesting a videoconference on October 3, which staff immediately provided, in line with the Facility's practices. Second Suppl. Dec. 20, Ex. 12.

D. <u>Plaintiffs will not succeed on class certification.</u>

On classwide relief, the question before the Court is not whether it could ever issue interim relief, but whether Plaintiffs have demonstrated a *likelihood of success on the merits* of the claims and the procedural vehicle they invoke *here*.

9

Because Plaintiffs seek class-wide injunctive relief under Rule 23(b)(2), the "likelihood of success on the merits" necessarily turns on whether a class is likely to be certified after the rigorous Rule 23 analysis. *See, e.g.*, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). Certification is not likely. Their putative class is indefinite, individualized, and incapable of a single indivisible remedy. These are fatal defects that preclude certification. The recent decisions in *A.A.R.P. v. Trump* and *Trump v. CASA* do not suggest otherwise.

1. *Recent Supreme Court precedent does not change the outcome.*

First, neither *A.A.R.P. v. Trump*, 605 U.S. 91 (2025) nor *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) impact this Court's analysis because the relief sought here is categorically different. In both cases, the Supreme Court granted temporary injunctions preserving the status quo under time constraints. They did *not* authorize courts to impose structural injunctions affecting hundreds of individuals whose circumstances change daily, and thereby transform the operation of state facilities, before certifying the putative class, as Plaintiffs request. That request requires precisely the evidentiary and procedural safeguards (class definition, commonality, typicality, and ascertainability) that Rule 23 provides.

Likewise, neither decision authorizes "provisional" certification without satisfying Rule 23. In *A.A.R.P.*, the Supreme Court confronted an emergency situation involving the due process rights of two detainees facing imminent removal. The Court determined "[a] district court's inaction in the face of *extreme urgency* and a high risk of 'serious, perhaps irreparable,' consequences" was

10

tantamount to "refusing an injunction." *A.A.R.P.*, 605 U.S. at 94 (emphasis added). Under these unique circumstances, the Court issued "temporary injunctive relief to the putative class . . . to preserve [its] jurisdiction pending appeal." *Id.* at 97. The Court did not address the standards for granting a class-wide preliminary injunction. Accordingly, the stringent requirements of Rule 23 remain.

*CASA* addressed the *scope* of injunctions (i.e., the applicability of injunctive relief to nonparties), not the standards for certifying a class. The concurrence, on which Plaintiffs rely, acknowledged that preliminary injunctions can have class-like effects. But *CASA* says nothing about bypassing Rule 23's requirements or recognizing a "provisional" class at the preliminary injunction stage.

Together, *A.A.R.P.* and *CASA* simply reaffirm that courts retain equitable discretion to issue interim relief.[2] They do not authorize class-wide preliminary injunction without plaintiffs demonstrating a likelihood of satisfying the "rigorous analysis" required by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

Plaintiffs also cite to *dicta* in *Benjamin v. Oliver*, stating that "class-wide injunctive relief . . . is no longer in doubt" post *A.A.R.P.* 2025 WL 2542072, at *17 (N.D. Ga. Sept. 4, 2025). But *Benjamin* involved a relatively contained medical policy in the prison context, supported by a more developed factual record. Moreover, it is both wrong and does not displace the "rigorous analysis" required

---

[2] Plaintiffs' attempt to transform those limited holdings into a new procedural mechanism for "provisional certification" finds no support in either decision and squarely conflicts with Eleventh Circuit precedent. *See Brown*, 817 F.3d 1225 (11th Cir. 2016); *Sellers v. Rushmore Loan Mgmt. Services, LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019).

11

by *Dukes*. *See Brown*, 817 F.3d at 1234; *Sellers v. Rushmore Loan Mgmt. Services, LLC*, 941 F.3d 1031 (11th Cir. 2019).

Absent a showing that such a class would likely be certified – and no such showing has been made here – Plaintiffs have not met their burden for class-wide preliminary relief. Plaintiffs are trying to turn *dicta* about temporary relief from these cases into a new procedural shortcut that the Supreme Court never created.

2. *Plaintiffs' "provisional certification" theory is unsupported by law*.

Rule 23 contains no provision for "provisional" certification. The Supreme Court has consistently required a "rigorous analysis" and evidentiary proof before any class may be certified, even a Rule 23(b)(2) injunctive class. *E.g., Dukes*, 564 U.S. at 350–51.

The Eleventh Circuit likewise holds that "mere allegations will not suffice" and that courts may not certify a class based on assumptions or pleading-stage allegations. *Brown*, 817 F.3d at 1234 ("The district court also misstated the law when it said that it 'accepts the allegations in the complaint as true'"); *see, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267–68 (11th Cir. 2009); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). Moreover, the Eleventh Circuit has rejected attempts to certify classes without discovery. *Mills*, 511 F.3d at 1309 (reversing and remanding lower courts order on class certification to complete the Rule 23 analysis).

Plaintiffs' invitation to "provisionally" certify a class at this stage finds no support in Supreme Court or Eleventh Circuit caselaw. The rule in this Circuit remains clear: certification requires an evidentiary showing, not conjecture.

3. *Rule 23(b)(2) requires a single, indivisible remedy.*

Plaintiffs assert that "access to counsel" constitutes a single indivisible remedy applicable to all detainees. The record shows otherwise. Detainees at the facility vary widely in immigration status, detention length, and representational needs. Some have counsel and communicate freely; others do not seek representation or are subject to separate federal processes. These factual differences preclude a uniform injunction that applies equally to all class members. Rule 23(b)(2) does not authorize individualized relief repackaged as an institutional injunction.

4. *The proposed class is not ascertainable.*

Even a Rule 23(b)(2) class must be sufficiently definite to determine membership. *See, e.g.*, *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1180 (11th Cir. 2019) (concluding proposed class was "fatally overinclusive" because it "fail[ed] to limit membership to providers who are likely to see more [insureds]" and "would sweep them in (and others like them).")[3] Plaintiffs' definition – "all current and future detainees" – improperly sweeps in hypothetical future individuals with no present standing. The Southern

---

[3] *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012).

13

District of Florida recently rejected nearly identical language as overbroad and unworkable. *See Fla. Immigrant Coalition v. Uthmeier*, 780 F. Supp. 3d 1235, 1270 (S.D. Fla. 2025).

    5. *Commonality and typicality are illusory.*

Plaintiffs claim a "common" injury, but their own declarations show wide variations in experience. These factual differences mean there is no single question capable of being resolved in "one stroke." *See Dukes*, 564 U.S. at 350. And the Facility has now implemented robust procedures for attorney access, further undermining any claim of uniform ongoing harm.

    6. *Broad institutional injunctions require heightened proof.*

Even where institutional conditions are challenged, the federal courts demand careful proof of uniform injury and class cohesion. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847 (5th Cir. 2012) (finding that proposed class's claims allege individual injuries that are not uniform). And Plaintiffs' reliance on *Gayle v. Meade* is misplaced. *Gayle* involved multiple ICE facilities with a federal defendant and a fully developed record, not a temporary state facility where detainees have access to counsel. 614 F. Supp. 3d 1175, 1189 (S.D. Fla. 2020)

## II. Plaintiffs do not show they will suffer imminent cognizable harm.

Plaintiffs maintain that detainees will suffer irreparable harm if the Court does not grant their requested relief. Their claims, however, continue to misunderstand the law and misstate the conditions at the Facility.

Plaintiffs claim they are suffering harm because "Defendants continue to deny detained immigrants the ability to request unmonitored legal calls, fail to provide confidential spaces for video visits, unreasonably delay visits, and fail to provide basic information regarding attorney access at the [F]acility." Reply at 23.

There are two problems with this claim. First, with regards to their claims of delayed and non-confidential legal meetings, Plaintiffs again misstate the facts. *See* Sur-Reply, *supra* at 7-10. Second, failure to (1) install unmonitored legal telephones as a second method of confidential communication and (2) post information around the Facility regarding the rules for attorney access do not constitute irreparable harm because these failures are not cognizable injuries.[4] "No legally cognizable injury arises unless an interest is protected by statute or otherwise." *Cox Cable Commc'ns, Inc. v. United States,* 992 F.2d 1178, 1182 (11th Cir. 1993). As discussed, Plaintiffs cannot cite a single case suggesting that the First Amendment requires immigration detention centers to provide multiple methods of confidential communications *and* post its protocols for attorney access around the facility. Accordingly, Plaintiffs cannot show a cognizable, and thus irreparable, harm from these failures. *See Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1330-31 (N.D. Ga. 2020) (concluding claimed injury of preferred candidates losing an election "d[id] not create a legally cognizable harm, much less an irreparable one").

---

[4] Moreover, the Facility already posts information explaining the protocols for requesting and obtaining meetings with attorneys. *See* Response at 11; Suppl Dec. ¶¶ 73-75.

### III. The balance of equities strongly favors the State Defendants.

Last, Plaintiffs rely on general propositions to show the balance of the equities weighs in their favor. But the propositions do not apply here.

Plaintiffs state that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Gayle*, 614 F. Supp. 3d at 1206. Similarly, they note that "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.,* 2020 WL 3265533, at *33 (D.D.C. June 17, 2020) (citation modified). All true, but irrelevant, because the State Defendants are complying with the First Amendment.

Accordingly, the balance of the equities strongly favors permitting the State Defendants to exercise their discretion over the Facility, rather than the Court usurping that discretion and installing itself as a "super warden" to order the State Defendants to do what they are already doing. *Pesci II*, 935 F.3d at 1167.

Dated: October 9, 2025

Francis A. Zacherl, III (FBN 868094)
Timothy W. Odzer (FBN 1020018)
Shiza Francis (FBN 1058470)
**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd, Suite 4100
Miami, Florida 33131
(305) 358-6300
FZacherl@shutts.com
TOdzer@shutts.com
SFrancis@shutts.com

Respectfully submitted,

/s/ *Nicholas J.P. Meros*
Nicholas J.P. Meros (FBN 120270)
Tara K. Price (FBN 98073)
Kassandra S. Reardon (FBN 1033220)
**SHUTTS & BOWEN LLP**
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
NMeros@shutts.com
TPrice@shutts.com
KReardon@shutts.com

*Counsel for the State Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system on October 9, 2025.

/s/ *Nicholas J.P. Meros*
*Counsel for the State Defendants*