# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

H.C.R., D.G.M., and H.P., *on behalf of themselves and all others similarly situated*,

    Plaintiffs,

                                    Case No 2:25-cv-00747-SPC-DNF

*v.*

KRISTI NOEM, *Secretary of the United States Department of Homeland Security, et al.*,

    Defendants.

## STATE DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

    Defendants, Ron DeSantis, in his official capacity as Governor of the State of Florida, Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management, and the Florida Division of Emergency Management ("State Defendants"), move to dismiss Plaintiff's Amended Complaint for lack of subject matter jurisdiction (under Federal Rule of Civil Procedure 12(b)(1)) and for failure to state a claim (under Rule 12(b)(6)).

## INTRODUCTION & BACKGROUND

    The Court is familiar with the facts of this case from the parties' extensive briefing. Nonetheless, to summarize, on June 23, 2025, the State of Florida began constructing a temporary immigration detention facility on a portion of the Dade-Collier Training and Transition Airport to temporarily house illegal aliens.

Amended Complaint ¶ 2. The facility, known as Alligator Alcatraz ("Facility"), began accepting detainees on July 2, 2025. Declaration of Mark Saunders ("Saunders Decl."), ¶ 4. Because of factors beyond the State Defendants' control, the Facility did not conduct the first videoconference meetings between detainees and their counsel until July 15, 2025. *Id.* ¶¶ 20, 22. And the Facility held the first in-person legal meetings on July 28, 2025. Supplemental Declaration of Mark Saunders ("Suppl. Decl.") ¶¶ 36.

Plaintiffs, unsatisfied with their access to legal counsel, filed this lawsuit on July 16, 2025, in the Southern District of Florida. Doc. 1. That Court dismissed the case for improper venue and transferred it here. Docs. 86, 88. After holding a case management conference and issuing a scheduling order, Plaintiffs filed the operative Amended Complaint. Doc. 113. In it, Plaintiffs ask the Court to declare that the Defendants' actions violated the First Amendment and order Defendants to:

d) "permit and ensure that Detained Plaintiffs . . . can meet and confer confidentially in person with their current or prospective legal representatives and legal assistants during legal visitation hours, without requiring pre-scheduled visits, with minimum visitation hours of eight hours on regular business days and four hours on weekends and holidays";

e) "permit and ensure" that the "attorney-client videoconference or telephone conversations . . . are timely, confidential, unmonitored, and unrecorded";

f) "provide and ensure a method for [detainees] . . . to place timely, free, confidential, unmonitored, and unrecorded outgoing legal calls";

g) "provide and ensure a method for timely and confidential legal document exchange and signature, including via fax, email, or electronic signature platform, courier service, and mail";

h) "provide and post in locations accessible and visible to all . . . written information about protocols for attorney-client communication in English, Spanish, and Haitian Creole";

i) "maintain publicly available information regarding protocols for attorney-client communication via Defendant ICE and/or State of Florida websites";

j) accurately update the location of detainees held at the Facility in the ICE Online Detainee Locator System "within 24 hours of their transfer to the facility."

Am. Compl. Requests for Relief (d)-(j). The State Defendants are, and have been, providing detainees the relief requested in requests (d), (e), and (g).[1] And the First Amendment does not require the remaining requests in Items (f), (h), (i), and (j).

Accordingly, the Amended Complaint's requests for injunctive relief in Items (d), (e), and (g) are moot. And the Amended Complaint fails to state a claim under the First Amendment for the remaining requests. Thus, the Court should dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6).

## **LEGAL STANDARDS**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face,"

---

[1] The lone exception is the portion of Request (d) that asks the Court to order the State Defendants to permit detainees to meet with their legal counsel "without requiring pre-scheduled visits." Am. Compl. at Request for Relief (d). The State Defendants have not been providing on-demand legal meetings because the First Amendment does not require them.

meaning it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). Courts must "assume the veracity of well-pleaded factual allegations," but may not credit allegations in the form of "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (citation modified). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" either. *Iqbal*, 556 U.S. at 678. (citations omitted). And "legal conclusions must be supported by factual allegations." *Randall v. Scott,* 610 F.3d 701, 709–10 (11th Cir. 2010).

Motions to dismiss under Rule 12(b)(1), on the other hand, challenge the Court's subject matter jurisdiction. These challenges come in two forms: facial and factual. *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.,* 501 F.3d 1244, 1251 (11th Cir. 2007). On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs standards similar to those governing Rule 12(b)(6). *Houston v. Marod Supermarkets, Inc.,* 733 F.3d 1323, 1335 (11th Cir. 2013). Rule 12(b)(1) factual attacks "challenge subject matter jurisdiction in fact, irrespective of the pleadings." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003). Thus, when a district court evaluates a factual attack, it "may consider extrinsic evidence such as testimony and affidavits." *Id.* And the court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case."

*Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. May 1981)). Accordingly, "no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

## ARGUMENT

### I. Plaintiffs' requests for timely and confidential in-person and videoconference meetings and confidential legal document exchange are moot.

A case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 86–94 (1947)). Put another way, a case becomes moot when "events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citation modified). And a case "may be moot as to some issues yet 'live' as to others." *Fla. Bd. of Bus. Regul. v. N.L.R.B.*, 605 F.2d 916, 918 (5th Cir. 1979); (quoting *Powell*, 395 U.S. at 497).

"A moot case is nonjusticiable and Article III courts lack jurisdiction to entertain it." *Troiano v. Supervisor of Elections,* 382 F.3d 1276, 1281 (11th Cir. 2004). Thus, because mootness is jurisdictional, a moot case must be dismissed. *See, e.g.*, *Sierra Club v. EPA*, 315 F.3d 1295, 1299 (11th Cir. 2002).

**A.** For that reason, the State Defendants bring this motion to dismiss the Amended Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). And the Motion presents a factual attack on this Court's subject matter jurisdiction because the mootness analysis requires courts to "look at the events at the present time, not at the time the complaint was filed." *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1254 (11th Cir. 2001); *see also Lawrence*, 919 F.2d at 1529 ("Factual attacks . . . challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings.").

As a result, this Court may consider "matters outside the pleadings, such as testimony and affidavits," *Lawrence*, 919 F.2d at 1529, and "the presumption of truthfulness afforded a plaintiff under Federal Rule of Civil Procedure 12(b)(6) does not attach," *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999). Here, that means this Court can consider the declarations and exhibits submitted in support of and in opposition to Plaintiffs' motion for preliminary injunction. (Docs. 49-1 & 49-2; 132-1; and 152-1). *See, e.g.*, *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1187, 1188-89 (11th Cir. 2007) (considering affidavits attached to motion for summary judgment claiming mootness when ruling on motion that it subsequently treated as motion to dismiss under Rule 12(b)(1)); *Lawrence*, 919 F.2d at 1527, 1529-30 (considering affidavits attached to motion to dismiss when deciding factual attack under Rule 12(b)(1)).

**B.** When evaluating mootness, "[t]he fundamental question is whether events have occurred that deprive [the Court] of the ability to give the [plaintiff]

meaningful relief." *Djadju v. Vega*, 32 F.4th 1102, 1107 (11th Cir. 2022) (citing *United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008)). The mootness doctrine "demands that there be something about the case that remains alive, present, real, and immediate so that a federal court can provide redress in some palpable way." *Gagliardi v. TJCV Land Tr.,* 889 F.3d 728, 733 (11th Cir. 2018).

Relevant here, requests (d), (e), and (g) ask this Court for timely and confidential videoconference and in-person meetings between detainees and their attorneys, and confidential legal document exchange for all detainees. Am. Compl. Requests for Relief (d)-(e), and (g). But the filings and evidence in this case demonstrate that the State Defendants began providing this relief before Plaintiffs filed this suit. And they have not stopped since.

With regard to in-person and videoconference meetings, Facility staff quickly and timely respond to emails requesting meetings between detainees and their counsel and continue to make every reasonable effort to accommodate the first requested meeting time. *See* Suppl. Decl. ¶¶ 27-30. Staff also strive to accommodate urgent requests for emergency meetings and, regardless of how framed, staff routinely schedule meetings within 24 hours of the request, including on the same day. *See* Suppl. Decl. ¶¶ 17-18, 29, Exs. 5-8. Indeed, there have been at least 12 same day visits, Second Supplemental Declaration of Mark Saunders ("Second Suppl. Decl.") ¶ 14, Exs. 3-10, and of the 515 visits conducted, staff scheduled 395 – or more than 76% – for fewer than 3 days from the date of the request, *id.* ¶¶ 13-14.

All meetings between detainees and their counsel are also confidential. The Facility conducts all attorney meetings in a separate structure with private rooms without staff present. Suppl. Decl. ¶¶ 43-44; Ex. 9. Only detainees and their counsel use these rooms. *Id.* ¶¶ 39-40. Attorneys may share and exchange documents with the detainees during the in-person meetings. *Id* ¶ 45. Detainees may keep these documents for personal use. *Id.* If the documents are too voluminous for the detainee to keep in his holding cell, the documents are stored with the detainee's property and are accessible upon request. *Id.*

Likewise, videoconference meetings are invite-only. *Id.* ¶ 51. Facility staff provide the attorneys a dedicated link to the videoconference platform via e-mail when they schedule the meeting. *Id.* The videoconferences are not recorded or transcribed. *Id.* ¶ 53. And detainees use laptop computers with the Zoom application and over-the-ear headphones to see and speak with their attorney(s). *Id.* ¶ 52.

Facility staff sit in chairs outside the room's closed door for security purposes, but they are neither close enough to see images on the computer screen during videoconferences or on documents exchanged during in-person meetings, nor to hear the detainees' conversations with their attorneys. Suppl. Decl. ¶ 46; Second Suppl. Dec. ¶ 15, Ex. 11. Exhibit 9 to the Supplemental Declaration includes pictures of meeting rooms and the location of staff during the meetings. Doc. 132-1, at 81-82. The Facility has security cameras outside of the meeting rooms, but none inside of the rooms, to monitor the meetings for the safety of all parties.

Suppl. Decl. ¶¶ 47, 53. The cameras do not record audio and cannot capture the contents of any documents being exchanged. *Id.*

Last, the Facility permits both in-person and videoconference meetings between 7 a.m. and 7 p.m. from Monday through Saturday, and from 8 a.m. to 4 p.m. on Sundays. *Id.* ¶ 26. Indeed, since the first videoconference meeting occurred four months ago on July 15, 2025, detainees and their counsel have held videoconference meetings almost every day, except on Sundays, even though Sundays are available. *Id.* ¶ 57. To date, no detainee or attorney has raised an issue with any aspect of the in-person or videoconference meetings with Facility staff. *Id.*

As for document exchange, the Facility allows attorneys to confidentially send legal documents to detainees via e-mail and courier service. *Id.* ¶ 62. Attorneys can send an e-mail to the Facility's legal inbox attaching documents for detainees to review or sign. *Id.* Facility staff will then print out the documents without reviewing their contents and deliver the documents to the detainees in confidential folders or pouches. *Id.* If it is a document that needs to be signed, staff will deliver the document to the detainee to sign and then scan and e-mail the signed document back to the attorney. *Id.*

Attorneys can also send legal mail to the Facility's mailing address through regular mail or a courier service. *Id.* ¶ 63. Facility staff inspect the packages received via mail or courier service for contraband in the presence of the detainees, but do not read or otherwise inspect their contents. *Id.* Staff then deliver the

documents to the detainees. *Id*. And detainees may bring any documents they
receive to their in-person meetings, and either keep them for personal use or sign
and provide them to their attorneys. *Id*. ¶ 69.

The above demonstrates that the State Defendants, at least for requests (d),
(e), and (g) are providing Plaintiffs all the relief they seek. In other words, there is
no longer a live controversy "with respect to [those requests] which the court can
give meaningful relief." *Fla. Ass'n of Rehab. Facilities v. Fla. Dep't of Health &
Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000). Accordingly, those requests
for relief are moot and must be dismissed. *See Chafin v. Chafin*, 568 U.S. 165, 172
(2013) ("[A] case becomes moot only when it is impossible for a court to grant any
effectual relief." (citation modified) (quoting *Knox v. Service Employees*, 567 U.S.
298, 307 (2012)); *see also Sumrall v. Georgia Dep't of Corr.*, 154 F.4th 1304, 1315-
16 (11th Cir. 2025) ("The district court correctly determined that this claim was
moot because the only relief Sumrall sought in connection with his request for
vegan meals was to be placed back on the AEP—which happened nearly five years
ago."); *C.M. v. Noem*, -- F.Supp.3d ----, No. 25-CV-23182-RAR, 2025 WL
2400953, at *11 (S.D. Fla. Aug. 18, 2025) ("The [Plaintiffs] have therefore received
all the relief they seek. The Court can do no more.").

**C.** "Any decision on the merits of a moot case or issue would be an
impermissible advisory opinion." *Fla. Ass'n of Rehab. Facilities,* 225 F.3d at 1217.
"[T]he oldest and most consistent thread in the federal law of justiciability is that
the federal courts will not give advisory opinions." *Knight v. Fla. Dep't of Corr.*,

936 F.3d 1322, 1338 (11th Cir. 2019) (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)). And while courts have recognized limited exceptions to the mootness doctrine, none apply here.[2]

The first is the voluntary cessation doctrine. Under this exception, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Cambridge Christian Sch., Inc. v. Fla. High sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1284 (11th Cir. 2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000)). Otherwise, "a defendant could willingly change its behavior to avoid a lawsuit and then, after doing so, 'return to its old ways.'" *Id.* (quoting *Keohane*, 952 F.3d at 1267 (citation modified)). This exception, however, does not apply – i.e., a defendant's voluntary cessation of the challenged conduct *does* moot a case – where "subsequent events

---

[2] Two rarely-used exceptions, neither of which are relevant here, are worthy of a brief note. The first is the "collateral consequences" exception, which states that an otherwise moot claim based on a court's order remains live if the order could have dangerous or significant collateral consequences if not reviewed. *See Bekier v. Bekier*, 248 F.3d 1051, 1054 n.4 (11th Cir. 2001), *abrogated on other grounds by Chafin v. Chafin*, 568 U.S. 165 (2013). This exception does not apply because a court's order did not moot Plaintiffs' requests for relief – the State Defendants mooted the requests by providing the relief. The second, the "inherently transitory" exception, applies to putative class actions. It provides that class action claims that are inherently short-lived and tend to expire before class certification (i.e., "inherently transitory") are "not necessarily moot upon the termination of the named plaintiff's claim," *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75-76 (2013), if it is " 'certain that other persons similarly situated' will continue to be subject to the challenged conduct," *id.* (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (citation modified)). This exception is not relevant here because the Facility's policies apply to both the named Plaintiffs *and* all potential members of the putative class.

ma[k]e it *absolutely clear* that the allegedly wrongful behavior could not
reasonably be expected to recur." *Flanigan's Enters., Inc. of Ga. v. City of Sandy
Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc) (emphasis added),
*abrogated on other grounds by Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021)
(quoting *Laidlaw*, 528 U.S. at 189). Put another way, "intervening events will
render a case moot only when [courts] have no reasonable expectation that the
challenged practice will resume after the lawsuit is dismissed." *Id.* (citation
modified) (quoting *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162
F.3d 627, 629 (11th Cir. 1998)). That is the case here.

This test is a "stringent" one, so the party asserting mootness "generally
bears a heavy burden of persua[ding] the court that the challenged conduct cannot
reasonably be expected to start up again." *Id.* (citation modified) (quoting *Laidlaw*,
528 U.S. at 189). But this burden flips when the defendant is a governmental entity
because "there is a rebuttable presumption that the objectionable behavior will *not*
recur." *Troiano*, 382 F.3d at 1283 (emphasis in original); *Sheely*, 505 F.3d at 1184
(same). That is because government defendants "are more likely than private
defendants to honor a professed commitment to changed ways." *Cambridge
Christian*, 115 F.4th at 1284 (quoting *Keohane*, 952 F.3d at 1267-68); *see also
Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320, 1328-29 (11th Cir.
2004) ("[G]overnmental entities and officials have been given considerably more
leeway than private parties in the presumption that they are unlikely to resume
illegal activities."). Thus, the party challenging the government's conduct "must

show a reasonable expectation that the government will reverse course" to invoke the exception and defeat a mootness claim. *Djadju*, 32 F.4th at 1108 (quoting *Walker v City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018).

Given the deference with which courts view voluntary changes by government defendants, "plaintiff[s] disputing a finding of mootness must present more than [m]ere speculation that the [Defendant] may return to its previous ways." *Flanigan's*, 868 F.3d at 1256 (quoting *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005) ("Mere speculation that the City may return to its previous ways is no substitute for concrete evidence of secret intentions.")). Instead, plaintiffs "bear[] the burden of presenting affirmative evidence that its challenge is no longer moot." *City of Miami*, 402 F.3d at 1334. This is a substantial burden, demonstrated by the fact that "[w]hen government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Troiano*, 382 F.3d at 1283 (collecting cases); *see also Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) ("Hence, the Supreme Court has held almost uniformly that voluntary cessation by a government defendant moots the claim.") (citation modified). Indeed, the Supreme Court "has rejected an assertion of mootness in this kind of challenge *only* when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated." *Troiano*, 382 F.3d at 1283-84 (emphasis in original).

When deciding whether a plaintiff has met that burden, courts consider three factors: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) whether the decision to end the challenged conduct was "unambiguous" and can be "fairly viewed as being permanent and complete"; and (3) "whether the government has consistently maintained its commitment to the new policy." *Cambridge Christian*, 115 F.4th at 1284-85 (citation modified) (quoting *Keohane*, 952 F.3d at 1268). These factors are neither exclusive nor is any one dispositive. *Flanigan's*, 868 F.3d at 1257. Rather, courts should find that a government defendant's voluntary cessation of challenged conduct moots a case "when the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged policy." *Djadju*, 32 F.4th at 1109 (quoting *Keohane*, 952 F.3d at 1268). Thus, for our purposes, the key inquiry is whether "the evidence leads us to a reasonable expectation" that the State Defendants will "reverse course" and reenact the allegedly offensive policies regarding access to legal counsel at the Facility if the Court grants this Motion.

**D.** Plaintiffs have argued, and will likely again in response to this motion, that the State Defendants had a policy of refusing to provide detainees access to their counsel and to confidential legal document exchange, and began providing access to both only in response to this lawsuit and in an effort to skirt this Court's jurisdiction. Plft.'s Reply at 26 (Doc. 67). Thus, the argument goes, the State

14

Defendants' "voluntary cessation" of its policy should not moot requests (d), (e),
and (g).

They will cite the fact that the Facility began accepting detainees on July 2,
but the first videoconference did not occur until July 15, the first in-person meeting
did not occur until July 28, and the Facility did not establish a process for legal
document exchange until approximately one week later. Saunders Decl. ¶¶ 4, 54-
55; Suppl. Decl. ¶¶ 34-35. All true. But the State Defendants never had a policy,
formal or otherwise, to deny access to counsel and legal document exchange.
Instead, there was a delay only because the State Defendants did not have access
to the Facility's legal inbox – the method of coordinating and scheduling meetings
between detainees and their attorneys – until July 10th, and because the Facility
had to create both a document exchange protocol and postal service system from
scratch. Saunders Decl. ¶¶ 4-7; Suppl. Decl. ¶¶ 11-12. Indeed, immediately after
gaining control of the legal inbox, Facility staff began responding to the requests
for meetings, including following up on any requests missed while staff did not
have access to the inbox. *Id.* And staff scheduled the first videoconference meeting
as soon as possible and conducted the first in-person meeting as soon as
contractors built the infrastructure to hold such meetings. Saunders Decl. ¶¶ 20-
23. Likewise, by August 7, the Facility had begun using a courier service for
detainees and their legal counsel to sign and exchange confidential documents,
while simultaneously establishing a postal service for detainees to communicate

with their counsel on-demand. State Defs.' Resp. at 15; Saunders Decl. at ¶¶ 54-55. The latter began operating in late September. Suppl. Decl. ¶¶ 62-69.

Thus, the Facility's inability to hold meetings between detainees and their counsel and facilitate confidential document exchange via mail service was not intentional, and certainly was not a policy, informal or otherwise. Instead, it was a consequence of standing up a temporary detention center for thousands of detainees in a remote area with little existing infrastructure. And, as demonstrated, the State Defendants corrected it as quickly as possible.

Accordingly, the voluntary cessation doctrine does not apply on its face. The State Defendants had no "policy" of allegedly improper conduct for them to "voluntary cease." Their policy was always to provide detainees access to their counsel and confidential legal document exchange. Saunders Decl.¶¶ 4-7, 50, 56, 58-59; Suppl. Decl. ¶¶ 3, 11, 28. They did so as quickly as possible, and have continued providing access since. *Id.* But even assuming that the State Defendants' efforts to establish a legal access and document exchange process could be seen as "voluntary ceasing" a policy of refusing to offer both, their actions still do not meet the exception – and thus requests (d), (e), and (g) are still moot – because Plaintiffs cannot show there is a reasonable expectation that the State Defendants will reverse course and stop providing detainees access to their attorneys and legal document exchange. Applying the three factors makes this clear.

As to the first factor, courts consider the timing of the policy change "and any explanations independent of this litigation which may have motivated it."

16

*Flanigan's*, 868 F.3d at 1257. As discussed, the evidence shows that events out of
their control delayed the State Defendants from providing detainees immediate
access to their counsel, but that they never had a policy of denying access. On the
contrary, the State Defendants always intended to provide access and scheduled
meetings as quickly as possible after resolving the delays. *See id.* Likewise, the
State Defendants always intended to create a confidential legal document exchange
process via mail. But it could not happen overnight. Instead, as discussed, the State
Defendants quickly employed a courier service to allow detainees to sign and
exchange confidential legal documents with their counsel, while simultaneously
establishing a postal service at the Facility for detainees to confidentially exchange
legal documents on demand. Saunders Decl. at ¶¶ 54-55; Suppl. Decl. ¶¶ 62-69.
Thus, State Defendants "have a persuasive explanation, not dependent upon this
litigation, to explain [their] course of conduct." *Flanigan's*, 868 F.3d at 1260.
*Compare Troiano*, 382 F.3d at 1285 (determining voluntary cessation did not
apply because "[Defendant's] decision to implement the changes in the voting
machines was well reasoned . . . "), *with Harrell v. The Fla. Bar*, 608 F.3d 1241,
1267 (11th Cir. 2010) (concluding voluntary cessation exception applied because
"the Board ... fail[ed] to disclose any basis for its decision").

What's more, as to timing, the State Defendants began scheduling meetings
on July 10th, and conducted the first videoconference on July 15, all before
Plaintiffs filed this lawsuit on July 16. Saunders Decl. ¶¶ 7, 22; Suppl. Decl. ¶ 34;
*see* Doc. 1. These undisputed facts show that the State Defendants did not begin

scheduling meetings between detainees and their counsel in "an attempt to manipulate [the Court's] jurisdiction." *Cambridge Christian*, 115 F.4th at 1284-85. And while it is true that the Facility did not establish its legal document exchange system until a couple weeks after Plaintiffs filed this lawsuit, or its mail system for a number of weeks more, the Eleventh Circuit has made clear that "timing considerations shouldn't be overemphasized in the voluntary-cessation analysis and, in any event, that alleged jurisdiction-manipulation is only one among several non-exhaustive factors that inform the inquiry." *Keohane*, 952 F.3d at 1271; *see also Flanigan's*, 868 F.3d at 1259 ("[T]he timing of repealing legislation should not be dispositive of our inquiry into whether there is a reasonable expectation of reenactment."). Thus, despite the delay in establishing the mail service, the first factor weighs in favor of mootness. And even if it did not, the other factors weigh decidedly in their favor.

On the second factor, courts ask "whether the government's decision to terminate the challenged conduct was unambiguous, which, in turn, entails an inquiry into whether the government's policy shift is fairly viewed as being permanent and complete." *Keohane*, 952 F.3d at 1268 (quoting *Flanigan's*, 868 F.3d at 1257) (citation modified). Even assuming the Facility's initial delays in legal access and document exchange were the State Defendants' policy – it was not – the State Defendants terminated that policy by establishing the current robust legal access and document exchange regime. And a government's decision to terminate

a policy or practice is generally taken as an "unambiguous termination." *Keohane*,
952 F.3d at 1269 (quoting *Flanigan's*, 868 F.3d at 1261).

Moreover, the State Defendants have repeatedly represented to this Court
that they will continue providing detainees the same level of access to their counsel
and legal document exchange services, which they reiterate now. *See* Saunders
Decl. ¶¶ 50, 56, 58-59; Suppl. Decl. ¶¶ 3, 11, 28. And the Eleventh Circuit has relied
on such representations as evidence of "unambiguous termination." *See Keohane,*
952 F.3d at 1269 (noting that the Eleventh Circuit has "previously relied on . . .
representations" made at oral argument to determine whether the government's
decision to terminate the challenged conduct was unambiguous where "there is no
evidence or history that would cause" doubt as to the government's
representations); *Flanigan's*, 868 F.3d at 1262 ("[I]n its motion to dismiss for
mootness, the [defendant's] attorney expressly warranted that it "disavows any
intent to adopt such a regulation in the future. We have previously relied on such
representations in filings with this Court in the very circumstance we consider
here."); *Coral Springs*, 371 F.3d at 1333 ("[T]he City's brief repeatedly represented
that there was 'no indication whatsoever that the City would reenact the [offending
code provisions] in the future.'"). Thus, the State Defendants' actions "reflect a
rejection of the challenged conduct that is both permanent and complete."
*Keohane*, 952 F.3d at 1268 (Wilson, J., characterizing the majority opinion in his
dissent). Accordingly, the second factor also weighs decisively towards mootness.

As to the third factor, the State Defendants have consistently provided the same level of robust access to counsel. Since the first meetings on July 15, detainees and their counsel have had videoconference meetings almost every day, except on Sundays, although Sunday meetings are available upon request. Suppl. Decl. at ¶ 57. Indeed, the State Defendants have granted every single request for a meeting with counsel. *Id.* ¶ 36. Likewise, since early August, the Facility has coordinated confidential document exchange between detainees and their counsel, and have done so via mail since late September. Saunders Decl. ¶ 54-55; Suppl. Decl. ¶¶ 62-69. Indeed, once the State Defendants start providing a service, they have not stopped. Thus, there is no "pattern of broken promises" that could be seen as evidence of a lack of commitment to the new policy. *Keohane*, 952 F.3d at 1270 ("There is certainly no 'pattern' of broken promises here of the sort that has concerned us in the past."); *see also, e.g., Doe v. Wooten*, 747 F.3d 1317, 1323-24 (11th Cir. 2014). As a result, once again, this factor weighs toward mootness.

In the end, it is Plaintiffs' burden to show "a reasonable expectation that the government will reverse course." *Djadju,* 32 F.4th at 1109. They come nowhere close. Based on all of the factors, and the totality of the circumstances, there is no indication that the State Defendants will stop providing detainees access to their counsel, much less a reasonable expectation of such a reversal. *See Al Najjar v. Ashcroft,* 273 F.3d 1330, 1336 (11th Cir. 2001) ("The remote possibility that an event might recur is not enough to overcome mootness."). For all these reasons, the voluntary cessation doctrine does not save the day for Plaintiffs.

**E.** The outcome is the same for the second exception. This one, known as the capable-of-repetition-yet-evading-review exception, applies when "the action being challenged by the lawsuit is capable of being repeated *and* evading review." *Al Najjar*, 273 F.3d at 1336 (emphasis in original). But the exception is narrow and can be invoked only in "exceptional situations," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Warren v. DeSantis*, 125 F.4th 1361, 1364 (11th Cir. 2025) (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)).

But two conditions would have to occur for this exception to apply. Plaintiffs that have been transferred from the Facility would have to be re-detained there *and* the State Defendants would have to reverse course and begin denying detainees access to their legal counsel and refuse to deliver or accept their legal mail. Neither condition is likely to occur, and any remote possibility is entirely speculative.

There is no evidence that detainees transferred from the Facility are being, or will be, returned to the Facility. Indeed, there is no reason they would be given that the Facility was created to be, and is operated as, a "temporary detention facility." *See* Pltfs.' Reply at 1 (referring to Facility as a "temporary detention facility"); State Dfts.' Response at 2 (same); Federal Dfts.' Response at 1 (same). Nor is there any suggestion that the State Defendants would backtrack and begin

denying detainees access to their counsel and refusing to deliver or accept their legal mail. Indeed, this outcome is especially unlikely given the significant efforts and investment of the State Defendants to establish and refine the attorney visitation and document exchange protocols and the overwhelming evidence that is has always been their policy to provide detainees with confidential access to legal counsel and legal correspondence. Saunders Decl.¶¶ 4-7, 50, 56, 58-59; Suppl. Decl. ¶¶ 3, 11, 28; Second Suppl. Decl. ¶¶ 8-12 And "[t]he remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there would be ample opportunity for review at that time." *Al Najjar*, 273 F.3d at 1336. Thus, there is simply no "reasonable expectation or . . . a demonstrated probability that the *same* controversy will recur involving the same complaining party." *Id.* (emphasis in original); *Cambridge Christian*, 115 F.4th at 1286 n.5 (concluding capable-of-repetition-yet-evading-review exception did not apply because plaintiff could not "show a reasonable expectation that it will be subjected to the same action again, which is one of the requirements for that exception to mootness to apply") (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (explaining that "a mere physical or theoretical possibility" of repeated action is not sufficient to invoke the exception).

Indeed, Judge Ruiz has already determined that the capable-of-repetition-yet-evading-review exception to mootness does not apply here. *See C.M. v. Noem*, -- F.Supp.3d ----, No. 25-CV-23182-RAR, 2025 WL 2400953, at *10-11 (S.D. Fla.

Aug. 18, 2025). Specifically, Judge Ruiz concluded that the Federal Defendants mooted Count V of Plaintiffs' Supplement to Complaint (Doc. 28) – which asked the court to identify which federal immigration court had jurisdiction over the Facility – by publicly identifying the appropriate immigration court. *Id.* And in his order dismissing Count V as moot and transferring the case to this Court, Judge Ruiz determined the exception did not apply because there was no evidence that "detainees moved from Alligator Alcatraz to other facilities are being returned to Alligator Alcatraz," or that the Federal Defendants would "backtrack by again failing to publicize which immigration court has jurisdiction over Alligator Alcatraz." *Id.* at * 11. Thus, he concluded "there is simply no reasonable expectation or . . . demonstrated probability that the *same* controversy will recur involving the same complaining party." *Id.* (emphasis in original). As discussed, the same analysis applies here. Accordingly, the capable-of-repetition-yet-evading-review exception to mootness likewise does not apply to Plaintiffs' moot requests for relief in Counts I-IV.

Thus, because no exception to mootness applies, requests (d), (e), and (g) are now moot and the Court must dismiss them for lack of subject matter jurisdiction. *See Soliman v. U.S. ex rel. INS*, 296 F.3d 1237, 1242 (11th Cir. 2002) ("[I]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed.") (quoting *Al Najjar,* 273 F.3d at 1336).

**II.    Plaintiffs' remaining requests for relief fail to state a claim under the First Amendment.**

The Amended Complaint also asks this Court to order the State Defendants to provide detainees an on-demand, confidential telephone service for outgoing legal calls (in addition to confidential videoconferences), post the protocols for detainees to communicate with their attorneys in multiple languages around the Facility and on the Defendants' websites, and update the locations of all detainees on the ICE "Online Detainee Locator System" once transferred to the Facility. Am. Compl. Requests for Relief (f), (h), (i), and (j).

But, as discussed in the preliminary injunction briefing, the First Amendment does not require the State Defendants to provide this relief. State Defendants' Response at 22-23; Sur-Reply at 4, 15. Indeed, after almost four months since filing this lawsuit, and through three different rounds of briefing, Plaintiffs have yet to cite a single case showing otherwise. Thus, no matter what facts Plaintiffs allege, they cannot show that they are entitled to their requested relief under the First Amendment. Accordingly, the Amended Complaint fails to state a claim for requests (f), (h), (i), and (j) and should be dismissed as to them. *See, e.g.*, *Blackston v. State of Ala.*, 30 F.3d 117, 120 (11th Cir. 1994) ("Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (citation modified) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

24

## CONCLUSION

For the foregoing reasons, the State Defendants request the Court dismiss the Amended Complaint.

Dated: November 14, 2025                    Respectfully submitted,


                                            /s/ Nicholas J.P. Meros
Francis A. Zacherl, III (FBN 868094)        Nicholas J.P. Meros (FBN 120270)
Timothy W. Odzer (FBN 1020018)              Tara K. Price (FBN 98073)
Shiza Francis (FBN 1058470)                 Kassandra S. Reardon (FBN 1033220)
**SHUTTS & BOWEN LLP**                      **SHUTTS & BOWEN LLP**
200 South Biscayne Blvd, Suite 4100         215 South Monroe Street, Suite 804
Miami, Florida 33131                        Tallahassee, Florida 32301
(305) 358-6300                              (850) 241-1717
FZacherl@shutts.com                         NMeros@shutts.com
TOdzer@shutts.com                           TPrice@shutts.com
SFrancis@shutts.com                         KReardon@shutts.com

                                            *Counsel for the State Defendants*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system on November 14, 2025.

                                            /s/ Nicholas J.P. Meros
                                            *Counsel for the State Defendants*

25