UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

H.C.R., *et al.*, on behalf of
themselves and others similarly
situated,

      Plaintiffs,

v.                                                   Case No.:  2:25-cv-747-SPC-DNF

MARKWAYNE MULLIN, *et al.*,

      Defendants.

_____

**OPINION AND ORDER**

Detained Plaintiffs[1] are a proposed class of current and future detainees of South Florida Soft Sided Facility South ("SFSSFS")—also known as "Alligator Alcatraz"—and Organizational Plaintiffs are a law firm and legal service organization that represent detainees at the facility. Plaintiffs allege that restrictions on attorney access at the facility violate their First Amendment free speech rights. Accordingly, they seek certification of a proposed class of Alligator Alcatraz detainees and a

_____

[1] H.C.R., D.G.M., and H.P. on behalf of themselves and all others similarly situated are collectively referred to as "Detained Plaintiffs." Since filing the Amended Class Action Complaint for Declaratory and Injunctive Relief ("Amended Complaint") (Doc. 113), all Detained Plaintiffs have been deported. (Doc. 231 at 241). Sanctuary of the South and Bilbao Law, LLC are jointly referred to as "Organizational Plaintiffs." All plaintiffs are collectively referred to as "Plaintiffs."

      The Court permitted the named plaintiffs and certain proposed witnesses at the preliminary injunction hearing to proceed under pseudonym. (Docs. 154, 218).

preliminary injunction requiring Defendants to permit timely, confidential attorney-client communication at the facility by ordering them to permit unscheduled in-person legal visits; permit unmonitored, unrecorded legal telephone calls; and publicly post attorney access protocols.

Before the Court are Plaintiffs' Motion for Class Certification (Doc. 114), Federal Defendants'[2] response (Doc. 139), State Defendants'[3] response (Doc. 185), and Plaintiffs' replies (Docs. 150, 186). Also before the Court are Plaintiffs' Motion for Preliminary Injunction (Doc. 115), Federal Defendants' response (Doc. 131), State Defendants' response (Doc. 132), Plaintiffs' reply (Doc. 140), Federal Defendants' sur-reply (Doc. 151), and State Defendants' sur-reply (Doc. 152). Finally, before the Court are Plaintiffs' Motion for Leave to Supplement the Record (Doc. 235), Federal Defendants' response (Doc. 237), and State Defendants' response (Doc. 238).

On January 28 and 29, 2026, the Court conducted an evidentiary hearing and oral argument on the motions for class certification and

---

[2] Markwayne Mullin, Secretary of the United States Department of Homeland Security ("DHS"), in his official capacity; DHS; Todd Lyons, Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement ("ICE"), in his official capacity; ICE; and Garrett Ripa, Field Office Director for ICE's Enforcement and Removal Operation's ("ERO") Miami, Florida Field Office, in his official capacity, are collectively referred to as "Federal Defendants."

Markwayne Mullin was confirmed by the United States Senate on March 23, 2026, as DHS Secretary. By rule, he is substituted as a defendant in this action as the successor to previously named heads of DHS. Fed. R. Civ. P. 25(d).

[3] Ronald DeSantis, Governor of the State of Florida, in his official capacity; Kevin Guthrie, Executive Director of the Florida Division of Emergency Management ("FDEM"), in his official capacity; and FDEM are collectively referred to as "State Defendants."

preliminary injunction.   (Docs. 227, 228).  For the reasons stated below, the motion for class certification is granted to the extent the Court provisionally certifies the proposed class, the motion for preliminary injunction is granted in part and denied in part, and the motion to supplement the record is granted.

## I.     BACKGROUND AND PROCEDURAL HISTORY

In June 2025, the State of Florida began constructing Alligator Alcatraz, a temporary immigration detention facility located on a portion of the Dade-Collier Training and Transition Airport in the Florida Everglades, to house illegal aliens.  The facility began accepting detainees on July 3, 2025, and can house up to 3,000 detainees.  (Joint Ex. 2 ¶¶ 8–9).  As of late January 2026, the facility housed approximately 1,500 detainees.  (Doc. 231 at 48).  Within two weeks of construction, Alligator Alcatraz facilitated the first videoconference meeting between a detainee and an attorney on July 15, 2025, and the first in-person legal visit on July 28, 2025.  (Joint Ex. 2 ¶¶ 34–35).

On July 17, 2025, five individual detainees and four legal organizations filed a putative class action lawsuit in the United States District Court for the Southern District of Florida on behalf of current and future detainees.  (Doc. 1).  Plaintiffs also filed a motion for an expedited temporary restraining order and preliminary injunction and a motion for class certification.  (Docs.

5, 6). Plaintiffs filed a supplemental class action complaint (Doc. 28), a renewed motion for preliminary injunction (Doc. 29), and a renewed motion for class certification (Doc. 30). After a hearing on August 18, 2025, the case was transferred to the United States District Court for the Middle District of Florida because proper venue rests here. (Doc. 88).

After a scheduling conference with the undersigned on September 4, 2025 (Doc. 109), Plaintiffs filed their Amended Complaint (Doc. 113), motion for class certification (Doc. 114), and motion for preliminary injunction (Doc. 115). Plaintiffs bring four claims for relief under the First Amendment: a violation of the First Amendment on behalf of Detained Plaintiffs and the proposed class against Federal Defendants and State Defendants under the U.S. Constitution and equity (count I); a violation of the First Amendment on behalf of Detained Plaintiffs and the proposed class against State Defendants under 42 U.S.C. § 1983 (count II); a violation of the First Amendment on behalf of Organizational Plaintiffs against Federal and State Defendants under the U.S. Constitution and equity (count III); and a violation of the First Amendment on behalf of Organizational Plaintiffs against State Defendants under § 1983 (count IV). (Doc. 113).

This case presents a moving target. Nearly every aspect of the litigation has changed with each filing, status conference, and hearing. In an effort to conserve scant judicial resources and expeditiously resolve this

4

case, the Court set aside two days and conducted a settlement conference on December 16, 2025. (Doc. 187). But the parties could not reach an agreement. So the moving target continued until January 28, 2026, at which time the Court heard evidence and oral argument at a two-day preliminary injunction hearing. (Docs. 227, 228).

At the hearing, Plaintiffs advised they no longer wished to pursue relief regarding Defendants' alleged failure to timely provide legal mail to detainees; the lack of confidentiality for in-person and video legal visits; or the alleged delays in updating the ICE online detainee locator. (Doc. 231 at 183). Therefore, the Court need not discuss these alleged barriers to access to counsel further.

However, that did not end the matter. Plaintiffs still pursue relief concerning the requirement that lawyers preschedule in-person legal visits; the lack of confidential, private, free, unmonitored outgoing legal telephone calls; and Defendants' failure to provide attorney access protocols to the public and detainees. (*Id.* at 183–84).

Although it should have been clear that the evidence the Court would consider was limited to that introduced at the hearing, because State Defendants blindsided Plaintiffs with new evidence related to critical legal visit and phone policies, Plaintiffs moved for leave to supplement the record. (Doc. 235). After receiving the request and the responses, the Court formally

deemed the evidentiary record closed on February 26, 2026, and took the motion to supplement the record under advisement.[4] (Doc. 239).

The Court outlines the alleged barriers to access to counsel below.

## A. In-person Legal Visits

According to Plaintiffs, as late as October 2, 2025,[5] Defendants required attorneys to pre-schedule in-person legal visits but would often transfer detainees from the facility immediately before their scheduled visits. (Doc. 140 at 3; *see also* Doc. 152 at 4). These actions prevented some detainees from ever meeting with counsel before their transfer.

This practice affected at least two named plaintiffs. For example, Katherine Blankenship represented named plaintiff H.C.R. She scheduled an in-person visit with him on September 15, 2025, but on the morning of the visit, the facility informed her that H.C.R. had been transferred. (Pl. Ex. 13 ¶ 3). At the hearing, H.C.R. testified that he never personally spoke with an attorney while at the facility; instead, a relative contacted Blankenship about representing him. (Doc. 230 at 35, 41–42). According to Blankenship, when she schedules legal visits with clients detained at Alligator Alcatraz, "they are typically canceled by the facility prior to the . . . visit. This is most often due to transfers to other facilities." (Pl. Ex. 13 ¶ 7).

---

[4] The Court grants the motion to supplement, *see infra*, Part II.C.

[5] On this date, Plaintiffs filed their reply brief, their last written submission on the motion for preliminary injunction before the hearing. (Doc. 140).

In a similar situation, Federal Defendants transferred named plaintiff H.P. before his scheduled attorney visit. Kenia Garcia represented H.P. and scheduled a visit for September 16, 2025. (Doc. 140-2 ¶ 3). That morning, an employee from the facility emailed Garcia to inform her that ICE was in the process of transferring H.P., so her scheduled visit would not take place. (*Id.* ¶ 4).

Contrast that with State Defendants' vastly different view on the availability of unscheduled in-person visits. Mark Saunders, Vice President of the contractor, Nakamoto Group, Inc., oversees the facility's operations regarding detainees' access to counsel, including providing detainees with in-person meetings and videoconferences. (Joint Ex. 2 ¶¶ 1, 3). In his September 2025 declaration, Saunders detailed the procedure for attorneys to schedule a meeting with detainees.

FDEM and Critical Response Strategies ("CRS"), the contractor that operates the facility, developed the Detainee Legal Visitation Policy ("Visitation Policy"). (*Id.* ¶ 13 (exhibit 2)); Doc. 230 at 96). Under the Visitation Policy, attorneys can schedule in-person meetings with their clients by emailing the facility's legal inbox, which three officials monitor. (Joint Ex. 2 ¶¶ 15–16). The officials review scheduling requests in order of receipt and make their best efforts to respond within 24 hours. (*Id.* ¶¶ 16–17). Typically, attorneys can meet with detainees within 24 hours of a request. (*Id.* ¶ 18).

7

After receiving a request, the facility provides attorneys with a Legal Counsel Visitation Request Form ("Visitation Form") and a DHS Form G-28 ("G-28 Form").  (*Id.* ¶ 20).  The Facility Visitation Request Guide requires attorneys to submit both the Visitation Form and G-28 Form at least three business days before the requested visit date.  (*Id.* (exhibit 10)).  Officials work with attorneys to find a mutually convenient time for meetings (*id.* ¶ 27) and often schedule meetings on the same day the request was made.  (*Id.* ¶ 29 (exhibits 5–8 are same-day requests the facility accommodated)).  Legal visits are available from 7:00 a.m. to 7:00 p.m. Monday through Saturday and from 8:00 a.m. to 4:00 p.m. on Sundays.  (*Id.* ¶ 26).

But in October 2025, the script changed.  In another supplemental declaration, Saunders clarified that the facility's prior policies "incorrectly represented that attorneys must submit the documents required to schedule a visit at least three (3) business days before the visit is scheduled, thereby creating a de-facto three-day waiting period for legal visits." (Joint Ex. 3 ¶ 9).  He explained that such language "was incorrectly included and has never been a policy," and to his knowledge, the facility "never enforced such a three-day requirement" anyway.  (*Id.* ¶ 10).

Moreover, the first version of the Visitation Form required attorneys to attach copies of legal documents for approval.  But Saunders upended that notion, stating that the "current and operative copy of the Visitation Form . .

8

. includes no such direction." (*Id.* ¶ 12). He explained that the facility requires attorneys to preschedule in-person or videoconference visits so that "[t]he staffing logistics can be worked out to make visits smooth and on time[.]" (Doc. 230 at 138).

As late as October 9, 2025, although the facility did not enforce the three-days' notice requirement, officials still refused to allow unscheduled legal visits. To Plaintiffs and the Court, this was the protocol—until the hearing.

On the first day of the hearing, Saunders blindsided Plaintiffs and the Court. (Doc. 231 at 158 (Plaintiffs' counsel stating that they heard "for the first time that attorneys can make drop-in visits")). He testified that an "attorney now could show up and they will get their visit anyway, if they have a detainee there[.]" (Doc. 230 at 138). He described it as a "mandate issued that simply stated no attorney will be turned away," once attorneys "go through the process" and are escorted through checkpoints, processed, and identified. (*Id.*). Apparently, Bill Alley, CRS' Director of Operations, wrote the policy in an "email mandate edict" and sent it to CRS management staff and the legal inbox around or before Thanksgiving 2025—at least two weeks before the settlement conference, and two months before the hearing. (*Id.* at 178–80). Shockingly, State Defendants did not introduce this crucial email into evidence at the hearing, nor did they call Alley as a witness. According

to Saunders, since the mandate was issued, the facility has not refused any attorney's request for an unscheduled meeting, even if the attorney arrives at the facility without an appointment.  (*Id.* at 139).

Saunders guessed that only attorneys who have arrived unannounced at Alligator Alcatraz and requested an impromptu visit know about the unscheduled visit policy because, at least on paper, the facility still operates under a scheduling system.  (*Id.* at 180).  He did not know whether the public knew about the policy, whether the facility publicized it, or whether it was available to detainees.  (*Id.* at 180–81).  And he did not know whether any posting at the facility contained the policy.

Saunders explained that the facility was "not operating under any previous policy;" rather, it was "trying to establish practice and policy . . . then make the policy match . . . with the condition that the standards[6] were going to be honored regardless."  (*Id.* at 192–93).  The facility's "ultimate goal" is to implement the ICE detention standards, even if the practice is not documented in a written policy.  (*Id.* at 193).  According to Saunders, the ICE

---

[6] Plaintiffs' Amended Complaint and motion for preliminary injunction refer to the ICE Performance-Based National Detention Standards 2011 ("PBNDS").  (*See, e.g.*, Doc. 113 ¶ 61; Doc. 115 at 10, 16–22).  (Pl. Ex. 7).  According to ICE, its 2011 PBNDS "reflect [its] ongoing effort to tailor the conditions of immigration detention to its unique purpose." U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011* (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last accessed Mar. 4, 2026).  The PBNDS "are crafted to . . . increase access to legal services," among other things, and "are drafted to include a range of compliance, from minimal to optimal."  (*Id.* at i (Preface)).

10

2025 National Detention Standards ("NDS")[7] apply at Alligator Alcatraz.[8] (*Id.* at 177 (testifying that "all new facilities after January of 2025 opened under the ICE NDS 2025 guidelines")).  When the policy and the ICE standards conflict, he testified that "you're going to do the correct thing, which would be operate under the standards." (*Id.* at 193).

In short, the written policies at Alligator Alcatraz "lag behind the practices." (*Id.*).  Despite the lack of an up-to-date written policy, Saunders advised that five or six attorneys had unexpectedly arrived at the facility and, though staff told them it operated under a reservation system, it would find a way for them to see the detainees the same day. (*Id.* at 180).

Frank Lumm, the Incident Commander for Florida's Disaster Response Team, oversees daily operations at Alligator Alcatraz. (Doc. 231 at 38).  He also confirmed the policy's existence; his description was substantially like Saunders'. (*Id.* at 73–75).

To discredit Saunders' and Lumm's testimony, Plaintiffs submitted supplemental evidence to persuade the Court that unannounced legal visits are, in fact, not happening.  Attorney Andrea Jacoski emailed the facility at

---

[7] U.S. Immigration and Customs Enforcement, *2025 National Detention Standards* (2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf (last accessed Mar. 9, 2026). (Pl. Ex. 10).

[8] While certain details may differ, it appears as though the 2011 and 2025 versions of ICE's detention standards do not differ in any material respect regarding the restrictions on access to counsel alleged in this case.

legal@privacy6.com on February 9, 2026, to confirm whether she could visit a client in person without pre-scheduling the visit. (Doc. 235-2). She received an email the following day advising that, to visit, she would need to complete a legal counsel visitation form and a Form G-28, and the facility would schedule the visit. (*Id*.).

## B. Outgoing Telephone Calls

Like the evidence regarding unscheduled legal visits, as of October 2025, Plaintiffs and the Court believed that detainees at Alligator Alcatraz could not make unmonitored, unrecorded legal phone calls. (Doc. 140 at 2; *see also* Doc. 152 at 4; Doc. 231 at 158 (Plaintiffs' counsel observing that they heard "for the first time that guards may have cellphones for detainees to request to place calls to attorneys")). Until the hearing, the evidence showed that detainees could only call their lawyers on monitored phone lines. (Pl. Ex. 12 ¶ 7 (Blankenship declares: "The only way that clients . . . detained at Alligator Alcatraz can call me is still via a monitored, recorded outgoing phone line.")); (Doc. 140-2 ¶ 4 (only way Garcia could communicate with client was "when he called [her] on a monitored, recorded line")); (Doc. 140-3 ¶ 6 (Attorney Jose Flores declares: "The only way that my clients have been able to call me is on a monitored, recorded outgoing phone line from Alligator Alcatraz.")); (Doc. 140-5 ¶ 10 ("only way for detainees at Alligator Alcatraz to place outgoing phone calls is on a recorded, monitored line," according to

Attorney Viviana Eugenia Medina)).

Two former Alligator Alcatraz detainees testified via video at the preliminary injunction hearing about using phones to make legal calls. H.C.R. was detained at Alligator Alcatraz on September 4, 2025, for about 12 days, until he was deported to Colombia. (Doc. 230 at 31–32). He testified that "if you needed to call . . . an attorney . . . you would, and then the call would drop." (*Id.* at 33–34). When he spoke about certain topics on the phone, such as "getting my attorney and talking about an attorney," "the call would immediately drop." (*Id.* at 34). Ultimately, H.C.R. was never able to personally contact an attorney while detained. (*Id.* at 35).

Another detainee, J.E., arrived at Alligator Alcatraz on November 11, 2025, and remained there until January 7, 2026, when he was deported to Haiti. (*Id.* at 44–46). He testified that the facility recorded his phone calls and could hear "everything" when he was on the phone. (*Id.* at 54). And he explained:

> Q: Let's talk about your attempts to call an attorney. What happened when you tried to call a lawyer?
>
> A. When I had an attorney before I got here on my case, I was able to have appointments with them and speak with them, but as soon as I got here and they had the attorney get on Zoom calls, I was never able to get in contact with them again. Every time I would try to get in contact with them, the phone would go tuk, tuk, tuk, tuk, and I wasn't able to get in contact ever since.
>
> Q. Okay. Just to confirm, when you say the phone went tuk,

13

tuk, tuk, you mean it wasn't even trying to call the lawyer?

A. Yes.

(*Id*. at 48).  When he asked officers at the facility for help contacting an attorney, they told him he "would have to get in contact with [his] family because there was nothing that they could do."  (*Id*. at 46).

When asked about the facility's policies on making unmonitored legal calls, Saunders dropped yet *another* evidentiary bombshell.  Apparently, there *is* an unmonitored legal call option for detainees that neither the Court nor Plaintiffs knew of until the hearing.  According to Saunders, a detainee merely must ask a staff member, and the detainee can use a cell phone to make an unmonitored call to a lawyer.[9]  (*Id*. at 115–16).  He testified the cell phones are located outside the housing units in the possession of the corrections officers or the guards on duty in the housing areas.  (*Id*. at 115).

Yet Saunders did not know several key details about the new policy, including when the facility began promulgating it (*id*. at 183); whether it is written anywhere or whether it is in the record (*id*.); or how many cell phones are available (*id*. at 149).  None of the signs posted at the facility explain how a detainee can request an unmonitored outgoing legal call.  (*Id*. at 116–18).  The CRS Attorney Call Scheduling and Legal Communication Policy, which

---

[9] J.E. testified before Saunders and Lumm, so ostensibly, Plaintiffs did not ask him about the new cell phone policy because they did not yet know of its existence.

provides the guidelines for legal visits and call scheduling, does not explain that cell phones are available for detainees' confidential legal calls on request. (*Id.* at 190; State Defs. Ex. 7).[10]

In further late-breaking evidence, Lumm expounded on Saunders' testimony, explaining that the facility began offering confidential cell phone calls to detainees just before Thanksgiving—at least two weeks before the settlement conference. (Doc. 231 at 66). While the policy is not documented in writing, detainees are verbally notified of the policy at intake. (*Id.* at 102). Lumm testified that the facility provides two cell phones for all 1,500 detainees' use. (*Id.* at 67).

Despite Saunders' and Lumm's testimony, Plaintiffs supplemented the record post-hearing showing that detainees may not be able to make unmonitored calls as advertised. Attorney Diane Aburto spoke to her client, a detainee at Alligator Alcatraz, on February 4, 2026. (Doc. 235-1). She notified him of the policy and asked him to call her. Two days later, her client's partner told Aburto that the client tried to call Aburto, but officers did not let him. So Aburto still must email the facility to request videoconferences to speak with her client.

## C. Attorney Access Protocols

---

[10] State Defendants' counsel incorrectly refers to this document as State Defendants' Exhibit 4 in the transcript. (Doc. 230 at 148).

The third barrier to access to counsel at issue in this case is the lack of any publicly posted information regarding Alligator Alcatraz's attorney access protocols.   (Pl. Ex. 13 ¶ 5 (Blankenship cannot find publicly available information showing how attorneys should contact their clients at the facility confidentially)); (Doc. 140-3 ¶ 5 (Flores knows of no publicly available information about attorney access at the facility, including a phone number, which is standard at other immigration facilities)); (Doc. 140-5 ¶ 4 (Medina states there is no website or public guidance for contacting detained clients and no listed phone or email contacts)).   According to Dr. Dora Schriro, Plaintiffs' expert on ICE detention and corrections management, ICE does not post any information about Alligator Alcatraz on its website, www.ice.gov/detention-facilities.   (Doc. 230 at 199, 203–04, 222).   Similarly, the State of Florida does not post any information about Alligator Alcatraz on any of its websites.[11]   (*Id.* at 223).

Nor have Defendants provided this information to detainees.   J.E. testified that officers provided no information about how to communicate with attorneys.   (*Id.* at 46).   He did not receive a detainee handbook.   (*Id.*).   And he saw no information on posters at the facility that provided immigration attorneys' phone numbers.   (*Id.*).

---

[11] Defendants do not dispute this testimony or offer evidence to the contrary.

16

During the hearing, the Court heard testimony that various documents containing relevant information for detainees are posted in conspicuous places on the walls of the facility, such as the dining area and law library. (Doc. 231 at 42).  But it was ultimately unclear what documents are posted where.  What was clear is that the facility rarely, if ever, updates the written documents to reflect the current policies.  (*Id.* at 87).  In fact, Lumm testified that most of the documents posted at the facility were "done back in July of 2025," "when we initially opened the facility."  (*Id.* at 47, 85).

## II.    PRELIMINARY MATTERS

### A. Jurisdiction

On August 20, 2025, the United States District Court for the Southern District of Florida transferred this case here.  (Doc. 87).  The parties do not dispute that the Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 5 U.S.C. § 702.  (Doc. 113 ¶ 14).

### B. Federal Defendants' Status

Federal Defendants argue that Plaintiffs fail to plausibly allege that they are interfering with any attorney-detainee communications at the facility.[12]  (Doc. 131 at 6).  For support, they raise arguments concerning the

---

[12] These arguments are more appropriate for a motion to dismiss, but the Court nevertheless briefly addresses them.

17

section 287(g) agreements,[13] United States District Judge Rodolfo A. Ruiz II's early rulings in this case, and the Eleventh Circuit's early findings in another case involving Alligator Alcatraz. (*Id.* at 6–9). Plaintiffs respond that Federal Defendants rely on inapposite language in the other court orders and that the section 287(g) agreements do not transfer absolute responsibility over the detention of federal immigration detainees and oversight of conditions of detention to State Defendants. (Doc. 140 at 12).

Having reviewed the filings and the evidence presented at the hearing, the Court agrees with Plaintiffs and finds that at this stage of the litigation, Federal Defendants must continue to defend against the First Amendment claims. One of the most persuasive pieces of evidence is the declaration of Federal Defendants' own witness, Juan Lopez Vega. (Joint Ex. 6). Vega is the Deputy Field Office Director for DHS, ICE, and ERO in Miami, Florida. (*Id.* ¶ 1). He provides oversight of ICE operations in detention facilities, including Alligator Alcatraz. (*Id.* ¶ 3). According to Vega,

> ICE's role concerning the development of the SFSSFS Detention Facility has been limited to touring the facility to ensure compliance with detention standards, and meeting with officials from the State of Florida to discuss operational matters. ICE has continued to work with Florida as Florida utilizes its 287(g) delegated authority.

---

[13] Defendants invoke an agreement under 8 U.S.C. § 1357(g)—known as section 287(g) agreements—as the source of the authority to detain individuals, including Detained Plaintiffs, at Alligator Alcatraz. (Doc. 140 at 12 (citing Docs. 131, 132)).

(*Id.* ¶ 5).

Vega's statement undermines Federal Defendants' position that they have no role in access to counsel at the facility. In fact, Vega plainly states that at least to some degree, ICE plays a part in ensuring compliance with detention standards and overseeing operational matters. Ensuring compliance with detention standards necessarily relates to access to counsel, particularly in light of the fact that Federal Defendants "make[] decisions regarding transfer into SFSSFS based on the posture of aliens' immigration proceedings[.]" (*Id.* ¶ 6; Joint Ex. 3 ¶ 4 ("ICE is solely responsible for transferring detainees.")). Federal Defendants' decisions concerning which detainees to transfer and when are linked to the alleged barriers to access to counsel.

Further, Vega's and Lumm's testimony at the hearing bolsters the Court's conclusion that Federal Defendants are involved with access to counsel at the facility. Vega testified that the ICE compliance team visits the facility at least once or twice every two weeks to monitor the facility's compliance with detention standards. (Doc. 230 at 73). Further, he testified that measuring compliance includes ICE detention standards' provisions regarding "telephone access and legal visitation." (*Id.* at 75–76). Lumm stated that "what we were directed by ICE was to ensure that the detainees had the ability to make phone calls, how to reach out to their attorneys." (Doc.

19

231 at 42).  Later, he testified that "ICE is there every day with us.  There are six ICE agents that are there that work hand in hand with the team that's on site." (*Id.* at 48).   He explained that the facility "get[s] inspected every two weeks by all federal and state agencies as far as ICE . . . [which] inspects us for . . . access rights, as we're talking about now," and "ICE gives us additional updated policies and procedures on how things need to occur."   (*Id.*). Accordingly, any argument that Federal Defendants have nothing to do with access to counsel fails.

## C. Plaintiffs' Motion for Leave to Supplement the Record

Plaintiffs requested leave to supplement the record following the eleventh-hour evidence State Defendants presented at the hearing.  (Doc. 235). Defendants oppose the motion.  (Docs. 237, 238).  Upon due consideration and given that State Defendants blindsided Plaintiffs with at least two material changes to the in-person visitation and legal phone call policies at the hearing (after opposing Plaintiffs' request for discovery (Docs. 197, 200)), the Court grants the motion.

## III.   CLASS CERTIFICATION

The Court turns to Plaintiffs' request for class certification under Federal Rule of Civil Procedure 23.  (Doc. 114).

## A. Preliminary Matters

1. *Jurisdiction*

Federal Defendants argue that the Court lacks jurisdiction to grant the relief requested to some class members under 8 U.S.C. § 1252(f)(1), and that the proposed class thus lacks commonality. (Doc. 139 at 6–7). The Court disagrees and, for these reasons, finds it has jurisdiction.

Under § 1252(f)(1),

> [r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quotation marks and citation omitted). It does not deprive lower courts of subject matter jurisdiction.

In arguing § 1252(f)(1) bars class-wide relief for some purported class members, Federal Defendants mischaracterize the relief requested. Plaintiffs do not challenge ICE's authority or ability to detain or remove class members. (Doc. 150 at 3). Rather, Plaintiffs seek attorney access at the facility. The requested injunction—remedying access to counsel barriers—would not "have the effect of interfering with or otherwise affecting the enforcement of the

21

immigration laws governing the inspection, apprehension, examination, and removal of aliens[.]" *Jimenez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-06353-RMI, 2024 WL 2306281, at *4 (N.D. Cal. May 20, 2024) (cleaned up). And the Court has no intention of interfering with ICE's authority to enforce immigration laws. Thus, § 1252(f)(1) does not strip the Court of jurisdiction.

Federal Defendants also argue "[a]nother separate jurisdictional bar . . . prohibits injunctive and declaratory relief for those detained for the purposes of reinstatement of a final order of removal." (Doc. 139 at 7 (citing 8 U.S.C. § 1252(e)(1)(A) (prohibiting lower courts from entering declaratory, injunctive or other equitable relief where an order to exclude the alien under § 1225(b)(1) is at play))). This statute provides:

> (e) Judicial review of orders under section 1225(b)(1)
>     (1) Limitations on relief
> Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may--
>     (A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection

8 U.S.C. § 1252(e)(1)(A).

Again, the Court disagrees. Section 1252(e)(1)(A) limits courts from granting equitable relief "in any action pertaining to an order to exclude an alien" in expedited removal proceedings. 8 U.S.C. § 1252(e)(1)(A). But Plaintiffs and the proposed class do not challenge removal or exclusion, so §

22

1252(e)'s provisions do not apply. *See Cap. Area Immigrs.' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 59 (D.D.C. 2020) (finding § 1252(e)(1) inapplicable to vacatur of rule as plaintiffs were "not challenging any specific order to exclude an individual alien"); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *16 (D.D.C. June 17, 2020) (finding challenge to detention conditions "ancillary to the removal process" and outside "any part of the process by which . . . removability will be determined."). So the Court has jurisdiction to consider class certification.

2. *Standing*

The Court must also address the issue of standing as it applies to the proposed class. To satisfy constitutional standing in federal court, a plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).

Here, Plaintiffs have suffered and are threatened with the loss of their First Amendment rights due to substantially restricted access to counsel at the facility. That injury is traceable to their detention in Alligator Alcatraz and is likely to be redressed by a favorable judicial decision. Accordingly, the Court finds that Plaintiffs meet Article III's standing requirements.

3. *Mootness*

23

Lastly, mootness.  All named plaintiffs have been deported since they filed this case.  "Class actions are normally moot if no named class representative with an unexpired claim remains at the time of class certification."  *Nielsen v. Preap*, 586 U.S. 392, 403 (2019) (cleaned up, citation omitted).  That said, a case is not moot simply because the class was not certified until after the named plaintiffs' claims had become moot.  Such a situation does not deprive the court of jurisdiction when "the harms alleged are transitory enough to elude review."  *Id.*

That is the case here.  The proposed class is fluid, as ICE frequently transfers detainees to and from the facility.  And to the extent State Defendants argue the case is moot because they have cured all alleged restrictions on access to counsel (Doc. 185 at 5), the Court disagrees and discusses its reasoning below.  *See infra*, Part IV.C.  Thus, mootness is no obstacle to class certification.

## B. Provisional Class Certification

In *A.A.R.P. v. Trump*, the Supreme Court held that "courts may issue temporary relief to a putative class."  605 U.S. 91, 98 (2025).  According to a prominent class action treatise cited in *A.A.R.P.*, "the Court's holding means that the filing of a class suit (a 'putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief to the entire putative class.  Nothing more, in terms of class certification, is

24

necessary." *Mercado v. Noem*, 800 F. Supp. 3d 526, 558 (S.D.N.Y. 2025) (quoting William Rubenstein, 2 *Newberg and Rubenstein on Class Actions* § 4:30 (6th ed. 2022 and Supp. June 2025)). That said, possible ambiguity in the Supreme Court's language and tension with its later reasoning in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), counsels that "a district court would be on safest ground if it were to go through the entire Rule 23 analysis prior to granting preliminary relief." *Id.*

"Courts routinely grant provisional class certification for purposes of entering injunctive relief" before a final ruling on class certification. *Id.* (quoting *Barbara v. Trump*, No. 25-CV-244-JL-AJ, 2025 WL 1904338, at *3 (D.N.H. July 10, 2025) (quoting *Idaho Org. of Res. Councils v. Labrador*, No. 1:25-CV-00178-AKB, 780 F. Supp. 3d 1013, 1046 (D. Idaho Apr. 29, 2025) (citing cases))). "[C]ourts that label preliminary certification 'provisional' employ that term to signal that the certification will dissolve if the injunction does, *not* to suggest they undertook less than a full Rule 23 analysis." *Id.* (citation omitted).

Although Plaintiffs have moved for class certification (or alternatively, provisional class certification) (Doc. 114 at 20), final resolution of the class certification motion is inappropriate at this juncture given "the deliberative and fact-intensive" nature of the class certification process and the lack of discovery on class-related issues. *Mercado*, 800 F. Supp. 3d at 558.

25

Accordingly, the Court conducts a full Rule 23 analysis to determine whether provisional certification of the class in connection with the preliminary injunction motion is warranted.

## C. Class Definition

At the outset, the Court must determine the scope of the putative class. Plaintiffs seek certification of the following class ("Detainee Class"):

> All persons who are currently, or in the future, held at the
> Alligator Alcatraz detention facility.

(Doc. 114 at 2). In response, Federal Defendants argue the proposed class is "too broad to offer a common, class-wide solution to its members." (Doc. 139 at 6). State Defendants argue the class definition is impermissibly broad and not ascertainable because it is "inherently fluid and indeterminate, sweeping in hypothetical future individuals with no present standing." (Doc. 185 at 8). Neither argument is well-developed. But no matter.

Another court in the Eleventh Circuit recently rejected a similar argument, observing that the defendants "misperceive what is required in a case like this for classes to be deemed ascertainable." *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1269 (S.D. Fla. 2025). Defendants make the same mistake here. As in *Florida Immigrant Coalition*, State Defendants cite cases in which plaintiffs sought class certification under Rule 23(b)(3). (Doc. 185 at 8 (citing *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021)

26

(requesting class certification under Rule 23(b)(3) to seek damages); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019) (same); *Karhu v. Vital Pharm., Inc.*, 621 Fed. Appx. 945, 951 (11th Cir. 2015) (declining to reach the district court's Rule 23(b)(3) decision); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (Rule 23(b)(3) at issue); *Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 693 (S.D. Fla. 2015) (same))).

But Plaintiffs seek certification not under Rule 23(b)(3), but (b)(2), meaning they only seek injunctive and declaratory relief. And "classes constructed to seek prospective class-wide injunctive relief are inherently different from those formed to seek backward-looking damages." *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1269 (citing *Shelton v. Bledsoe*, 775 F.3d 554, 560 (3d Cir. 2015) ("Though classes certified under Rule 23(b)(3) and Rule 23(b)(2) all proceed as 'class actions,' the two subsections actually create two remarkably different litigation devices.")). "Because the focus in a [Rule 23](b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a [Rule 23](b)(2) action than in a [Rule 23](b)(3) action." *Id.* (citing *Shelton*, 775 at 561; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–63 (2011)).

In fact, courts within the Eleventh Circuit have expressed "serious reason to doubt that the judicially created ascertainability requirement applies

27

to Rule 23(b)(2) classes." *Id.* (quoting *Braggs v. Dunn*, 317 F.R.D. 634, 671 (M.D. Ala. 2016)).  The Eleventh Circuit has described classes generally as needing to be "adequately defined and clearly ascertainable," but has not had occasion to analyze in-depth how ascertainability differs between class actions under 23(b)(3) and 23(b)(2).  *Id.* n.22 (quoting *Cherry*, 986 F.3d at 1302 (internal quotations omitted)); *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019) (relying on a 23(b)(3) case when articulating the rule that "[e]very class must be 'adequately defined and clearly ascertainable.'") (quoting *Little,* 691 F.3d at 1304).

In this case, Plaintiffs allege that class members risk current and future harm.  In the Court's view, State Defendants' claim that the class definition "encompasses all current and future detainees is simply unworkable" lacks merit.  (Doc. 195 at 9); *see Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1269; *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2). . . .  In fact, many courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring a suit on behalf of a shifting prison population.") (citations omitted)).  In fact, another court in the Eleventh Circuit certified a similar immigrant detainee class, defined as: "All current civil immigration

28

detainees who are now held by ICE at Krome, BTC, and Glades when this action was filed, since this action was filed, or in the future." *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1208 (S.D. Fla. 2020); *see also Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-CV-09757-MMC, 2026 WL 391924, at *2 (N.D. Cal. Feb. 10, 2026) (provisionally certifying class defined as "All persons who are now, or in the future will be, in the legal custody of [ICE] and detained at California City Detention Facility").

The question here is whether Defendants' restrictions on access to counsel, which impact all members of the proposed class, violate the First Amendment. The alleged conduct can only be enjoined or declared unlawful as to all of the class members or as to none of them. Therefore, the Court concludes that the class definition is not overbroad.

**D. Rule 23**

Now the Court considers whether Plaintiffs have satisfied the requirements of Rule 23(a) and (b)(2). Defendants contend that the Court should deny certification because the commonality, typicality, and adequacy requirements of Rule 23(a) are not satisfied, and relief under Rule 23(b)(2) would not provide class-wide resolution. Defendants do not challenge numerosity or the adequacy of counsel, so the Court finds those requirements are satisfied.

1. *Rule 23(a)*

29

The Rule 23(a) requirements are:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The Supreme Court has held that "actual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). The party seeking class certification bears the burden of demonstrating it has satisfied all four Rule 23(a) prerequisites and that the class lawsuit falls within one of the three types of actions permitted under Rule 23(b). *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

### a.   Commonality and Typicality

Commonality is established when there are "questions of law or fact common to the class." Fed R. Civ P. (23)(a)(2). "Commonality requires the [Plaintiffs] to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law . . . . Their claims must depend on a common contention[.]" *Dukes*, 564 U.S. at 350.

Typicality ensures that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ P. (23)(a)(3). The inquiry "turns on 'whether other members have the same or

30

similar injury, whether the action is based on conduct which is not unique to

the named class plaintiffs, and whether other class members have been injured

by the same course of conduct.'" *Gayle*, 614 F. Supp. 3d at 1231 (quoting *In re

Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012)).  This

nexus exists when "claims or defenses of the class and the class representative

arise from the same event or pattern or practice and are based on the same

legal theory."  *Id.* (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220

F.R.D. 672, 686 (S.D. Fla. 2004)).

> [T]he commonality and typicality requirements . . . tend to
> merge.  Both serve as guideposts for determining whether
> under the particular circumstances maintenance of a class
> action is economical and whether the named plaintiff's
> claim and the class claims are so interrelated that the
> interests of the class members will be fairly and adequately
> protected in their absence.

*Dukes*, 564 U.S. at 349 n.5 (internal quotations omitted).

First, commonality.  Questions of law and fact are common to the

putative class.  All members of the putative class are subject to Defendants'

policies and practices that restrict detainees' ability to timely and

confidentially communicate with attorneys.  The key legal question common to

all detainees is whether these restrictions violate Plaintiffs' and the putative

class members' First Amendment rights.  And the common issue of fact facing

Plaintiffs and all putative class members is whether they have timely,

confidential access to counsel.  That the putative class members are at different

31

stages of their immigration proceedings does not influence the analysis. *See Mercado*, 800 F. Supp. 3d at 562 (whether ICE provides confidential access to attorneys is one of many common questions of fact); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1267 (rejecting defendants' argument that commonality did not exist when immigrant class members had individualized differences in their situations); *Gayle*, 614 F. Supp. 3d at 1198 (commonality requirement satisfied on detained immigrants' conditions of confinement claim). Plaintiffs do not ask the Court to resolve any particular reason why an individual class member needs access to legal services or how he may have suffered harm from not having access to counsel. Commonality is satisfied.

For similar reasons, Plaintiffs show typicality. The named plaintiffs' claims are considered typical "if they stem from the same event, practice, or course of conduct that forms the basis of the class claims and are based upon the same legal or remedial theory." *Id.* (citation omitted). Here, Plaintiffs challenge policies that apply facility-wide, impacting every detainee. The record shows that H.C.R.'s experiences—such as being transferred before he could meet with an attorney—and the claims arising from them are typical. Plaintiffs submitted attorneys' declarations describing situations where ICE transferred their clients from the facility before their scheduled legal meetings. *See supra*, Part I.A. Variations in how interference with access to counsel occurs in any individual detainee's situation does not defeat typicality. *See*

*Carter v. City of Montgomery*, 108 F.4th 1334, 1350 (11th Cir. 2024) ("[O]ur case law recognizes that 'substantial factual differences' between a class representative's claim and those of the class members does not per se foreclose a typicality finding.") (citation omitted).   Accordingly, the requirement of typicality is satisfied.

> b.   Adequacy

Finally, Rule 23(a) demands adequacy.  The class must be structured so that named plaintiffs "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy of representation depends on "(1) whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and . . . (2) whether plaintiffs have interests antagonistic to those of the rest of the class."  *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 496 (S.D. Fla. 2003) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987)).

First, Defendants do not argue that Plaintiffs have interests antagonistic to the class or contest the adequacy of class counsel.  Instead, Federal Defendants contend the proposed class lacks adequate representation because Plaintiffs' proposed class representatives plan to proceed under pseudonyms. (Doc. 139 at 11).  State Defendants raise the same pseudonym argument but do so under Rule 23(a)'s typicality requirement.  (Doc. 185 at 7).

33

The pseudonym arguments lack merit. Plaintiffs cite ample authority showing that individuals using pseudonyms often serve as class representatives. (Doc. 150 at 10 (citing *CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 2263001, at \*3 n.2 (D. Md. Aug. 7, 2025) (pseudonymous representatives to a certified class); *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1339 (W.D. Okla. 2025) (same); *Air Force Officer v. Austin*, No. 5:22-CV-00009-TES, 2022 WL 1240856, at \*5 (M.D. Ga. Apr. 27, 2022) (same))). And in any case, Defendants know the identities of the class representatives. (Joint Ex. 2 ¶ 81; Doc. 231 at 250). The Court finds the proposed class meets the requirements of Rule 23(a)(4).

2. *Rule 23(b)(2)*

Rule 23(b)(2) provides:

> A class action may be maintained if Rule 23(a) is satisfied and if: . . . (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Rule 23(b)(2) "has been liberally applied in the area of civil rights." *Fla. Immigrant Coal.*, 780 F. Supp. 3d at (quoting *Braggs*, 317 F.R.D. at 667 (internal quotation marks omitted)). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful

34

only as to all of the class members or as to none of them." *Id.* (citing *Dukes*,

564 U.S. at 360).

Like many other courts, this Court finds that civil rights cases seeking

only injunctive and related declaratory relief, are the "very paradigm of a

proper 23(b)(2) class." *G.H. v. Tamayo*, 339 F.R.D. 584, 591 (N.D. Fla. 2021);

*Amchem*, 521 U.S. at 614 ("Civil rights cases against parties charged with

unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class

actions). Indeed, "some courts have gone so far as to say that the rule's

requirements are almost automatically satisfied in actions primarily seeking

injunctive relief." *Braggs*, 317 F.R.D. at 667 (quoting *Baby Neal v. Casey,* 43

F.3d 48, 59 (3d Cir. 1994) (cleaned up)). Provisional certification under Rule

23(b)(2) is appropriate because Defendants have acted on grounds generally

applicable to the class—subjecting them to the same set of policies governing

their access to attorneys—making injunctive relief suitable for the entire class.

*See Mercado*, 800 F. Supp. 3d at 564.

\* \* \*

The requirements of Rule 23(a) and Rule 23(b)(2) are satisfied here, at

least provisionally. Therefore, the Court provisionally certifies a class

consisting of all persons who are currently, or in the future, held at the

Alligator Alcatraz detention facility.

## IV.    PRELIMINARY INJUNCTION

The Court now addresses the substance of Plaintiffs' preliminary injunction motion. (Doc. 115).

## A. Legal Standard

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024) (quoting *Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (internal quotation marks and citation omitted)). "Failure to show any of the four factors is fatal . . . ." *Id.* (quoting *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)). Mandatory injunctions—such as that requested here—are "particularly disfavored," and the burden on the movant is even higher. *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017).

## B. Mootness

"A federal court cannot decide a 'moot' controversy." *In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1244 (11th Cir. 2020) (citing *Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1086 (11th Cir.

2004)).  So the Court has an independent duty to ensure that this case is not moot.  *See id.*  Here, the claims for injunctive relief by the named plaintiffs seem moot because they have been deported.  (Doc. 231 at 241 (Plaintiffs' counsel noting that ICE deported named plaintiffs after the filing of the Amended Complaint)).

That said, this case falls into the "narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975) (citation omitted).  "[T]he fact that a class was not certified until after the named plaintiffs' claims had become moot" does not deprive a court of jurisdiction when "the harms alleged are transitory enough to elude review." *Nielsen*, 586 U.S. at 403 (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (affirming jurisdiction over a class action challenging a county's failure to provide "prompt" determinations of probable cause for those subjected to warrantless arrest and detention) (internal quotation marks omitted)).  Because the class's alleged injuries end as soon as an individual is no longer detained at Alligator Alcatraz, they are transitory.  The apparent mootness of the named plaintiffs' claims following their deportation does not deprive the Court of subject matter jurisdiction.  *See Mercado*, 800 F. Supp. 3d at 558 (applying inherently transitory doctrine to immigrant detainees).  So the Court proceeds to the merits.

37

## C. Substantial Likelihood of Success on the Merits

To begin, the Court outlines the principles that guide its analysis of the constitutional claims of Detained Plaintiffs and, relatedly, Organizational Plaintiffs. *See Turner v. Safley*, 482 U.S. 78, 84 (1987). The Supreme Court teaches that "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Id.* In this case, this principle logically and appropriately extends to immigration detainees.

Alligator Alcatraz's immigrant detainees are civil detainees held under civil immigration laws, not criminal laws. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Even so, the legal framework concerning immigrant detainees has developed within the context of incarcerated individuals. Incarcerated individuals have a "First Amendment free speech right to communicate with [their] attorneys . . . ." *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008); *see also Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) (citations omitted) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.").

Alligator Alcatraz's "walls do not form a barrier separating [detainees] from the protections of the Constitution." *Turner*, 482 U.S. at 84. Because detainees retain their rights at detention centers, when a "regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Id.* (quoting *Procunier v.*

38

*Martinez,* 416 U.S. 396, 405–06 (1974)).

However, courts are "ill equipped to deal with the increasingly urgent problems of [immigration detention center] administration and reform." *Id.* (citation omitted).    Like prison administration, managing immigration detention centers is an "inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id.* at 85.  The task is "committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.*  In any event, this Court does not wish to become a super-warden of an immigration detention facility.  Nevertheless, it must review the reasonableness of detention center restrictions when they impinge on detainees' constitutional rights. *See id.* at 89.

"[W]hen a [condition of detention] impinges on [detainees'] constitutional rights, the [condition] is valid if it is reasonably related to legitimate [government] interests." *Id.*  A condition that "interferes with protected communications[] strips those protected communications of their confidentiality, and accordingly impinges upon [detainees'] right to freedom of speech." *Al-Amin,* 511 F.3d at 1334 (quoting *Jones v. Brown,* 461 F.3d 353, 359 (3d Cir. 2006)); s*ee also Mitchell v. Peoples,* 10 F.4th 1226, 1230 (11th Cir. 2021) ("inmates and pretrial detainees" are entitled to "the protection of

39

uninhibited, confidential communications with their attorneys") (cleaned up, citations omitted).

Under *Turner*, courts assess whether there exists "a valid, rational connection between the . . . regulation and the legitimate governmental interest put forward to justify it," "whether there are alternative means of exercising the right that remain open to [detainees]," "the impact accommodation of the asserted constitutional right will have on [detention] resources generally," and "the absence of ready alternatives" to the regulation. *Turner*, 482 U.S. at 89–91 (quotation marks and citations omitted).

Because immigrant detainees are held under civil immigration laws, the Supreme Court has modified the legal standard to "reflect the salient differences between civil detention and criminal incarceration." *Pesci v. Budz* ("*Pesci I*"), 730 F.3d 1291, 1297 (11th Cir. 2013). The analysis relevant to civil detention facilities recognizes that civil detention, unlike prisons, "is purely rehabilitative; it is not a form of punishment." *Pesci v. Budz*, ("*Pesci II*"), 935 F.3d 1159, 1166 (11th Cir. 2019). Therefore, "the range of legitimate governmental interests is narrower here than it is in a prison context." *Pesci I*, 730 F.3d at 1297.

1. *Scheduling Requirement for In-Person Legal Visits*

The Court explained above the ever-evolving in-person legal visitation policy. *See supra*, Part I.A. So, given everything that has happened, the Court

40

must decide on this record whether Plaintiffs are likely to succeed on the merits and show by a preponderance of the evidence that the current iteration of the in-person legal visitation policy violates the First Amendment. For these reasons, the Court finds they cannot.

To be clear, the testimony at the hearing about the existence of an unscheduled legal visitation policy was unexpected, to say the least. Until then, only State Defendants, certain facility officials and staff, and a few, unidentified attorneys who arrived unannounced at the facility and saw their detainee clients appeared to know about the new policy.[14] The unscheduled visitation policy is not published anywhere. Alley's email edict purportedly implementing the policy is not in evidence. So the question remains: is the facility practicing what it preaches?

It appears the answer is yes. On balance, the Court credits the testimony of Saunders and Lumm that the facility has provided unscheduled legal visits since late November 2025 and continues to do so when an attorney arrives at the facility unannounced and requests a visit with a detainee client. It is no surprise that since attorney visits were previously only by appointment, and State Defendants have failed to publish the new opportunity for unscheduled

---

[14] To this day, State Defendants have not explained why they did not notify the Court or Plaintiffs of this material change to the policy (or the new unmonitored cell phone legal call policy)—implemented in November 2025—when it became effective. Such transparency and professional courtesy would have conserved incalculable judicial resources.

41

visits, that this new policy has not been widely used. Plaintiffs offer only one piece of evidence in opposition. To be sure, Jacoski's declaration reveals that the facility is evasive when responding to attorneys' inquiries regarding the in-person visitation policy. While troubling, it is not persuasive evidence of a failure to provide unscheduled visits and does not convince the Court that Saunders and Lumm fabricated the policy.

The Court finds Saunders' and Lumm's testimony that unscheduled visits have occurred and will continue to occur credible. And therefore, neither Detained Plaintiffs nor Organizational Plaintiffs can demonstrate a First Amendment violation based on a scheduling requirement for in-person visits. Because the Court finds that Plaintiffs can now participate in unscheduled attorney visits, the Court need not examine the *Turner* factors in this context.[15]

---

[15] A side note about the first *Turner* factor. Defendants have consistently raised "order and security" as legitimate reasons to deny Plaintiffs unscheduled legal visits at the facility. State Defendants argue that "unfettered access to detainees without proper scheduling would cause chaos," and that the facility lacks "sufficient staff to adequately process requests from visiting counsel to meet with detainees while also monitoring all ongoing meetings." (Doc. 132 at 16).

Plaintiffs counter that immigration detention facilities routinely allow unscheduled in-person visits by attorneys during established visiting hours, with security screening and presentation of a bar card. (Doc. 140 at 20 (citing ICE, Krome North Service Processing Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/krome-north-service-processing-center "Legal representatives of detainees are authorized to visit their clients during [visiting hours]"); ICE, Broward Transitional Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/broward-transitional-center (same); ICE, Glades County Detention Center, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/glades-county-detention-center (same); ICE, FDC Miami, Hours of Visitation, https://www.ice.gov/detain/detention-facilities/fdc-miami (same))).

Despite State Defendants' prior arguments, Saunders and Lumm testified that attorneys may arrive unannounced at the facility and, after completing the required paperwork and security screenings, obtain a meeting with a detainee the same day. They

The Court will hold Defendants accountable for Saunders' and Lumm's representations.  Additionally, the Court will require Defendants to document the unscheduled legal visits policy in writing; publish it on their relevant websites for the public, attorneys, and detainees; and keep the published policies current.  *See infra*, Part IV.C.3.  This directive will ensure that detainees and attorneys know that they will continue to have unscheduled legal visits from 7:00 a.m. to 7:00 p.m. Monday through Saturday and from 8:00 a.m. to 4:00 p.m. on Sundays.

### 2. *Monitored, Recorded Outgoing Legal Phone Calls*

Next, the Court examines Defendants' initial policy to record and monitor all outgoing legal phone calls and the alleged subsequent decision in November 2025 to provide two cell phones facility-wide for unmonitored outgoing legal calls.  For the following reasons, the Court finds that Detained Plaintiffs have demonstrated a substantial likelihood of success on their claims asserting that the facility's policies regarding monitoring legal phone calls violate their First Amendment free speech rights.

### a.   Detained Plaintiffs

First, the legal landscape.  Generally, detained plaintiffs have a First

---

provided no testimony that any problems occurred when such meetings were requested— much less that any chaos ensued.  And there is no other evidence of the alleged chaos or staffing deficiencies in the record.  Accordingly, the Court finds that State Defendants' own evidence undermines any argument that the government's interest in order and security precludes unscheduled legal visits at the facility.

Amendment right to communicate with their attorneys in confidence. "Because the maintenance of confidentiality in attorney-client communications is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice." *Denius*, 209 F.3d at 954; *see also Mitchell,* 10 F.4th at 1230 (observing that nearly 50 years ago, the Eleventh Circuit "held that inmates and pretrial detainees have a right of access to the courts that includes the protection of 'uninhibited, confidential communications' with their attorneys") (citation omitted).

The Eleventh Circuit has recognized a First Amendment right to communicate confidentially with attorneys by mail. *See Al-Amin*, 511 F.3d at 1333–34 (finding "Al-Amin has a First Amendment free speech right to communicate with his attorneys by mail, separate and apart from his constitutional right to access to the courts" and opening his mail outside his presence violated that right). And other courts have applied this principle to confidential phone calls with attorneys. *See Hurdsman v. Gleason*, No. A-22-CV-254-RP, 2023 WL 2588562, at *6 (W.D. Tex. Mar. 21, 2023) (inmate stated claim for violation of his First Amendment right to freedom of speech, alleging defendants monitored, recorded, and distributed his privileged communications with attorney regarding his pending criminal cases to local law enforcement officers); *Williams v. Price*, 25 F. Supp. 2d 623, 630 (W.D. Pa.

1998) (granting plaintiffs' motion for summary judgment and noting: "It is recognized that the First Amendment right to free speech has not clearly been applied to assure confidential oral communications between prisoners and their attorneys, but it seems that it should be at least as clear as the right to confidential written communications."); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) ("[f]orcing prisoners to conduct their meetings with attorneys in the open or to yell over the phone obviously compromises the consultation," since "[d]etainees might be hesitant to disclose names and information relevant to the attorney's investigation and necessary to the advice sought"). The Court similarly does so here.

Facing an impingement on Plaintiffs' First Amendment rights, the Court considers the first *Turner* factor: is there a valid, rational connection between monitoring all outgoing legal calls and Defendants' legitimate government interest in order and security? In short, there is not. Defendants are quick to invoke the terms "order and security" to justify restrictions on access to counsel at the facility. What they fail to do is identify how unmonitored legal calls would threaten the facility's order and security. (Doc. 131 at 16–17; Doc. 132 at 8–14). Nor do they present evidence in support. Plaintiffs contend that Defendants' "failure to provide unmonitored outgoing legal calls has little rational relationship to maintaining order and security, particularly as such phone calls are required to be provided in detention

45

facilities nationwide." (Doc. 140 at 20). The Court agrees.

ICE's own detention standards offer particularly persuasive guidance on the first *Turner* factor. The 2011 ICE PBNDS state: "A detainee's call to a court, a legal representative, DHS OIG, DHS Civil Rights and Civil Liberties (CRCL) or for the purposes of obtaining legal representation, may not be electronically monitored without a court order." (Pl. Ex. 7, ICE 2011 PBNDS 5.6.V.B, F). Furthermore, the ICE 2025 NDS include a section dedicated to "Privacy for Telephone Calls on Legal Matters," which states in relevant part "Facility staff shall not electronically monitor detainee telephone calls related to legal matters, absent a court order." (Pl. Ex. 10, ICE 2025 NDS 5.4.II.J). Certainly, if allowing unmonitored, unrecorded legal calls threatened order and security, the ICE standards would not accommodate those calls.

Defendants' main argument against allowing unmonitored calls is that Plaintiffs cannot cite any cases showing that the First Amendment requires it. (Doc. 131 at 2, 11; Doc. 132 at 22; Doc. 231 at 171, 182). True, some cases Plaintiffs cite support broader or slightly different propositions. (*See, e.g.*, Doc. 115 at 13 (citing *Denius*, 209 F.3d at 954; *Al-Amin*, 511 F.3d at 1333–34; *Johnson-El*, 878 F.2d at 1052)). But it is also true—and very persuasive— that Plaintiffs have cited numerous recent cases where courts faced with similar issues concerning barriers to access to counsel at immigration detention facilities have issued preliminary injunctions or temporary

46

restraining orders directing defendants to provide free, unmonitored legal calls.[16]  *See Ruiz*, 2026 WL 391924, at *1 (granting preliminary injunction ordering scheduling of confidential legal calls with legal representatives of up to 90 minutes each, to take place within two (2) business days of a request); *Gonzalez v. Noem*, Case No. 1:25-cv-13323, 2025 WL 3170784, at *1 (N.D. Ill. Nov. 5, 2025) (granting temporary restraining order directing defendants to provide private telephone services for detainees to communicate with counsel without cost); *Mercado*, 800 F. Supp. 3d 526 (granting preliminary injunction ordering confidential, unmonitored, unrecorded, temporally unrestricted, and free telephone calls with counsel under the First Amendment); *cf. Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, No. 26-CV-749 (NEB/DLM), 2026 WL 404457, at *15 (D. Minn. Feb. 12, 2026) (providing free, unmonitored calls under the Fifth Amendment); *Vazquez Perdomo v. Noem*, Case No. 2:25-cv-5605-MEMF-SP, 2025 U.S. Dist. LEXIS 227039, at *46 (C.D. Cal. Nov. 13, 2025) (Doc. 256, Order Granting Plaintiffs' Motion for Preliminary Injunction)

---

[16] State Defendants also argue that Plaintiffs fail to cite authority suggesting that "all [legal] phone calls must be confidential if detainees already have another method of communicating confidentially with their counsel, or that detainees must have multiple methods of confidential communication.[]"  (Doc. 132 at 23).  While "*Turner* does not demand the ideal," *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 973 (11th Cir. 2018) (citation omitted), it at least requires that the restriction reasonably relates to legitimate government interests.  Defendants have provided no even remotely persuasive argument as to how monitoring legal calls relates to their interest in order and security.  Moreover, most of the cases cited above have ordered unmonitored legal calls in addition to unscheduled attorney visits and a host of other access to counsel-related relief, undermining Defendants' argument that simply because Plaintiffs may have other means to confidentially speak with an attorney, they are not also entitled to unmonitored legal phone calls.

47

(granting preliminary injunction ordering defendants to provide detainees with access to free, confidential telephone calls with attorneys that are not screened, recorded, or otherwise monitored under the Fifth Amendment).

The Court considers the second *Turner* factor: whether detainees have alternative means of exercising their rights. Defendants argue that detainees can communicate confidentially with attorneys (through means such as videoconferences (Doc. 132 at 10)). However, attorneys must request videoconferences via email. So videoconferences do nothing for those detainees who wish to have ready access to counsel on an outgoing unmonitored phone line. Additionally, detainees lack other quick ways to send outgoing communications. For instance, detainees do not have internet access, so they cannot confidentially email an attorney. (Doc. 230 at 114). To the extent outgoing legal mail is an option for detainees, given the time-sensitive nature of legal calls—particularly in a temporary, 72-hour facility like Alligator Alcatraz—sending physical mail to an attorney is not a reasonable alternative to unmonitored, unrecorded outgoing legal calls. And Lumm testified that no detainee at Alligator Alcatraz has ever sent outgoing mail to an attorney (Doc. 231 at 79)—which should surprise no one.

Similarly, that attorneys can request visits, videoconferences, or phone calls does not provide an alternative means for Detained Plaintiffs to exercise their right. Those are, for lack of a better word, incoming modes of

48

communication, all of which are confidential.  Detained Plaintiffs must have timely access to counsel via an outgoing method of communication.  This issue is particularly critical at Alligator Alcatraz, a short-term facility where ICE can transfer detainees in as few as six hours after arrival.  (Joint Ex. 5 ¶¶ 10–11; Doc. 131 at 15).

The Court turns to the remaining *Turner* factors.  Plaintiffs' contention that Defendants should have allocated funds for compliance with ICE's guidelines is logical.  (Doc. 140 at 21).  Even Federal Defendants' witness, Vega, testified that every time ICE ERO officials visit Alligator Alcatraz, they ensure that ICE detention standards are being followed—including, somewhat ironically, ensuring that detainees can call attorneys confidentially for free.  (Doc. 230 at 75–76).

The Court finds unavailing any argument claiming that the unique physical characteristics and location of Alligator Alcatraz makes the implementation of a sufficient number of phones too expensive.  In fact, the remote location makes the argument for confidential legal calls even *more* important because of the difficulty attorneys may experience making in-person visits.[17]  "Defendants may not properly choose a facility that is unfit

---

[17] Alligator Alcatraz is located inside the Big Cypress National Preserve in the Florida Everglades in Ochopee, Florida.  It is approximately 64 miles from Naples, Florida, and approximately 57 miles from Miami, Florida.  It is, in a word, remote.

for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution." *Mercado*, 800 F. Supp. 3d at 577.

At various points in the litigation, Defendants have argued that Plaintiffs fail to demonstrate that Defendants violate the First Amendment if they do not implement one or more of the NDS. (Doc. 131 at 11; Doc. 132 at 23). However, the Court is not equating the NDS with First Amendment requirements. Rather, the Court views the NDS as highly informative and persuasive guidance. The Eleventh Circuit has also emphasized examining regulations as evidence of a defendant's obligations, noting that "[w]hile [the Georgia State Prison] regulations themselves do not constitute constitutional law, they . . . undermine any claim by defendants that they were unaware of their legal obligations in handling [the plaintiff's] legal mail."[18]   *Al-Amin*, 511

---

[18] Federal Defendants cite this language from *Al-Amin* to support their argument that regulations are not constitutional law or the First Amendment threshold. (Doc. 131 at 11). But they critically omit the highly relevant second half of the Eleventh Circuit's sentence.

Relatedly, Federal Defendants argue that Plaintiffs must show a "pattern and practice" to demonstrate a First Amendment violation. (*Id.* at 12). Plaintiffs disagree with their characterization of the standard. (Doc. 140 at 15). So does the Court. While the Eleventh Circuit found a pattern and practice of opening legal mail outside an inmate's presence stated a claim for violation of an inmate's free speech rights, it did not explicitly hold that a plaintiff must demonstrate a pattern and practice to state a claim. *See Mitchell*, 10 F.4th at 1230–31. Rather, as Plaintiffs assert, "the operative test is whether an official practice is enough to chill, inhibit, or interfere with a person's ability to speak, protest, and complain openly to his attorney so that it infringed his right to free speech." (Doc. 140 at 15 (quoting *Mitchell*, 10 F.4th at 1230) (internal quotation marks omitted)).

F.3d at 1336 n.37.   And notwithstanding the case law, State Defendants' arguments are simply nonsensical.   In one breath, State Defendants argue that Plaintiffs improperly equate the NDS with what the First Amendment requires.   (Doc. 231 at 171 (counsel arguing "there's also no case that says that the ICE detention standards are co-equal with the First Amendment")).   In the next breath, they call Saunders to the stand to testify that the 2025 NDS *already apply* at Alligator Alcatraz.   But despite his testimony, all evidence suggests otherwise.   If what Saunders says is true, why are those standards not publicly promoted as the facility's policies and practices?   The Court questions whether Defendants themselves believe these arguments are coherent.

Saunders' and Lumm's hearing testimony significantly changed the evidentiary landscape and, as a result, the Court's analysis of the second, third, and fourth *Turner* factors.   In lieu of "alternative means of exercising the right," they testified that Defendants have already given Plaintiffs the precise relief requested: unmonitored legal calls on two cell phones.   482 U.S. at 90.   However, unlike Saunders' and Lumm's testimony about unscheduled legal visits, the Court finds their testimony regarding unmonitored, unrecorded legal calls lacking in credibility for the reasons below.

First, their testimony regarding the location of the two cell phones was inconsistent.   Saunders testified that the facility guards or those on duty in

51

the housing areas possess the phones.  (Doc. 230 at 115).  But Lumm stated that "[s]taff doesn't have cellphones and no one has cellphones.  Those cell phones are located outside in a secured area.  They are taken to that area and allowed to make private confidential calls.  Those phones are not monitored." (Doc. 231 at 45).

Second, Saunders and Lumm do not even agree on the number of cell phones available.  Saunders does not know how many cell phones are available for unmonitored legal calls.  (Doc. 230 at 149).  On the other hand, Lumm says there are two phones.  (Doc. 231 at 67).

If Saunders and Lumm, who oversee facility operations, do not agree on who has the cell phones, where they are located, or how many there are, it is difficult for the Court to believe their testimony that the phones exist.  But even if, for the sake of argument, the Court credits their testimony, it evokes the thought experiment: if a tree falls in the forest and no one hears it, does it make a sound?

The limited, contradictory evidence regarding the new confidential, unrecorded legal phone call policy supports the Court's conclusion.  There is no record of a detainee making an unmonitored legal call on a cell phone. However, there is firsthand testimony from J.E., who was at the facility after the policy was allegedly implemented in November.  When he asked for help contacting an attorney, officers told him he "would have to get in contact with

[his] family because there was nothing that they could do." (Doc. 230 at 46). Notably, officers did not offer him access to an unmonitored cell phone to call a lawyer. His testimony undermines Saunders' and Lumm's claims. The declaration from Aburto, whose detainee client could not access an unmonitored phone to call her as recently as February 2026 further supports this conclusion. (Doc. 235-1). Given these facts, it is hard to believe that detainees have had the option to make unmonitored legal calls since November 2025. Under these circumstances, the Court cannot credit the testimony of Saunders and Lumm on this issue. Plaintiffs have met their burden by providing sufficient evidence for the Court to find that they lack unmonitored outgoing legal phone calls at the facility.

And even if the Court were to credit Saunders' and Lumm's testimony regarding unmonitored legal calls and the two cell phones—which it does not—two cell phones are merely a drop in the bucket for a facility that can house 3,000 detainees. For context, ICE's 2025 NDS provide: "To ensure sufficient access, the facility shall provide at least one operable telephone for every 25 detainees." (Pl. Ex. 10, ICE 2025 NDS 5.4.II.C). As Defendants' own witnesses testified, the ICE standards are a helpful guide for determining reasonable access to counsel policies at Alligator Alcatraz. The Court finds the 2025 NDS guidance regarding one operable phone for every 25 detainees reasonable and persuasive.

Thus, the *Turner* factors favor Detained Plaintiffs. They have demonstrated a likelihood of success on the merits of their claim that Defendants' policies regarding legal phone calls violate their First Amendment rights.

            b.    Organizational Plaintiffs

The Court now considers Organizational Plaintiffs' claims. At this juncture, the Court finds that Organizational Plaintiffs have not met their burden to demonstrate a substantial likelihood of success on the merits regarding unmonitored legal calls. Certainly, the First Amendment affords attorneys the ability to advise people of their legal rights and solicit prospective litigants. (Doc. 115 at 18 (citing *NAACP v. Button*, 371 U.S. 415, 428–29 (1963)). But the evidence shows that Organizational Plaintiffs can go to the facility and obtain an unscheduled in-person visit with a detainee. They can also request a confidential videoconference via email. The evidence supports Defendants' assertions that they address those requests in a timely manner and often schedule videoconferences the same day they were requested. (Joint Ex. 2 ¶ 29 (citing exhibits 5–8)). So in practice, it appears the facility's current policies safeguard Organizational Plaintiffs' rights.

Separately, the Court finds that the parties did not sufficiently develop their legal arguments regarding the Organizational Plaintiffs' constitutional rights, which prevents the Court from properly analyzing the legal issues.

54

Plaintiffs offer broad support for their position, but Defendants challenge their interpretation of certain cases—particularly *Haitian Refugee Ctr. v. Baker*, 953 F.2d 1498 (11th Cir. 1982), and its purported "alternative holding." (*See* Doc. 115 at 19, Doc. 151 at 5–6). Going forward, the parties must develop their arguments and focus their analysis on the relevant case law in connection with Organizational Plaintiffs' claims. Therefore, this portion of the motion is denied with respect to Organizational Plaintiffs.

   3. *Failure to Make Attorney Access Protocols Publicly Available*

   The last issue is Defendants' failure to publicly share attorney access protocols. In tandem, the Court highlights Defendants' failure to document and keep current the facility's attorney access protocols. Since Defendants either do not record their policies or do not update them when changes happen, how can they possibly make protocols accessible to anyone?

   To start, it is undisputed that the facility's written policies are outdated, are sometimes not enforced, and "lag behind" its actual practices. (Doc. 230 at 193). The main issue is "paperwork." (Doc. 231 at 100). Policies must go "through a lot of lawyers, so every time a change is made it goes through the state legal team, the federal legal team, ICE's team, and the State of Florida's team[,] and then back to us." (*Id.*). While Lumm claims that a policy change happens "immediately," the follow-up documentation "takes forever." (*Id.* at

101).  So how can detainees or the public possibly become aware of the current policies?

It is also undisputed that neither State Defendants nor Federal Defendants have publicly posted information about attorney access protocols on their relevant websites: for State Defendants, FDEM's website, https://www.floridadisaster.org/, and for Federal Defendants, ICE's website, https://www.ice.gov/detention-facilities.   Even a Google search yields no information.  As a result, attorneys cannot even find basic information about the facility, such as the address, phone number, or email address used to request visits and videoconferences, much less the facility's attorney access protocols.

Defendants argue that Plaintiffs have not cited any case requiring public posting of attorney access protocols under the First Amendment.  (Doc. 231 at 182, 194).  They claim that requiring the publication of these protocols would amount to compelled speech in violation of the First Amendment.[19]  (*Id.* at 175,

---

[19] Defendants raised their compelled speech argument for the first time at the hearing.  The Court cannot locate analysis on the topic in their briefs on the motion for preliminary injunction.  "A party's failure to cite legal authority in support of its position suggests either that there is no authority to sustain its position or that it expects the court to do its research." *Alonso Cano v. 245 C & C, LLC*, No. 19-21826-CIV, 2019 WL 11769102, at *10 (S.D. Fla. Nov. 25, 2019) (cleaned up, quotation omitted).  So, "the Court declines the invitation to do Defendants' research and rejects their arguments for failure to cite supporting authority." *Id.* (cleaned up).

To the extent Federal Defendants argue that the Constitution does not require the government to assist the holder of a constitutional right in the exercise of that right (Doc. 131 at 13), this preliminary injunction does not require Defendants to assist in the exercise of Plaintiffs' First Amendment rights.  Rather, it merely requires Defendants to make the

193).  Additionally, State Defendants contend that they already provide this information to detainees at the facility.  Counsel for Federal Defendants notes that "the information about how to contact the detainee to make the appointment is actually posted in the facility" and references the detainee handbook.  (*Id.* at 193).  Federal Defendants' counsel also argues that Alligator Alcatraz is not an ICE facility but is a state-run facility, so it does not need to post information related to Alligator Alcatraz on ICE's website.  (*Id.*).

The Court first tackles the fact that no case explicitly requires Defendants to publicly post attorney access protocols online.  There is a good reason for this.  This unusual situation likely stems from the fact that, as far as the Court knows, Alligator Alcatraz is the only immigration detention facility of its kind—a hybrid facility where the state purportedly runs daily operations, but ICE maintains authority over detainee transfer decisions.  Logic suggests that all other ICE-operated immigration detention facilities across the United States follow ICE's policy of posting attorney access protocols

---

public and detainees aware of the facility's attorney access protocols so that Plaintiffs may exercise their constitutional rights to access counsel.

Notwithstanding Defendants' failure to develop their compelled speech argument, the Court rejects it for another, more basic reason.  This preliminary injunction does not compel Defendants to express any view or message.  The Court does not dictate what the government must say; Defendants' witnesses testified at length at the hearing that they developed their own policies specifically for Alligator Alcatraz.  Rather, the Court merely requires Defendants to share the facility's attorney access protocols with the public and detainees.  So the Court addresses Defendants' compelled speech arguments no further.

on its website. The Court's review of ICE's website pages dedicated to detention facilities in Florida confirms this.

A visitor to the ICE website may search for a list of each state's detention facilities. Each facility has its own page. Each page has a tab explaining the following: Contacting a Detainee; Legal & Case Information; Hours of Visitation; Sending Items to Detainees; Press & Media; and Feedback of Complaints. Additionally, each page lists the detention facility's address, phone number, and pertinent email address(es). Unsurprisingly, no court has *had* to direct ICE to post attorney access protocols online; it already does so. However, there is no information on ICE's website concerning Alligator Alcatraz—not an address, phone number, or email address. Nothing.

And State Defendants' FDEM website fares no better. FDEM is typically associated with hurricane and other disaster relief. Given its usual role, FDEM would appear unlikely to run an immigration detention facility, and its website does not seem to be a likely place for an attorney or family member to find information about immigration detainees. Nevertheless, FDEM and its affiliates (Nakamoto and CRS) primarily handle the facility's daily operations in close concert with ICE. Therefore, the FDEM website is the place where one would have to look for information. However, it contains no information about Alligator Alcatraz.

58

Given the foregoing, the Court rejects the premise that simply because no case requires Defendants to post attorney access protocols online, the First Amendment does not require such action. ICE cannot arrest an individual, whisk him away to Alligator Alcatraz, and not post any information about the who, what, where, when, and why of the facility for public consumption.

State Defendants argue that "the fact that the policies lag behind the practice and the fact that the facility is offering more than what the written policy provides is not a First Amendment violation." (Doc. 231 at 172). Viewing this argument in isolation, perhaps the Court might agree. But here, the complete lack of transparency has led to almost everyone's ignorance of the policies' very existence. Federal Defendants contend that to show a First Amendment violation, Plaintiffs must show "intentional, active interference between a lawyer and a client in their communication." (*Id.* at 206–07). Shrouding core attorney access policies in secrecy constitutes such interference.

Defendants' explanation that this facility is somehow different from other immigration detention facilities (Doc. 230 at 192), and thus the absence of updated written policies is understandable or justifiable, lacks merit. It bears repeating: "Defendants may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal

59

counsel to the extent demanded by the Constitution." *Mercado*, 800 F. Supp. 3d at 577. Moreover, Defendants' explanation is absurd. On one hand, they say there is "no formula" (Doc. 230 at 192) for Alligator Alcatraz, so they must develop policies from scratch; but on the other hand, they state the "ultimate goal" is to meet ICE standards which were preexisting and already promulgated by Federal Defendants themselves. (*Id.* at 193). The Court rejects any argument that failing to document the facility's current protocols for attorney access does not violate the First Amendment.

To be clear, the Court finds that these restrictions impinge both Detained Plaintiffs' and Organizational Plaintiffs' constitutional rights. Failure to publicly provide attorney access protocols prevents Organizational Plaintiffs from soliciting and representing immigration detainee clients. Additionally, failure to notify Detained Plaintiffs of how they may contact and consult with attorneys alone denies them access to counsel.

Finding that the facility's failure to document and publish its policies impinges Plaintiffs' First Amendment rights, the Court examines these barriers to access to counsel under *Turner*. These failures lack any valid, rational connection to a genuine interest in order and security. To the extent Defendants even make such an argument, it is unreasonable—especially given ICE's common practice of posting its detention facilities' attorney access policies online. Additionally, there are no alternative ways for Plaintiffs to

60

exercise these rights.  How can Plaintiffs access counsel if they do not know what protocols are in place on any given day for them to do so?  Furthermore, accommodating the right would likely benefit guards and facility staff because they would have consistent awareness of existing policies.  Same goes for the detainees.  Finally, documenting and publishing the facility's policies on access to counsel should require little to no additional resources, with no evidence to the contrary.  Therefore, the *Turner* factors favor Plaintiffs, who have shown a likelihood of success on the merits of their claim that Defendants' failure to publicly share the facility's attorney access protocols and make them available to detainees violates their First Amendment rights.

**D. Irreparable Harm**

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Even if a plaintiff can show a substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Id.* (citation omitted).  It is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (loss

61

of First Amendment freedoms constitutes irreparable harm); *City of Jacksonville*, 896 F.2d at 1285–86 (noting that an ongoing violation of First Amendment rights constitutes irreparable injury).

Regarding the allegations that the restrictions on attorney-client communication violate Plaintiffs' and class members' First Amendment rights, the Court concludes that Plaintiffs have demonstrated irreparable harm. Plaintiffs' evidence indicates that without a preliminary injunction, Defendants' practices at the facility will prevent Plaintiffs from exercising their First Amendment rights to consult with and have advice and assistance from legal counsel. *See Mercado*, 800 F. Supp. 3d at 565 (finding prevention of access to counsel at detention facility was irreparable harm) (citing *Denius*, 209 F.3d at 953 ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.")).

In the cases of H.C.R. and J.E., for example, Defendants' policies prevented them from obtaining legal advice before their removal from the United States. Additionally, Vega testified that ICE deportation officers may ask detainees to sign voluntary departure orders. (Doc. 230 at 77). Doing so without the ability to consult an attorney may have irreversible consequences for detainees.

"Without counsel, detainees—who are already in a vulnerable position—cannot effectively exercise their rights[.]  Counsel also serves the important role of informing people of their constitutional and statutory rights, which is especially important given the complexity of immigration law." *Advocs. for Hum. Rts.*, 2026 WL 404457, at *14 (finding plaintiffs showed irreparable harm due to violations of First Amendment rights of access to counsel and granting temporary restraining order).  In sum, the Court concludes that Plaintiffs have demonstrated irreparable harm at this stage of the litigation.

**E. Balance of the Equities and Public Interest**

"Where the government is the opposing party, balancing of the harm and the public interest merge." *Gayle*, 614 F. Supp. 3d at 1206 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "It is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Fraihat v. ICE*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020)).  Where "the plaintiffs are likely to succeed on their [First Amendment] claims, the balance of equities and the public interest favor injunctive relief." *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F. 4th 1075, 1098 (9th Cir. 2022)). Moreover, "it is always in the public interest to protect First Amendment liberties." *KH Outdoor*, 458 F.3d at 1272 (quoting *Joelner v. Vill. of Washington Park,* 378 F.3d 613, 620 (7th Cir. 2004)).

63

Federal Defendants did not address the balance of the equities and public interest factor. (*See generally* Docs. 131, 151). State Defendants argue that because they are scheduling timely, free, and confidential meetings, the balance of the equities does not support granting preliminary relief. (Doc. 132 at 29; Doc. 152 at 16). They highlight one public interest in their favor: "'the public interest in allowing the government discretion to carry out its authorized functions.'" (Doc. 132 at 29 (quoting *S. Poverty L. Ctr.*, 2020 WL 3265533, at \*33)). The Court has no intention of subverting that interest—Defendants may continue operating Alligator Alcatraz, and ICE may continue to deport illegal aliens, but they must do so by respecting the most basic constitutional rights.

In evaluating the third requirement for injunctive relief, the Eleventh Circuit has held that "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor*, 458 F.3d at 1272. It is in the public's interest to safeguard the First Amendment rights of immigration detainees and organizational plaintiffs. Despite Defendants' arguments, the threatened injury to Plaintiffs outweighs any damage the preliminary injunction might cause Defendants. This factor favors Plaintiffs.

**E. Bond**

Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant

64

gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Decisions about the security required when issuing preliminary relief "are entrusted to the discretion of the district court," including the discretion to "elect to require no security at all." *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres*, 910 F.3d 1130, 1171 (11th Cir. 2018) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)). Many district courts exercising this discretion decline requiring security in cases brought by indigent, detained, and/or incarcerated individuals, those seeking to exercise their constitutional rights, and in cases that serve the public interest. *See, e.g. Campos v. I.N.S.,* 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998); *Cruz v. Dudek*, No. 10-23048-CIV, 2010 WL 4284955, at *16 (S.D. Fla. Oct. 12, 2010), *report and recommendation adopted sub nom. Cruz v. Arnold*, 2010 WL 11601831 (Nov. 24, 2010); *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335–36 (M.D. Fla. 2009).

Plaintiffs argue the Court should not require a bond. (Doc. 115 at 23–24). Neither the State Defendants nor Federal Defendants address this issue. With no opposition, the Court exercises its discretion in declining to require Plaintiffs to provide security.

Accordingly, it is now

**ORDERED:**

1. Plaintiffs' Motion for Leave to Supplement the Record (Doc. 235) is **GRANTED**.

2. Plaintiffs' Motion for Class Certification (Doc. 114) is **GRANTED** to the extent set forth above.

3. The Court **PROVISIONALLY CERTIFIES** the proposed class, which is defined as "All persons who are currently, or in the future, held at the Alligator Alcatraz detention facility," for the purpose of issuing the Preliminary Injunction.

4. Plaintiffs' counsel are **APPOINTED** as provisional class counsel.

5. Plaintiffs' Motion for Preliminary Injunction (Doc. 115) is **GRANTED IN PART AND DENIED IN PART** as follows:

> a. Each of the State Defendants and Federal Defendants, the officers, agents, servants, employees, and attorneys of each of them, and all persons in active concert or participation with any of the foregoing who receive actual notice of this order by personal service or otherwise be and they hereby are **ENJOINED AND RESTRAINED**, pending the final determination of this action, as follows:
>
> > i. State Defendants and Federal Defendants shall, pending further Order of this Court, provide the Detainee Class with access to timely, free,

66

confidential, unmonitored, unrecorded outgoing legal calls.   They must provide at least one operable telephone for every 25 detainees at Alligator Alcatraz.

ii. State Defendants and Federal Defendants shall, pending further Order of this Court, update and document in writing all protocols for attorney-client communication in English, Spanish, and Haitian Creole, including but not limited to, the detainee handbook, legal visitation policies, and legal phone call policies.   If any material changes to policies related to access to counsel are made, State Defendants and Federal Defendants shall promptly update those changes in writing and disseminate them to the public and the Detainee Class.

iii. State Defendants and Federal Defendants shall, pending further Order of this Court, provide and post in locations accessible and visible to the Detainee Class written information about protocols for attorney-client communication in English, Spanish, and Haitian Creole.

67

iv. State Defendants and Federal Defendants shall, pending further Order of this Court, maintain publicly available information regarding protocols for attorney-client communication via ICE and FDEM websites.

b. Plaintiffs shall not be required to furnish security for costs.

6. The Court **SETS** a Zoom status conference for **April 13, 2026, at 2:00 p.m.**

7. The Court no longer requires the parties to file biweekly status reports.

**DONE** and **ORDERED** in Fort Myers, Florida on March 27, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

68