**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

H.C.R., D.G.M., and H.P., *on behalf of themselves and all others similarly situated*,

    Plaintiffs,

*v.*

MARKWAYNE MULLIN, *Secretary of the United States Department of Homeland Security, et al.*,

    Defendants.

Case No 2:25-cv-00747-SPC-DNF

**STATE DEFENDANTS' MOTION TO STAY**
**PRELIMINARY INJUNCTION PENDING APPEAL**

Defendants Ron DeSantis and Kevin Guthrie, in their official capacities, and the Florida Division of Emergency Management (collectively, "State Defendants"), move to stay the Court's preliminary injunction entered on March 27, 2026, Doc. 142.

### INTRODUCTION

Plaintiffs did not meet their heightened burden to show that the facts and law clearly support all four factors required for a mandatory preliminary injunction. Specifically, the First Amendment does not require the State Defendants to provide detainees with three separate methods to confidentially communicate with their attorneys, and the Court cited no authority to support its conclusion that it does. Likewise, the First Amendment does not require the State Defendants to publicly post Alligator Alcatraz ("Facility")'s attorney access protocols. The First Amendment prohibits governments from denying the freedom of speech; it does not authorize courts to order governments to engage in speech. In other words, Plaintiffs came nowhere close to showing that the law clearly supports their requested relief. A mandatory preliminary injunction cannot issue without this showing.

Plaintiffs also did not demonstrate any evidence of imminent irreparable harm, much less a clear showing of such harm. The State Defendants, on the other hand, presented significant unrebutted evidence that the Facility has been providing – and continues to provide – confidential access to counsel. For each of these reasons, the State Defendants are likely to prevail on the merits. And the equities strongly favor a

stay, which will preserve both the Court's and the parties' resources and avoid duplicative litigation.

Accordingly, the Court should stay the injunction during the appeal.

**LEGAL STANDARD**

"[A]s part of [the] traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9-10 (1942) (citation omitted)' *see* Rule 62(d), FED. R. CIV. P. To obtain a stay, the movant must show: (1) it is likely to succeed on the merits, (2) it will be irreparably injured absent a stay, (3) issuing the stay will not substantially injure the other parties, and (4) the public interest favors a stay. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,* 32 F.4th 1363, 1370 (11th Cir. 2022). "Ordinarily the first factor [likelihood of success on the merits] is the most important." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

**ARGUMENT**

All four factors favor a stay. The State Defendants are likely to prevail on the merits. The State is irreparably harmed when the Court orders it to provide relief not authorized by the First Amendment, particularly where compliance may incur unrecoverable costs. Plaintiffs would not be substantially injured by a stay. And a stay would promote the public interest by conserving judicial resources and avoiding duplicative litigation.

## I.    The State Defendants are likely to succeed on the merits.

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jack.*, 896 F.2d 1283, 1284 (11th Cir. 1990) (citation omitted). But "[w]hen a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a 'mandatory or affirmative injunction' and the burden on the moving party increases." *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1295 (M.D. Fla. 2010) (quoting *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971)).

That is what Plaintiffs sought – they asked this Court to order the State Defendants to publicly post information at specific locations and provide detainees with specific numbers of phones to make confidential phone calls while the case progresses. This type of mandatory preliminary relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted); *see also Mia. Beach Fed. Sav. & Loan Ass'n v. Callander,* 256 F.2d 410, 415 (5th Cir. 1958) (same). In other words, plaintiffs seeking a mandatory injunction must "mak[e] a 'clear' showing on each of the four elements," *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172,

4

1192 (S.D. Fla. 2011) (citation omitted), or show that "extreme or serious damage would result absent the relief," *Verizon Wireless Pers. Commc'n LP v. City of Jack.*, 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009) (citation omitted).

The Court briefly acknowledged this heightened standard. Doc. 243 at 36 ("Mandatory injunctions – such as that requested here – are 'particularly disfavored,' and the burden on the movant is even higher." Yet it issued a mandatory preliminary injunction anyway, despite not coming close to meeting this exacting standard on any of the four elements of injunctive relief. For that reason, the district court erred, and the Preliminary Injunction should be stayed pending appeal.

A. <u>Plaintiffs did not clearly show the First Amendment requires the State Defendants to provide multiple methods of confidential access to counsel.</u>

Plaintiffs sought a preliminary injunction requiring Defendants to permit "timely, confidential, and meaningful attorney-client communication at Alligator Alcatraz." Doc.115 at 1. As to phone calls, they asked the Court to require that Defendants allow detainees "to place timely, free, confidential, unmonitored, and unrecorded outgoing legal calls." Doc.115-2 at 2. The Court acquiesced to that demand, concluding that Plaintiffs demonstrated a substantial likelihood of success on their claim that the Facility's policies regarding monitoring legal phone calls violated the First Amendment. Doc. 243 at 43.

The Court's order, however, downplayed the fact that detainees can timely and confidentially meet with their counsel through in-person meetings at the Facility or through unrecorded and unmonitored private Zoom videoconferences. Indeed, the

State Defendants introduced unrebutted testimony describing both methods of confidential access. *Contrast with Mercado v. Noem,* 800 F. Supp. 3d 526, 577 (S.D.N.Y. 2025).[1] And while Plaintiffs initially argued these methods were not sufficiently confidential or timely under the First Amendment, they dropped those challenges during the hearing on their Motion for Preliminary Injunction. *Id.* 426:17-20. As they should have, because both methods fully preserve the substance of attorney-client communications required under the First Amendment.

Despite Plaintiffs' forfeiture of those challenges, the Court proceeded to require the State Defendants to provide detainees with a third method to communicate with their counsel. But the First Amendment does not guarantee a buffet of electronic communication options, and neither the Court nor the Plaintiffs cited a single case suggesting otherwise.

To be sure, the First Amendment protects the right to communicate confidentially with counsel. *See Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008). The First Amendment does not, however, guarantee detainees or inmates their preferred method of communication – only that they receive access to their counsel. *See Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (explaining that under *Turner v. Safley*, 482 U.S. 78 (1987), alternatives "need not be ideal"); *see also, e.g.*, *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989) ("Although in some instances prison

---

[1] Hr'g Tr. 131:7-16, 132:22-133:5, 134:2-6, 136:14-24, 138:11-16, 145:22-146:4, 173:13-174:3, 296:10-18, 301:19-302:7, 304:13-20, 307:10-24, 308:2-13, 309:8-10, 309:11-16.

inmates may have a right to use the telephone for communication with relatives and friends, prison officials may restrict that right in a reasonable manner[.]"). Nor does it require states to provide multiple, unrestricted methods of confidential communication. *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1049 (9th Cir. 2002) (finding restrictions on attorney-client calls did not violate First Amendment because the inmate still had other ways to communicate, including mail and in-person visits).

The Court's order does not dispute this caselaw or otherwise demonstrate that the First Amendment requires that detainees have three methods to confidentially access their counsel. Instead, the Court relied on district court orders directing facilities to provide their detainees with *some* access to counsel. *See Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-CV-09757-MMC, 2025 WL 4090285, at *1 (N.D. Cal. Dec. 16, 2025); *Gonzalez v. Noem,* No. 1:25-cv-13323, 2025 WL 3170784, at *1 (N.D. Ill. Nov. 5, 2025); *Mercado,* 800 F. Supp. 3d at 558; *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.,* No. 26-CV-749 (NEB/DLM), 2026 WL 404457, at *15 (D. Minn. Feb. 12, 2026); *Vazquez Perdomo v. Noem,* Case No. 2:25-cv-5605-MEMF-SP, 2025 WL 3192939, at *46 (C.D. Cal. Nov. 13, 2025). But three of those five cases sought relief under the Fifth Amendment – not the First. *See Ruiz*, 2025 WL 4090285 at *1; *Advocs. for Hum. Rts.,* 2026 WL 404457, at *15; *Vazquez Perdomo,* 2025 WL 3192939, at *46.[2] Indeed, the Court's order explicitly noted that *Advocates for Human Rights* and

---

[2] The complaint in *Gonzalez* brought claims under both the First and Fifth Amendments, but the motion for temporary restraining order made clear it sought relief only under the Fifth Amendment. *Gonzalez,* 2025 WL 4090285, at *1 ("Plaintiffs respectfully move the Court to enter a temporary restraining order to remedy ongoing violations of Plaintiffs' Fifth Amendment right.").

*Vazquez Perdomo* were brought under the Fifth Amendment. Doc. 243 at 47-48. And the one case that granted relief under the First Amendment (*Mercado*) did not find that the plaintiffs were entitled to more than one method of confidential access to counsel. Instead, the court granted the injunction because the "[d]etainees' only access to legal counsel . . . was through sporadic, time-restricted, monitored phone calls." *Mercado*, 800 F. Supp. 3d at 542, 577.

The Court also suggested that because the ICE standards provide that "Facility staff shall not electronically monitor detainee telephone calls related to legal matters," neither should the Facility here. Doc. 243 at 46. But the ICE Guidelines also do not require detention facilities to provide confidential zoom videoconferences, which the Facility does. And most importantly, the ICE Guidelines are not the First Amendment. Here, the Court used the ICE Guidelines and an internal ICE draft policy to conclude that monitored calls lacked a rational security connection and to set a phone-to-detainee ratio. *Id.* at 46, 53. The ICE Guidelines and other draft policies, however, "do not constitute constitutional law[.]" *Al-Amin*, 511 F.3d at 1336 n.37. Despite insisting that it does not, the Court improperly elevates these standards to constitutional minima. *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima[.]"). This application contravenes *Turner*'s deference and improperly converts guidance into binding constitutional requirements. *See* 482 U.S. at 84-85; *Alexander S. By & Through Bowers v. Boyd*, 876 F.

8

Supp. 773, 798-99 (D.S.C. 1995) ("In deciding minimum constitutional requirements for the institutions under challenge here, this court is not bound by standards promulgated by organizations.").

Last, the relevant question under *Turner* is not whether the Facility's policy is the least restrictive means, but whether it is reasonable given the relevant interests. *See* 482 U.S. at 89. Judicial analysis of these claims must be grounded in "judicial restraint and deference to the professional judgment of institutional officials." *Pesci v. Budz (Pesci I*), 730 F.3d 1291, 1298 (11th Cir. 2013). Here, Plaintiffs fail to show how the Facility's policy is unreasonable – which was their burden. *See U.S. v. Noriega*, 917 F.2d 1543 (11th Cir. 1990) ("It is not unusual or unreasonable to condition the use of telephones by penal inmates on monitoring of the telephone calls by the authorities charged with maintaining the security of the penal facility."). As required by *Turner*, State Defendants have shown a "valid, rational connection" between limiting or monitoring outgoing inmate telephone calls and "institutional order, safety, and security." *See* 482 U.S. at 89; *Pesci I*, 730 F.3d at 1298 ("[T]he government undoubtedly may justify a civil detention regulation based on its valid, rational connection to legitimate interests in institutional order, safety, and security.").

The second *Turner* factor also defeats Plaintiffs' claim. *See* 482 U.S. at 90. That factor asks whether detainees have "alternative means of exercising" their asserted rights." *Id.* "When considering this factor, the Supreme Court has instructed that the right must be viewed sensibly and expansively." *Pope v. Hightower,* 101 F. 3d 1382,

1385 (11th Cir. 1996). Thus, regulations satisfy the First Amendment under the *Turner* test when the State provides a meaningful avenue for confidential attorney-client communication. That is the case here, as shown by the State Defendants' unrebutted testimony that the Facility provides detainees at least two methods to timely and confidentially communicate with their attorneys.

All told, the facts show that Plaintiffs can timely and confidentially communicate with their attorneys in at least two ways, and the First Amendment does not require a third. In other words, Plaintiffs failed to show that "the facts and law are clearly in favor of the moving party." *Mia. Beach*, 256 F.2d at 415. Without that showing, the Court abused its discretion by granting mandatory preliminary relief. For that reason alone, the Court should vacate the mandatory preliminary injunction.

B. <u>Plaintiffs did not clearly show that the First Amendment requires the State Defendants to publicly post the Facility's attorney access protocols.</u>

Plaintiffs also asked this Court to require the State Defendants to post the Facility's protocols for access to counsel throughout the Facility and on both the ICE and FDEM websites. Doc. 115 at 11. Plaintiffs again failed to show that the law clearly supports their position because the First Amendment does not allow this Court to order a government to engage in speech.

"The First Amendment prohibits Congress and other government entities and actors from abridging the freedom of speech." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (citation modified). "The Free Speech Clause . . . does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (citations

10

omitted). "Thus, when the government speaks, it is free to choose what to say and what not to say." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1333 (11th Cir. 2023); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). "This freedom includes choosing not to speak and speaking through the removal of speech that the government disapproves." *Mech v. Sch. Bd. of Palm Beach Cnty.,* 806 F.3d 1070, 1074 (11th Cir. 2015) (citation modified). And the doctrine applies regardless of the type of speech. *See Johanns v. Livestock Mtkg. Ass'n*, 544 U.S. 550, 553 (2005) (applying doctrine to generic advertising campaigns); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (specialty license plates); *McGriff*, 84 F.4th at 1334 (art installations); and *Gundy v. City of Jacksonville Florida*, 50 F.4th 60 (2022) (invocations at government meetings). That said, "[b]ecause characterizing speech as government speech strips it of all First Amendment protection under the Free Speech Clause . . . we do not do so lightly." *Mech*, 806 F.3d at 1074 (citation modified) (quoting *Walker,* 576 U.S. at 221 (Alito, J., dissenting)).

The Supreme Court and Eleventh Circuit "lack a precise test for separating government speech from private speech." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1230 (11th Cir. 2019) (citation omitted). But they generally consider three factors: "(1) whether the government maintains control over the speech; (2) whether the type of speech has traditionally communicated government messages; and (3) whether the public would reasonably believe that the government has endorsed the speech." *McGriff*, 84 F.4th at 1334. These factors,

however, "are neither individually nor jointly necessary for speech to constitute government speech." *Id.* And a court's review "is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). The purpose is to "determine whether the government intends to speak for itself or to regulate private expression." *Id.*

That said, "a finding that *all* [factors] evidence government speech will almost always result in a finding that the speech is that of the government." *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021). That is the case here. All three factors demonstrate that the requirement to post additional attorney access protocols throughout the Facility implicates the government's speech.

First, the State Defendants, with input and guidance from the Federal Defendants, developed the protocols and decided which and where to post them throughout the Facility. To be sure, private contractors helped draft and post the protocols. But "[t]he fact that private parties take part in the design and propagation of a message does not extinguish its governmental nature." *McGriff*, 84 F.4th at 1334 (quoting *Mech*, 806 F.3d at 1078 (citation modified)). Thus, a government is "not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages," provided "the government sets the overall message to be communicated and approves every word that is disseminated." *Johanns*, 544 U.S. at 562.

Second, public postings in immigration detention centers, or any other government carceral settings, have historically communicated only government messages – not private speech. And that makes sense. Official postings in jails and detention centers are undoubtedly designed to support and protect both the guards and the inmates/detainees they oversee, while also educating both on facility operations – both quintessentially government functions. Third, it goes without saying that the public would reasonably believe the government has approved and endorsed protocols that it posts inside an immigration detention center.

For all these reasons, the Facility's public postings are government speech. And if the First Amendment does not regulate government speech, this Court cannot use the First Amendment as a vehicle to force the State Defendants to engage in government speech they do not wish to conduct. Similarly, the Supreme Court has stated that while the First Amendment provides an "undoubted right to gather news," that right "affords no basis for the claim that the First Amendment compels others – private persons or governments – to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978); *id.* at 9 (noting precedent does not suggest "the Constitution *compels* the government to provide the media with information or access to it on demand").

C.  Plaintiffs did not make a clear showing of irreparable harm.

A preliminary injunction is "an *extraordinary* remedy that may only be awarded upon a *clear showing*" that the plaintiff is "*likely* to succeed on the merits" and "*irreparable* injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def.*

13

*Council, Inc.,* 555 U.S. 7, 20, 22 (2008) (emphasis added) (citations omitted). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter.,* 896 F.2d at 1285. In other words, establishing irreparable harm requires a showing that "irreparable injury is *likely"* – a mere "possibility" of harm is not enough for the extraordinary remedy of injunctive relief. *Winter,* 555 U.S. at 22.

As discussed above, Plaintiffs failed to clearly show that detainees would suffer irreparable harm. *Siegel,* 234 F.3d at 1176. They also failed to show that irreparable harm is likely – not just possible – without an injunction. State Defendants do not dispute that a loss of First Amendment rights is an irreparable injury. But Plaintiffs failed to show that the State Defendants are violating or even likely to imminently violate their First Amendment rights. This evidentiary failure alone should have doomed their quest for a preliminary injunction.

During the Court's hearing on the Motion, the State Defendants presented unrebutted testimony demonstrating that Plaintiffs are timely and confidentially meeting with their counsel through two methods: in-person meetings and Zoom videoconferences.[3] Indeed, unrebutted testimony showed that attorneys are "always" receiving confidential meetings with detainees within 24 hours, and "sometimes within minutes of the [attorney's] request." Hr'g. Tr. (Saunders) 101:20-23. And

---

[3] *See, e.g.*, Hr'g. Tr. (Saunders) 95:8-16, 101:20-23, 105:4-106:16, 107:19-108:11, 114:20-25, 115:15-116:2, 130:24-132:10, 132:24-133:5, 133:25-134:6, 134:14-17, 136:14-24, 138:11-139:19, 141:16-142:7, 145:2-8, 145:22-23, 149:2-22, 160:11-24; 178:12-179:12; *see id.* (Lumm) 285: 4-286:12, 288:2-13, 289:24-290:15, 294:16-295:17, 307:10-308:13, 309:17-20, 310:17-312:7, 344:25-345:7, 345:18-20

14

although the Facility generally operates under a reservation system, if an attorney visits the Facility without a reservation, "[t]hey would not be turned away" and "would be accommodated a visit" with the requested detainee. *Id.* 179:21-180:5.

The Court nonetheless credited Plaintiffs' assertions about its speculative and unlikely injuries. We consider Plaintiffs' purported evidence in turn. First, Plaintiffs called an ICE official who has never been to the Facility to make first-hand observations regarding Plaintiffs' alleged injuries. *See* Hr'g Tr. (Vega) 65-91. Mr. Vega testified that he "do[esn't] know specifically if voluntary departures have been obtained [at the Facility] or not," but it would be "within the spectrum of immigration authority" if an ICE deportation officer asked a detainee to sign one. *Id.* at 77-4:10. The Court seized upon this testimony to conclude that an ICE deportation officer could ask a detainee to sign voluntary departure forms "without the ability to consult an attorney." Doc. 242 at 62-63. Not only is there insufficient record support for this conclusion, but at best it shows a mere possibility of a harm that could occur – not the required showing that a harm is likely imminently facing Plaintiffs.

Second, Plaintiffs called two former detainees whose attorney visits in September 2025 were canceled due to the detainees' transfers to other facilities. Hr'g Tr. 31:19-42:11, 43:5-62:13. Notably, the unrebutted testimony showed that the Facility's policies changed months after those scheduled attorney visits to increase detainees' access to their attorneys. *See, e.g.*, Hr'g Tr. (Saunders) 95:8-16; 178:12-179:12. The fact that the Facility had already changed its policies to give Plaintiffs the

relief they had requested – confidential meetings and phone calls between attorneys and detainees, most often within hours or minutes of the request – shows there was no likelihood of future irreparable harm, and thus, no basis for injunctive relief.

Finally, Plaintiffs submitted two declarations after the hearing that offered no probative information on which the Court could rely. One declaration was from Ms. Jacoski, who emailed the Facility to ask if she could visit a client without scheduling the visit ahead of time. Doc.235-2 at 2. Because Ms. Jacoski was asking about having a meeting in the future, the Facility repeatedly asked Ms. Jacoski to submit a form so that it could "ensure the detainee is available for the visit without delay." *Id.* at 3. The Facility pleaded with Ms. Jacoski on the third time that it emailed her, asking, "Do you wish to schedule a visit?" *Id.* But there is no evidence that Ms. Jacoski even wanted to schedule a visit. And there is no evidence that Ms. Jacoski ever attempted to visit a client at the Facility without having a scheduled visit ahead of time.

The second declaration was from Ms. Aburto, who told one of her detainee clients that he could make confidential calls to her using cell phones. Doc. 235-1 at 2. Ms. Aburto wrote in her declaration, "I got a call from his partner saying my client had been trying to call me, but the officers did not let him." *Id.* This was the extent of Ms. Aburto's testimony. In fact, there was no testimony that her client even *asked* an officer to make a phone call, let alone testimony describing the circumstances of the purported denial. Ms. Aburto's declaration is so devoid of probative information that it does not even state whether Ms. Aburto's client requested to use a cell phone. *Id.*

16

The Court relied upon Plaintiffs' evidence about past harms – from before a policy change – and speculation about future harms. Doc. 243 at 61-63. But the Court overlooked the fact that Plaintiffs' evidence did not show *imminent future harm*. The Court did not address why the State Defendants' unrebutted testimony that the Facility was currently providing detainees multiple avenues of confidential access to their attorneys did not defeat Plaintiffs' arguments about irreparable harm. And the State Defendants were entitled to a rebuttable presumption that the Facility will continue its new policy of allowing attorneys to meet with detainees without a prior appointment. "In this circuit a government entity that has discontinued challenged conduct enjoys a rebuttable presumption that the conduct will not recur." *United States v. Florida*, 870 F. Supp. 2d 1346, 1351 (N.D. Fla. 2012) (citing *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1351-52 (11th Cir. 2011)).

Because the Court issued a mandatory preliminary injunction without a sufficient showing of actual and imminent harm in the future, the Court should stay the preliminary injunction.

## II.    The remaining equities support a stay.

### A.    Granting a stay is necessary to avoid irreparable harm to the State.

This Court should stay the preliminary injunction to avoid irreparable harm to the State. Importantly, for this element State Defendants need not show that they will prevail on the merits; they need only show irreparable harm from the enforcement of the preliminary injunction. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). Should this

17

Court refuse to stay the preliminary injunction, State Defendants will suffer irreparable harm for three reasons.

> **1. The injunction irreparably harms the State because it forces Florida's executive branch to take actions and make court-specified government speech in specific locations, contrary to Florida and federal laws empowering the State to make those decisions.**

To begin, a state is irreparably harmed by preliminary injunctions that are likely to exceed the authority conferred on the district courts by the Judiciary Act. *CASA*, 606 U.S. at 860; *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'") (quoting *New Motor Vehicle Bd. of Cal v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1997) (Rehnquist, J., in chambers))).

The same irreparable harm occurs when district courts exceed their supervisory role over state agencies, including in the prison and immigration detention context. Indeed, the Supreme Court made clear in *Turner* that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." 482 U.S. at 85. The same is true of a civil detention facility such as Alligator Alcatraz. *Pesci v. Budz (Pesci II)*, 935 F.3d 1159, 1166 (11th Cir. 2019). And "principles of federalism bolster that deference when a 'state penal system is involved." *Id.* (quoting *Turner*, 482 U.S. at 85). To that end, the Eleventh Circuit has noted that "courts do not sit as super-wardens," but

instead "prison officials, rather than judges, will make the difficult judgments concerning institutional operations." *Id.* (quoting *Turner*, 482 U.S. at 89); *see also CASA*, 606 U.S. at 861 ("[F]ederal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them. When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too."); *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec'y*, No. 25-12873, 2025 WL 2598567, at *10 (11th Cir. Sept. 4, 2025).

The Court insisted in its order that it "d[id] not wish to become a super-warden of an immigration detention facility." DE 243 at 39. But then it proceeded to grant a *mandatory* preliminary injunction that micromanages how the State Defendants operate the Facility and requires them to do more than the First Amendment requires. Doc. 243 at 66-68. For example, even though there was no evidence that detainees were denied access to phones due to excessive detainee demand, the Court itself determined that the Facility should have one telephone per 25 detainees and ordered State Defendants to purchase more telephones. *Id.* at 66-67. The Court directed State Defendants to engage in government speech by rewriting certain provisions of the detainee handbook, legal visitation policies, and legal phone call policies, based on the idea that a written policy violates the First Amendment if it has not been updated to reflect current practice. *Id.* at 67. And the Court directed State Defendants to engage in government speech in certain locations of the Facility, "pending further Order of

19

this Court." *Id.* Finally, the Court directed the State Defendants to update certain government websites with the Court-ordered government speech. *Id.* at 68.

Mandatory injunctions like these unlawfully place the judiciary in a supervisory role over the executive and exceed the judiciary's authority to rule upon cases brought before it. Courts have long recognized that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell*, 441 U.S. at 548 (citations omitted); *see id.* at 521 ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Thus, the State Defendants' "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (citation omitted).

Without a clear violation of a lawful constitutional right – which was not present on this record – it is the executive branch and detention facility administrators, not the courts, who are in the best position to determine what government speech to make and where to make it, or how many phones a facility needs to provide adequate access to counsel.

### 2. Exceeding the rights guaranteed by the First Amendment constitutes irreparable harm.

The preliminary injunction also irreparably harms State Defendants because it grants Plaintiffs relief beyond their First Amendment rights. Where a district court

20

has "exceed[ed] the requirements of the First Amendment," a stay of the preliminary injunction is proper. *Houchins*, 429 U.S. at 1342 (internal quotation marks and citation omitted). For example, in *Houchins*, Justice Rehnquist granted a stay of a district court's injunction that gave the press greater access to a county jail than was granted to the public, because the injunction exceeded the rights of the press under the First Amendment. *Id.* at 1342, 1346; *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (Kavanaugh, J., concurring in grant of application for stay).

Here, as previously discussed, the preliminary injunction far exceeds the requirements of the First Amendment by mandating the specific means of electronic communication that State Defendants must provide – beyond those already being provided prior to the injunction – and mandating the number of phones to be provided. The injunction also exceeds the First Amendment by ordering State Defendants to engage in certain government speech at certain locations. The First Amendment does not empower the Court to issue these mandates.

When an injunction compels the government to provide more than what the Constitution requires – even if the underlying claim has some merit – the government suffers irreparable harm from being forced to comply with an overly broad remedy that goes further than necessary to vindicate the plaintiffs' constitutional rights.

3. **The injunction requires Florida to make irrevocable expenditures**.

In granting a stay pending appeal in another case involving Alligator Alcatraz, a motions panel of the Eleventh Circuit recently determined that compliance with a

21

mandatory injunction requiring the dismantling of the Facility would irreparably harm Florida because Florida had not been reimbursed by the federal government. *Friends of the Everglades*, 2025 WL 2598567, at *11. Since the time of that stay order, the federal government still has not reimbursed Florida for costs associated with the Facility. Accordingly, the same analysis and result should apply here. Where Plaintiffs have not committed to "repay[ing] grant money if the Government ultimately prevails," and those expenditures are unable to be recouped, a stay of the injunction is proper. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025).

As previously discussed, the Court did not order State Defendants to stop taking an action. Instead, it ordered the State Defendants to take multiple actions – including engaging in government speech at court-specified locations and adding dozens and dozens of telephones to the Facility. Doc. 243 at 66-68. These mandatory actions will cost the State money – both in the purchase of new items and replacement of materials, as well as the expended staff time. Specifically, FDEM must purchase approximately 77 cell phones and associated equipment and order its staff to spend approximately 60 hours – 5 days at 12 hours per day – facilitating the mobilization and installation of this new equipment by specialized technicians, and unknown time spent on weekly maintenance and upkeep. *See* Ian-Paul Gadea-Guidicelli Declaration

at 3.[4] The costs for this mobilization will be roughly $180,025, plus an additional $6,283.75 per week to maintain connectivity. *Id.*

As noted, the Federal Government has not obligated itself to reimburse the State Defendants for the costs of complying with the preliminary injunction. But even if it eventually reimburses for the Facility's operations, federal tax dollars will still have been spent that cannot be recouped. Moreover, Plaintiffs have made no promises to repay State Defendants for their expenses if the injunction is ultimately reversed on appeal. For these reasons, the preliminary injunction causes State Defendants irreparable harm and should be stayed pending resolution of the appeal on the merits. *Friends of the Everglades*, 2025 WL 2598567, at *11.

B. <u>The remaining factors also weigh in favor of a stay.</u>

After satisfying the first two factors (the likelihood of success and a showing of irreparable harm), "the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "These factors merge when the Government is the opposing party." *Id.*; *see also Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (reaffirming that the government's "interest and harm merge with the public interest" "where the government is the party opposing the preliminary injunction") (citation omitted)).

---

[4] FDEM decided it would have to use cell phones because the Facility cannot provide traditional landline phone service because the geographic area lacks the required telephone carrier infrastructure. Thus, the only option is to use cell phones. And to provide sufficient cellular coverage for the required additional phones, FDEM must purchase and use multiple Starlink systems because the only alternative is constructing a cellular tower at the Facility, which is both cost- and time-prohibitive. *See* Ian-Paul Gadea-Guidicelli Declaration at 3.

1. **Staying the preliminary injunction serves the public interest and will promote efficiency.**

Staying the district court's preliminary injunction is in the public interest and promotes efficiency of the court system. As this Court previously found in *Friends of the Everglades*, "discretion in the enforcement of immigration law embraces immediate human concerns" and the courts must not underestimate the "problems posed . . . including risks to safety." 2025 WL 2598567, at *12 (internal question marks, brackets, and citations omitted). And although the federal government possesses the power to determine immigration policies, the states "'bear[ ] many of the consequences of unlawful immigration.'" *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)).

There is a court-recognized "public interest in allowing the government discretion to carry out its authorized functions." *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760 (CKK), 2020 WL 3265533, at *33 (D.D.C. June 17, 2020). For the imposition of mandatory sets of conditions upon detention facilities, Plaintiffs must show there is "'no alternative if the rights of pretrial detainees are to be respected.'" *Id.* (quoting *Campbell v. McGruder*, 580 F.2d 521, 551-52 (D.C. Cir. 1978)). That is plainly not the case here, where State Defendants are already voluntarily granting Plaintiffs all the relief under the First Amendment to which they are entitled.

Furthermore, courts can "order a stay" of proceedings "pending the outcome of [an] appeal" when it is "[i]n the interest of judicial economy." *Lozman v. City of Riviera Beach*, 2011 WL 13107422, at *4 (S.D. Fla. May 4, 2011); *see also Danner*

*Constr. Co., Inc. v. Hillsborough County*, 2009 WL 3055315, at * (M.D. Fla. Sept. 24, 2009) (granting a stay of proceedings "in the interest of judicial economy, and avoidance of unnecessary discovery and litigation expenses") Such is the case here.

2. **Issuing a stay will not injure Plaintiffs.**

In balancing the harms of the parties, courts analyze "whether the plaintiffs have shown that they will suffer irreparable injuries that they would not otherwise suffer in the absence of an injunction." *Swain*, 958 F.3d at 1090-91 (citation omitted). Where plaintiffs are already receiving the requested relief from defendants, and there is "[n]othing in the record [that] indicates that the defendants will abandon the current [attorney contact] measures absent a preliminary injunction, the balance of the harms weighs in favor the defendants. *Id.* at 1091.

Here, the record evidence shows that State Defendants were already providing Plaintiffs' requested relief even in the absence of an injunction. Specifically, Plaintiffs were already receiving timely and confidential access to their attorneys via a variety of methods – at least via in-person and Zoom meetings. Plaintiffs cannot show any protected First Amendment interest in having a third avenue for communications, and therefore cannot show that a stay of this portion of the preliminary injunction would injure them.

Moreover, the First Amendment does not mandate that State Defendants engage in certain government speech at the times and locations desired by Plaintiffs. Plaintiffs cannot show irreparable harm simply because State Defendants prefer to

communicate via one method as opposed to another. Thus, Plaintiffs will not be harmed by a stay of the preliminary injunction.

### 3. **A stay would promote uniformity of the law.**

Finally, "courts focus on whether the stay would promote the uniformity of the laws or the interests of third parties" when examining whether a stay is in the public interest. *In re Freedom Unlimited*, 489 F. Supp. 3d 1328, 1339 (S.D. Fla. 2020) (citation omitted). A stay of the preliminary injunction would promote the uniformity of the law because the district courts could benefit from clarity on the First Amendment regarding attorney access in immigration detention centers. *See In re Subpoena of S. Broward Hosp. Dist.*, No. 21-62550-MC-SINGHAL, 2022 WL 17583433, at *4 (S.D. Fla. Feb. 18, 2022). As immigration and detention continues to become an increasingly more complex problem for federal and state governments, precedent on these issues would greatly aid both governments and detainees as to the bounds of their respective First Amendment obligations and rights.

### CONCLUSION

This Court should stay the preliminary injunction until the Eleventh Circuit decides the appeal.

Dated: April 22, 2026                              Respectfully submitted,

                                                   /s/ *Nicholas J.P. Meros*
Francis A. Zacherl, III (FBN 868094)               Nicholas J.P. Meros (FBN 120270)
Oliver Sepulveda (FBN 111763)                      Tara K. Price (FBN 98073)
**SHUTTS & BOWEN LLP**                             Kassandra S. Reardon (FBN 1033220)
200 South Biscayne Blvd, Suite 4100                Margaret A. McCormick (FBN 1039517)
Miami, Florida 33131                               **SHUTTS & BOWEN LLP**
(305) 358-6300                                     215 South Monroe Street, Suite 804
FZacherl@shutts.com                                Tallahassee, Florida 32301
OSepulveda@shutts.com                              (850) 241-1717
                                                   NMeros@shutts.com
                                                   TPrice@shutts.com
                                                   KReardon@shutts.com
                                                   MMccormick@shutts.com

                                                   *Counsel for the State Defendants*


## RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3), I hereby certify that counsel for the State Defendants conferred with counsel for the Plaintiffs by e-mail on April 22, 2026, in a good faith effort to resolve the issues raised in this motion. Plaintiffs object to the requested stay.

                                        /s/ *Nicholas J.P. Meros*
                                        *Counsel for the State Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I filed a true and correct copy of the foregoing with the Court via its CM/ECF system, which served all counsel of record.

                                        /s/ *Nicholas J.P. Meros*
                                        *Counsel for the State Defendants*

27