# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

H.C.R., et al.,

       *Plaintiffs*,               Case No. 2:25-cv-00747-SPC-KRH

v.

MARKWAYNE MULLIN, et al.,

       *Defendants*.

                       /

## PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS'
## MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

This Court, following voluminous briefing and two days of hearing evidence and argument, entered a narrow preliminary injunction aimed at safeguarding Plaintiffs' fundamental First Amendment right to hire and consult with counsel. The relief the Court ordered was simple: provide Detained Plaintiffs at the facility with unmonitored outgoing legal calls and post attorney-access protocols publicly such that Detained Plaintiffs and attorneys can access the information.

After waiting almost an entire month, State Defendants now ask this Court to upend that relief and stay its preliminary injunction pending appeal. But their request for that extraordinary relief from this Court fails at every step of the analysis. *First*, State Defendants are not likely to prevail on the merits of their appeal. They claim that outgoing legal calls are unnecessary where the facility already allows in-person and virtual attorney visitation. But those attorney access mechanisms are attorney-

initiated, leaving detained persons without *any* mechanism to reach out to counsel affirmatively, whether to seek new representation or to communicate with existing counsel about urgent matters. *See* Part I.A. And State Defendants' protestations about compelled government speech are both forfeited and meritless. *See* Part I.B. *Second*, State Defendants have not shown that they will be irreparably harmed absent a stay. Most of their arguments on harm are nothing more than a recycling of their objections on the merits, and their sole claim of economic harm rings hollow and is contradicted by other record evidence. *See* Part II. *Third*, harm to Plaintiffs is a near certainty if the relief is stayed, as the harm that befell individuals like H.C.R. and J.E. will no doubt continue to recur. *See* Part III. *Fourth*, the public interest is not served by permitting State Defendants to continue to deprive Plaintiffs of fundamental First Amendment freedoms while they appeal the modest relief granted by this Court. *See* Part IV.

The Court should deny State Defendants' motion for a stay.

## ARGUMENT

State Defendants ask this Court for the "extraordinary remedy" of a stay of the preliminary injunction pending appeal. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986). A stay "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation modified). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34. Here, that means that State Defendants bear the burden of showing that (1) they are "likely to prevail on the merits on appeal," (2) they

2

will suffer irreparable damage" absent a stay, (3) Plaintiffs "will suffer no substantial harm from the issuance of the stay," and (4) "the public interest will be served by issuing the stay." *Garcia-Mir*, 781 F.2d at 1453 (citation modified). They fail to satisfy that burden at every step.

## I.     State Defendants Are Not Likely to Succeed on the Merits.

### A. The Court correctly concluded that Plaintiffs are entitled to free, confidential outgoing legal calls.

There is no dispute here that the First Amendment protects the right to "uninhibited, confidential communications" with counsel. *Mitchell v. Peoples*, 10 F.4th 1226, 1230 (11th Cir. 2021) (citation modified); *see also Al-Amin v. Smith*, 511 F.3d 1317, 1333–35 (11th Cir. 2008). State Defendants do not take issue with that fundamental First Amendment principle. Instead, they argue that because the facility provides attorney-initiated virtual and in-person visitation, the First Amendment is satisfied, and outgoing legal calls are unnecessary. Doc. 259 ("Mot.") at 5–6.[1] In their view, the First Amendment does not "require[] that detainees have three methods to confidentially access their counsel." Mot. at 7. But neither Plaintiffs nor the Court demand that State Defendants provide a particular number of legal communication methods to people detained at the facility. Rather, Plaintiffs' motion sought timely and confidential access to counsel for the Plaintiffs and members of the class. That includes

---

[1] State Defendants failed to mention legal mail as a current method of outgoing legal communication. Plaintiffs did not pursue that aspect of their preliminary relief request in reliance upon State Defendants' assurance that they were facilitating legal mail at the facility. Doc. 231 at 426:13-16. (Plaintiffs did not, contrary to what State Defendants contend, Mot. at 6, "drop" or "forfeit[]" any challenges.) To the extent their failure to reference that method of communication with counsel signals that the facility has changed course, Plaintiffs reserve the right to renew that portion of their motion.

outgoing legal calls not because of an arbitrary number of communication avenues, but because detained persons' First Amendment right to communicate with counsel cannot be satisfied solely with limited, attorney-initiated avenues.

The distinction between attorney-initiated and detainee-initiated access is critical for those seeking prospective counsel. Newly detained people often enter this facility without representation, and they have a right to a communication method that allows them to contact attorneys. If the only available methods for attorney access require attorney-initiated action, detainees without preexisting representation are effectively denied their rights. And the First Amendment unquestionably, inherently includes the "right to *hire* and consult an attorney." *See Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (emphasis added); *see also Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-CV-09757-MMC, 2026 WL 851980, at *7 (N.D. Cal. Mar. 27, 2026) (immigration detention facility cannot overtly restrict detainees' "right to hire and consult with an attorney"); *see also Guillen-Flores v. U.S. Att'y Gen.*, No. 22-13382, 2024 WL 2992645, at *3 (11th Cir. June 14, 2024) (right to counsel not violated where petitioner is "give[n] [] the chance to retain counsel").

But it is not only those seeking to hire new counsel who need access to confidential outgoing legal calls. Even represented detainees need a way to reach out, *affirmatively*, to their attorney. For instance, as this Court recognized, people detained at the facility may face imminent transfer, with ICE moving them out of the facility "in as few as six hours after arrival." Doc. 243 ("Op.") at 49. Without outgoing legal calls, detained people would be unable to contact counsel at all before being transferred

4

to a different jurisdiction. And given that ICE officers are asking detained people to sign forms that may result in their immediate removal, as J.E. testified, *see* Doc. 230 at 49:12–52:7, including to third countries, the ability to quickly contact counsel to consult before signing papers is essential, *see* Op. at 62 (noting that "ICE deportation officers may ask detainees to sign voluntary deportation orders").

State Defendants' rote invocation of *Turner v. Safley*, 482 U.S. 78 (1987), does not support their contention that they are likely to succeed on the merits. Mot. at 8–10. *Turner* does not compel courts to bless restrictions on attorney access merely because incomplete and theoretical alternatives may exist. Rather, *Turner* asks whether the restriction is reasonably related to legitimate interests and whether alternatives are genuine in practice. 482 U.S. at 89–90. Here, the Court correctly concluded that the alternatives that State Defendants advance are incomplete because although attorneys can request in-person or legal visits, those mechanisms "do[] nothing for those detainees who wish to have ready access to counsel on an outgoing unmonitored phone line." Op. at 48. The Court was right that detainees "must have timely access to counsel via an *outgoing method* of communication," especially where ICE may transfer detainees "in as few as six hours after arrival." *Id.* at 49 (emphasis added). In so concluding, the Court joined the growing number of courts across the country holding that detained immigrants must be afforded timely and confidential access to counsel, including outgoing legal calls. *See Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, No. 26-CV-749 (NEB/DLM), 2026 WL 404457 (D. Minn. Feb. 12, 2026); *Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-CV-09757-MMC, 2026

WL 391924 (N.D. Cal. Feb. 10, 2026); *Vazquez Perdomo v. Noem*, 815 F. Supp. 3d 1057 (C.D. Cal. 2025); *Gonzalez v. Noem*, Case No. 1:25-cv-13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025); *Barco Mercado v. Noem*, 800 F. Supp. 3d 526 (S.D.N.Y. 2025); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019).[2]

The Court was also right in concluding that, under *Turner*, State Defendants "fail[ed] to [] identify how unmonitored legal calls would threaten the facility's order and security" and did not "present [any] evidence in support" of a reasonable security interest. Op. at 45. In this stay motion, State Defendants again fail to articulate any threat; they merely recite the *Turner* standard without pointing to any reasonable security interest rooted in the record. *See* Mot. at 9. Indeed, as the Court concluded, that confidential outgoing legal calls are required under the ICE detention standards—which State Defendants' own witnesses testified is what "[they] want to do, [] what [they] have to do," and "[they are] going to get there as quickly as [they] can," Doc. 230 at 193:11-20, and which Mr. Saunders said they *could* do, *id.* at 152:16-24—undermines any assertion of order or security concerns. *See* Op. at 46 ("Certainly, if allowing unmonitored, unrecorded legal calls threatened order and security, the ICE standards would not accommodate those calls."). For that reason, *Overton v. Bazzetta*, 539 U.S. 126 (2003), does not help Defendants, as they assert. Mot. at 6. To start, *Overton* concerned restrictions on in-person visitation of prisoners by relative children,

---

[2] State Defendants claim that the Court erred by relying on cases that sought relief under the Fifth Amendment, rather than the First Amendment, Mot. at 7; but Courts often analyze sufficiently overlapping claims, such as these, at the same time. *See, e.g.*, *Gomez Ruiz*, 2026 WL 851980, at *7.

not confidential attorney communications. 539 U.S. at 135. More importantly, the Supreme Court found legitimate security interests supporting the challenged restrictions on visitation between people convicted of certain crimes and minors. *Id.* No such legitimate interests are present here.

Defendants also misread *Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002), *Benzel v. Grammer*, 869 F.2d 1105 (8th Cir. 1989), and *Pope v. Hightower*, 101 F.3d 1382 (11th Cir. 1996), all of which involved prison restrictions on *non*-legal *personal* calls where alternatives were available. Mot. at 6–7, 9. *Valdez* involved temporary restrictions in a criminal detention setting limiting "access to a telephone, except to call an attorney." 302 F.3d at 1045 (citation modified). The court noted that the plaintiff could "communicate daily with his attorney by telephone and in person." *Id.* at 1049. That is simply not the reality for detainees at the facility. *Benzel* concerned restricted communication with "nonattorney, nonrelative males." 869 F.2d at 1107. And *Pope* addressed limits on calling lists for nonattorneys. 101 F.3d at 1385. None of these cases involved the right to legal communications, let alone for immigration detainees who need to contact prospective counsel, or need to urgently communicate with counsel due to an imminent transfer or removal.

This is not a matter of competing hypotheticals; the record demonstrates that without confidential outgoing legal calls, access to counsel at the facility fails the First Amendment. For instance, the Court found that Named Plaintiff H.C.R. was *never* able to personally contact an attorney while detained, despite his repeated attempts and his family having retained one on his behalf. Op. at 13–14. The Court likewise

7

found that another detainee, J.E., attempted to call counsel but the phone would not complete the call, and officers told him he would need to contact family because "there was nothing that they could do." *Id.* at 14 (citation modified). Moreover, outgoing legal mail is nearly nonexistent, and although unscheduled visits are theoretically permitted, the remote location of the facility makes in-person visitation inaccessible for many attorneys. *See* Op. at 48–49. The record overwhelmingly demonstrates why detainee-initiated outgoing communication is indispensable.

The Constitution does not permit State Defendants to eliminate confidential detainee-initiated legal communication simply because the facility allows some attorney-initiated (and staff-controlled) communications. This is true as a matter of law, but especially critical in this case where the government detains people, moves them across or out of the country rapidly, and withholds contact protocols.

## B. State Defendants' Compelled Speech Arguments are Meritless.

State Defendants also dispute the portion of the preliminary injunction directing them to post attorney-access information to detainees and the public. Notably, State Defendants do not take the position that the Court erred in concluding that failing to post attorney-access protocols "impinge[s] both Detained Plaintiffs' and Organizational Plaintiffs' constitutional rights." Op. at 60. Instead, State Defendants argue that the order violates *their* First Amendment rights because, in their view, "the First Amendment does not allow this Court to order a government to engage in speech." *Id.* at 10. As this Court recognized, State Defendants forfeited this argument, *see* Op. at 56–57 n.19. Regardless, this objection to the preliminary injunction betrays

8

a fundamental misunderstanding of First Amendment doctrine.

To the extent State Defendants argue that the preliminary injunction violates their First Amendment Free Speech Clause rights against compelled speech, it fails. Courts do not apply Free Speech Clause protections to governmental actors like State Defendants. *Columbia Broad. Sys., Inc. v. Democratic Nat'l. Comm.*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the Government."); *Warner Cable Commc'ns, Inc. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir. 1990) ("[T]he government … is not itself protected by the first amendment ….").

State Defendants' reliance on the government speech doctrine, Mot. at 10–13, fares no better. Even if something is conceptualized as government speech, it does not thereby gain First Amendment protection. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("If [the government] were engaging in their own expressive conduct, then the Free Speech Clause has no application."). At most, government speech can be "*exempt* from First Amendment scrutiny" such that the government expressing its own views does not violate the free speech rights of private actors. *Id.* (citation modified). That point is simply irrelevant here.

Moreover, the argument also fails for a second fundamental reason: the requirement that the State Defendants post attorney-access protocols throughout the facility and on government websites does not count as "government speech."[3] Just

---

[3] State Defendants include an analysis of the three-part test for separating government speech from private speech. Mot. at 11–13. There is no need to engage in this exercise because, as Plaintiffs explain

because a private party may do something that qualifies as protected speech, it does not mean that when the government does the same thing it is "speech" at all in any meaningful sense. For example, a private party choosing what events to host, political groups to donate to, or speech to publish based on the political views expressed is association, speech, or editorial discretion protected by the First Amendment. Meanwhile, the government doing the same is not speech or expression at all; it is viewpoint-discrimination. In other words, far from being speech protected by the First Amendment, it is government conduct that the First Amendment prohibits. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 741 (2024).

Similarly, while requiring a private party to post factual information typically implicates the First Amendment, it is absurd to suggest that requiring the same of the government constitutes speech. State Defendants' argument would invalidate every court order requiring a government party to post information to the public, for example, in the context of class action settlements. Even the required publication of legal codes or court opinions could trigger a First Amendment challenge. State Defendants' new interpretation of the government speech doctrine would also invalidate the many statutes and regulations that require governmental entities to post information publicly. *See, e.g.*, 28 C.F.R. § 115.403(f) (requiring prisons, jails, and detention facilities to "publish on the agency's website" audit reports under the Prison Rape Elimination Act); 28 C.F.R. § 35.107(a)–(b) (requiring public entities to "make

---

in this section, the government speech doctrine does not apply here at all.

available to all interested individuals the name, office address, and telephone number" of their ADA coordinators and "publish grievance procedures"); Fla. Stat. § 1006.28(2)(d)(3) (requiting elementary schools to publish "a list of all materials maintained and accessible in the school library…."). Under State Defendants' logic, any such posting requirement would be invalid. The government speech doctrine is narrow, and it must remain so. *See Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[W]e must exercise great caution before extending our government-speech precedents.").

It is perhaps for this reason that, while State Defendants cite "government speech" cases that explain how to determine whether a private party or the government is speaking when it is ambiguous, Mot. at 11–12, they cite no case whatsoever applying "government speech" analysis to a scenario like this one. On the contrary, remedies like the one issued here are typical and entirely uncontroversial. *See*, *e.g.*, Preliminary Injunction, *Barco Mercado v. Noem*, No. 1:25-cv-06568-LAK, Doc. 97 at 5 (Sept. 17, 2025) (requiring "[a] telephone number for attorneys to call in order to schedule telephone calls with Detainees [to be] conspicuously displayed in the ICE internet web site"); *Torres v. U.S. Dep't of Homeland Sec.*, No. EDCV_18-2604 JGB (SHKx), 2020 WL 3124216, at *11 (C.D. Cal. Apr. 11, 2020) (requiring ICE to "create, implement, *and advertise*" a process for attorney calls) (emphasis added).

Even if the government speech doctrine applied, State Defendants push the doctrine too far. The government speech doctrine stands for the limited proposition that "[t]he Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak …." *Matal*, 582 U.S. at 234. Here, the

11

Court has not compelled State Defendants to communicate any viewpoint. Op. at 57 n.19 ("This preliminary injunction does not compel Defendants to express any view or message."). Instead, after finding that "[s]hrouding core attorney access policies in secrecy constitutes … interference" with Plaintiffs' First Amendment right to communicate with counsel, the Court ordered State Defendants to remedy that violation by posting attorney-access protocols throughout the facility and to the public. *Id.* at 59–60, 66–68. This posting of information does not require State Defendants to express a view of any kind. And State Defendants cite no authority applying the government speech doctrine so broadly to cover orders that the government provide basic factual information to the public, let alone factual information necessary to avoid interference with a core constitutional right.

## II.    State Defendants Have Not Established Irreparable Harm Absent a Stay.

State Defendants fail to establish the second "most critical" factor, *Nken*, 556 U.S. at 434, to show that they will be irreparably harmed absent a stay. To start, State Defendants waited almost an entire month before asking this Court to stay its preliminary injunction. This delay "vitiates much of the force of their allegations of irreparable harm." *Chianne D. v. Harris*, No. 3:23-CV-985-MMH-LLL, 2026 WL 759154, at *4 n.7 (M.D. Fla. Mar. 18, 2026) (citation modified).

Delay aside, State Defendants' arguments of harm fall flat. They devote four pages of their motion to vague arguments about judicial overreach, Mot. at 17–21, all of which merely rehash the merits and do not evince irreparable harm. *See Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1296 (S.D. Fla. 2020) (the likelihood-

of-success and irreparable-harm inquiries "ask different questions and require separate proof"). For instance, State Defendants' protestations of harm stemming from this Court purportedly installing itself as a "super-warden" of the facility rehash their failed merits arguments claiming there was no evidence of inadequate phone access and that their supposed First Amendment rights are implicated by the injunction. *See* Mot. at 18–21. State Defendants' repackaged failed merits arguments and handwaving complaints of judicial overreach come nowhere close to showing irreparable harm.

State Defendants also argue they will be harmed absent a stay because they may incur "irrevocable expenditures" purchasing "dozens and dozens" of cellphones and installing equipment. Mot. at 21–22. Relying on a new declaration from FDEM official Ian-Paul Gadea-Guidicelli, State Defendants now claim that cellphones are the only option for confidential legal calls "because the Facility cannot provide traditional landline phone service because the geographic area lacks the required telephone carrier infrastructure." *Id.* at 23 n.4.

This Court already rejected this excuse, explaining that "'Defendants may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution.'" Op. at 49–50 (quoting *Barco Mercado*, 800 F. Supp. 3d at 577); *see also id.* at 49 (endorsing Plaintiffs' contention that Defendants "should have allocated funds for compliance with ICE's guidelines").

In addition, this last-minute declaration contradicts other sworn evidence. State

13

Defendants' witness Mr. Lumm testified at the evidentiary hearing that the facility already had three phones installed in each of the 32-person cages within the tents. *See* Doc. 231 at 287:19-22. State Defendants' witness Mr. Saunders testified that the facility could "have landlines installed in the housing units that could be made confidential" by "program[ing] in the legal numbers" so that "when they're dialed, then the recording capability is stopped." Doc. 230 at 152:16-24. Mr. Gadea-Guidicelli now claims that "landline telephone service is not available at Alligator Alcatraz," without acknowledging the testimony to the contrary, nor explaining why the existing infrastructure cannot be used for legal calls.[4] Doc. 259-1 ¶ 3. State Defendants cannot meet their burden of showing irreparable harm by pointing to self-imposed costs, especially where they provide contradictory explanations regarding the need for those costs. *Cf. Chianne D. v. Harris*, No. 3:23-CV-985-MMH-LLL, 2026 WL 759154, at *4 (M.D. Fla. Mar. 18, 2026) (denying a stay where "the State ha[d] significant control over the extent of the harm" and failed to support its estimate of costs).

Lastly, State Defendants cite the stay of the preliminary injunction in *Friends of the Everglades, Inc. v. Sec'y of Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025), to argue they will be irreparably harmed because they have "not been reimbursed by the federal government." Mot. at 22. But that case is inapposite for several reasons. First, the preliminary injunction in *Friends of the Everglades* required State Defendants to shut down and dismantle the facility, whereas

---

[4] Plaintiffs' expert testified that "utilizing … phones that are dedicated in the housing unit is the best practice because [detained people] have ready access to that at any time[.]" Doc. 230 at 214:6–8.

the preliminary injunction here merely requires State Defendants to afford constitutional rights to the people they detain. Second, Mr. Gadea-Guidicelli, the same FDEM official cited here, attested that the *Friends of the Everglades* injunction would have "cost the State between $15 and 20 million," 2025 WL 2598567, at *11, not a mere $180,025 plus $6,283.75 per week, Mot. at 23—a tiny fraction of the money State Defendants spent on a facility for which they "should have allocated funds," Op. at 49, for necessities like attorney access. And third, the *Friends of the Everglades* injunction rested on the failure to engage in an environmental review, not the denial of a fundamental constitutional right. Simply put, "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).

"The Constitution does not permit the government to arrest thousands of individuals and then disregard their constitutional rights because it would be too challenging to honor those rights." *Advocs. for Hum. Rts.*, 2026 WL 404457, at *14. Because the preliminary injunction requires no more than what the Constitution demands, Defendants are not irreparably harmed. *See ACLU of Fla., Inc. v. Byrd*, 608 F. Supp. 3d 1148, 1157 (N.D. Fla. 2022) ("The State suffers no harm when a court precludes it from violating the Constitution.").

### III.   The Stay Would Cause Substantial Irreparable Harm to Plaintiffs.

When evaluating whether to stay a preliminary injunction, courts also consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding," including Plaintiffs. *Nken*, 556 U.S. at 426. Here, substantial irreparable

injury to Plaintiffs is a near certainty.

State Defendants concede that the loss of First Amendment rights constitutes an irreparable injury. *See* Mot. at 14. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation modified). That settled principle extends to First Amendment violations that occur during the extended appellate process. *See Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) ("The denial of plaintiffs' constitutional rights during the potentially protracted appellate process constitutes irreparable harm."). This is enough to find near-certain irreparable harm to Plaintiffs and to deny State Defendants' motion.

State Defendants try to evade this settled precedent by re-arguing the merits, claiming there is no harm to Plaintiffs because the availability of attorney-initiated in-person and video legal visits satisfies the First Amendment. Mot. at 14-15. But the evidence here overwhelmingly establishes that these limited means of communication are woefully insufficient at this facility, leading to substantial irreparable harm. *See* Op. at 62 ("In the cases of H.C.R. and J.E., for example, Defendants' policies prevented them from obtaining legal advice before their removal from the United States[,]" despite their repeated attempts to contact counsel); *see also* Pls.' Ex. 26 (Defendants' report shows an average of only 1.44 in-person visits and 9.44 virtual visits per day in January for approximately 1,500 detainees); Doc. 230 at 134:14-16 (Mr. Saunders testified that the facility only "ha[s] four simultaneous meeting rooms" and can only accommodate "approximately 40 videoconference meetings per day"); Op. at 49

(noting that timely access "is particularly critical at Alligator Alcatraz, a short-term facility where ICE can transfer detainees in as few as six hours after arrival"). Without confidential outgoing legal calls, people who arrive without counsel would be unable to engage an attorney before they are swiftly deported, as happened to H.C.R. and J.E. And even people with previously retained counsel would be unable to contact their attorneys about time-sensitive matters, such as an upcoming transfer, a notice of third-country removal, or ICE officers demanding that they sign deportation orders. *See* Op. at 48–49, 62 (noting rapid transfers are common and that "ICE deportation officers may ask detainees to sign voluntary departure orders").

Thus, State Defendants are flatly wrong to assert the injunction is unnecessary because "plaintiffs are already receiving the requested relief from defendants[.]" Mot. at 25. And that makes their reliance on *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020), misplaced. *Id*. There, the Eleventh Circuit found that incarcerated plaintiffs were already receiving the relevant COVID-19 protective measures, including many before the complaint was even filed, and nothing showed that defendants would abandon them absent the injunction. 958 F.3d at 1091. As this Court unequivocally held in its order, that is not the case here.

"Lack of access to counsel during detention … is not a mere inconvenience for detainees. It can have irreversible consequences." *Barco Mercado*, 800 F. Supp. 3d at 566).[5] Without the ability to timely and confidentially communicate with counsel,

---

[5] Having meaningful access to counsel can be determinative in immigration proceedings. *See* American Immigration Council, *Where Can You Win in Immigration Court?* (2025), *available at*

Plaintiffs cannot effectively challenge their detention or deportation. And wrongful or irreversible deportation is an additional irreparable injury. *Arcila Perez v. Noem*, No. 2:26-CV-00107-SPC-NPM, 2026 WL 206222, at \*2 (M.D. Fla. Jan. 27, 2026) (distinguishing *Nken* and finding that wrongful deportation amounted to irreparable injury to a detained individual where "[t]here is no pending immigration proceeding that could make Arcila Perez whole if he is wrongfully deported").[6] Similarly, unlawful detention itself, including civil immigration detention, is a deprivation of constitutional rights constituting an irreparable injury. *See Arcila Perez*, 2026 WL 206222, at \*2 (noting that "unlawful detention also constitutes irreparable injury").

Thus, Plaintiffs have overwhelmingly shown the threat of substantial, irreparable real-world harm in addition to the *per se* First Amendment harm they would suffer absent the preliminary injunction.

**IV.    Staying the Preliminary Injunction is Not in the Public Interest.**

State Defendants' motion also fails at the last step of the inquiry: "weighing the

---

https://www.americanimmigrationcouncil.org/report/immigration-court/     [archive.is/iyYg8] (finding that 26.9% of represented noncitizens were ordered removed, compared to 61.8% of unrepresented noncitizens) (last visited May 5, 2026). And such access to counsel is even more critical now, given the record number of habeas challenges to unlawful detention by ICE. *See* ProPublica, *Tracking Habeas Cases* (2026), *available at* https://projects.propublica.org/habeas-tracker/ [archive.ph/f0FUF] (since January 2025, more than 40,000 noncitizens have filed habeas cases claiming their immigration detention is illegal, a historically high number) (last visited May 5, 2026).
[6] Although the Supreme Court in *Nken* reasoned that "removal … is not categorically irreparable," that was in the context of direct review of a removal order and on reliance on the representations made by the government in that case that "those who prevail" in that context "can be afforded effective relief by facilitation of their return." 556 U.S. at 435. As this Court recognized in *Arcila Perez*, however, wrongful removals are not all the same and some are, in fact, irreversible. *See* 2026 WL 206222, at \*2. In addition, the unsupported representations on which the Supreme Court based its holding in *Nken* have since been called into question. *See, e.g.*, Nancy Morawetz, *Convenient Facts: Nken v. Holder, the Solicitor General, and the Presentation of Internal Government Facts*, 88 N.Y.U. L. Rev. 1600, 1663 (2013).

public interest." *Nken*, 556 U.S. at 435. The Eleventh Circuit has recognized that "it is always in the public interest to protect First Amendment liberties." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (citation modified). Staying the injunction, which would allow State Defendants to revert to denying Plaintiffs' fundamental First Amendment rights, is therefore not in the public interest.

State Defendants cite to *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *33 (D.D.C. June 17, 2020), for the proposition that there is a recognized "public interest in allowing the government discretion to carry out its authorized functions." Mot. at 24. But State Defendants are quoting the failed argument made in the case by the Department of Homeland Security, and omit the following sentence written by the Court, citing the U.S. Supreme Court: "However, courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *S. Poverty L. Ctr.*, 2020 WL 3265533, at *33 (citing *Brown v. Plata*, 563 U.S. 493, 511 (2011)). State Defendants cannot invoke facility administration as a talismanic principle that blesses the continued violation of Plaintiffs' constitutional rights. As this Court recognized, "Defendants may continue operating Alligator Alcatraz, and ICE may continue to deport illegal aliens, but they must do so by respecting the most basic constitutional rights." Op. at 64. For that same reason, the stay decision in *Friends of the Everglades* does not help State Defendants. Although the panel there recognized "an undisputed and wide-reaching interest in combatting illegal immigration," *Friends of the Everglades*, 2025 WL 2598567, at *12, it did not condone such enforcement at the

19

cost of fundamental First Amendment rights.

Finally, State Defendants' vague references to judicial economy and uniformity in the law similarly do not support their position. Mot. at 24–25. This is not a case where a separate judicial proceeding might prove determinative of the issues before the Court, such that a stay would promote judicial economy, as in *Lozman v. City of Riviera Beach*, No. 08-80134-CIV, 2011 WL 13107422, at *4 (S.D. Fla. May 4, 2011). Nor does this case involve supplemental jurisdiction over state-law claims that may be declined should federal claims be dismissed, as in *Danner Const. Co. v. Hillsborough Cnty.*, 8:09-CV-650-T-17TBM, 2009 WL 3055315, at *2 (M.D. Fla. Sept. 24, 2009). Furthermore, judicial economy does not justify suspending relief necessary to prevent irreparable constitutional injury. And although State Defendants claim that a stay would promote uniformity in the law, Mot. at 26, they identify no existing conflict or lack of uniformity that a stay would resolve—no competing injunction, conflicting district-court order, parallel proceeding, or split in authority. For good reason: with its opinion, this Court joined the growing number of courts across the country holding that government actors must afford immigration detainees with constitutionally adequate attorney access. *See supra* Part I.A. In the end, State Defendants' argument boils down to their desire to suspend constitutional relief pending appeal. Such a desire, however, is not in the public interest, and the stay should therefore be denied.

## CONCLUSION

The Court should deny the State Defendants' motion for a stay pending appeal.

Dated: May 6, 2026

Respectfully Submitted,

*/s/ Carmen Iguina González*
Carmen Iguina González*
ACLU FOUNDATION
915 15th St. N.W., 7th Floor
Washington, DC 20005
202-548-6616
ciguinagonzalez@aclu.org

Corene T. Kendrick*
Kyle Virgien*
Marisol Dominguez-Ruiz*
ACLU FOUNDATION
425 California St., Suite 700
San Francisco, CA 94104
202-393-4930
ckendrick@aclu.org
kvirgien@aclu.org
mdominguez-ruiz@aclu.org

Amy Godshall, Fla. Bar No. 1049803
Samuel Lester, Fla. Bar No. 1043063
Daniel Tilley, Fla. Bar No. 102882
ACLU FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
786-363-2714
agodshall@aclufl.org
slester@aclufl.org
dtilley@aclufl.org

Paul R. Chavez, Fla. Bar No. 1021395
Jennifer Smith, Fla. Bar No. 964514
Christina LaRocca, Fla. Bar No. 1025528
AMERICANS FOR IMMIGRANT JUSTICE
2200 NW 72nd Ave.
P.O. Box No 520037
Miami, FL 33152
786-218-3381
pchavez@aijustice.org
jsmith@aijustice.org
clarocca@aijustice.org

*Counsel for All Plaintiffs and the Class*
*\* Admitted pro hac vice*

21